**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| ELLA M. GLOVER, | ) | | |
| Plaintiff, | ) | Case No.: | 08-CV-2030 |
| | ) | | |
| v. | ) | | |
| | ) | Judge: | Virginia Kendall |
| KENWOOD HEALTHCARE | ) | | |
| CENTER, INC., | ) | Magistrate: | Arlander Keys |
| Defendant. | ) | | |

## PLAINTIFF ELLA GLOVER'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT II

Plaintiff, Ella Glover ("Glover"), by her attorneys and for her response to Defendant Kenwood Healthcare Center, Inc.'s motion to dismiss Plaintiff's retaliation Count II under Rule 12(b)(6)[1], states as follows:

## I.    BACKGROUND

### A.    Retaliatory And Discriminatory Termination Of Ella Glover.

In August of 2005, Glover was assigned to perform certified nursing assistant ("CNA") duties on the fourth floor of Defendant's facility. (Pl.'s Compl. ¶ 13). While working on the fourth floor as a CNA, Glover worked under the supervision of Barbara Bolden. (Pl.'s Compl. ¶ 14). During this period Barbara Bolden subjected Glover to various derogatory and humiliating statements related to her age and consistently assigned her to the hardest work assignments. (Pl.'s Compl. ¶¶ 15-16). In or

---

[1]The Defendant does not contest the merits of the allegations present in the Complaint. Defendant only claims that Plaintiff failed to exhaust her administrative remedies. As such, this brief does not address the sufficiency of the allegations in Plaintiff's Complaint.

around the third or fourth week of August 2005, Glover complained to Deloris Randall about the age-related comments and harassment from Bolden. (Pl.'s Compl. ¶ 24). Bolden became aware of Glover's complaint as Bolden confronted her regarding the same making additional comments about Glover's age and assigning her one of the hardest tasks. (Pl.'s Compl. ¶ 25). Shortly thereafter, Ella Glover was terminated from her employment with Defendant on September 7, 2005. (Pl.'s Compl. ¶ 27).

### B.    Ella Glover's EEOC Charge And Intake Questionnaire.

On October 12, 2005, Ella Glover filed a Charge of Discrimination ("Charge") with the Illinois Department of Human Rights ("IDHR"), which cross-filed the Charge with the Equal Employment Opportunity Commission ("EEOC").   (Exhibit 1; D. 1-2, pp. 3-4). The EEOC terminated its processing of Glover's Charge and issued a right to sue letter on March 7, 2008.  (D. 1-2, p. 2 ).

On October 12, 2005, the same day Ella Glover filed her charge with the IDHR, she also filed a sworn and notarized Complainant Information Sheet ("CIS") with the IDHR. (Exhibit 2). Ella Glover signed and filed these documents *pro se* without the assistance of an attorney.

The CIS Ella Glover filed with the IDHR states that she suffered retaliation after complaining to Debbie Missal, one of her supervisors, about Barbara Bolden's harassment. Question 12 on the CIS states:

> If you wrote **retaliation** in your answer to number 8 above, state how you opposed
> unlawful discrimination. . . Include dates, charge numbers, and/or the name or title
> of the person to whom your complained.

(Exhibit 2). In Glover's CIS, the word retaliation is circled and a line is drawn to Ms. Glover's answer in the space below. Glover had wrote the following in response to Question 12:

Spoke to supervisor: Deloris Randall regarding personal attacks by Barbara Bolden. 3rd Wk of August 2005. I was confronted by Ms. Bolden stating "so you told on me. . . Yall old folks should just quit." Inel Pullman stated to Barbara to learn how to address your staff.

(Exhibit 2).

## II.    SUMMARY OF ARGUMENT

Glover has exhausted her administrative remedies with respect to Count II of her Complaint. Glover's Charge is sufficient to put Defendant on notice of a possible retaliation claim, and afford the EEOC and the Defendant an opportunity to settle the retaliation claim through conference, conciliation, and persuasion. Furthermore, Glover clearly intended that the IDHR and EEOC investigate her retaliation claim as it was included in the CIS she filed with the IDHR the same day she filed her *pro se* charge.

## III.    ARGUMENT

### A.    Standard Of Review.

A Rule 12(b)(6) motion to dismiss a claim may only be granted when viewing all facts in the light most favorable to the plaintiff the plaintiff can prove no facts which may support her claim for relief. *Alexander v. City of Chicago*, 994 F.2d 333, 335 (7th Cir. 1993). Further, the court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences from those facts in the plaintiff's favor. *Dixon v. Page*, 291 F.3d 485, 486 (7th Cir. 2002); *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999).

### B.    Ella Glover's Retaliation Claim Is Within The Scope Of Her Administrative Charge.

Glover has exhausted her administrative remedies with respect to Count II of her Complaint.

Generally, plaintiffs may not bring a claim for retaliation for the first time in Federal Court that was not included in their EEOC charge. *Cheek v. Western & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). However, the Seventh Circuit recognizes an exception to that rule when the additional claim is within the scope of the administrative charge. *Id.* Although Glover's charge did not explicitly state retaliation as an issue/basis, the additional count need not be explicitly stated and the corresponding box need not be checked for the count to be considered within the scope of the charge. *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.3d 164, 167 (7th Cir. 1976). Instead, Glover's retaliation claim falls within the scope of her Charge as it is "like or reasonably related to" and "grows out of" her Charge. *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.3d 164, 167 (7th Cir. 1976).

When utilizing this two-pronged test, the Seventh Circuit liberally construes allegations in EEOC charges because they are most often drafted by pro se complainants who "are least able to protect themselves." *Id.* The Seventh Circuit has reasoned that "to compel the charging party to specifically articulate in a charge filed with the Commission the full panoply of discrimination which they have suffered may cause the very persons Title VII was designed to protect to lose that protection." *Id.*

1.    **Glover's Retaliation Claim Is Like Or Reasonably Related To The Allegations in Her Charge.**

Glover's retaliation claim is like and reasonably related to the allegations in her Charge. The Seventh Circuit in *Cheek* has interpreted the "like or reasonably related to" standard to require that a factual relationship exist between the EEOC charges and complaint. In other words, the claims must "at a minimum, describe the same conduct and implicate the same individuals." *Cheek*, 31

F.3d at 501. While generally retaliation and discrimination claims are not reasonably related, "different claims may be so linked, however, where they are so related and intertwined in time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the Act." *Sitar v. Ind. IDOT*, 344 F.3d 720, 726 (7th Cir. 2003) citing to *Kristufek v. Hussman Foodservice Co.*, 985 F.2d 364, 368 (7th Cir. 1993).

In the instant case, the allegations in Glover's Charge and in Count II of her Complaint describe the same conduct and implicate the same individuals. Glover's Charge states that she suffered harassment due to her age during August and September of 2005 by Barbara Bolden. (Exhibit 1). This is the same conduct which Glover opposed, forming the basis for her retaliation claim. (Pl.'s Compl. ¶ 25). Further, Glover's charge describes her termination on September 7, 2005. (Exhibit A). This termination is also included in Glover's retaliation claim as one of the retaliatory acts. (Pl.'s Compl. ¶¶ 27-28).

Moreover, the retaliation count and Glover's Charge involve the same individuals. Glover's Complaint states that Barbara Bolden took a retaliatory action against her by assigning her to the heaviest patient on the floor after Bolden had learned of her complaint to Delores Randall. (Pl.'s Compl. ¶ 25). Barbara Bolden is the same individual named in Glover's Charge who subjected her to age harassment by assigning her to the heaviest patients. (Exhibit 1).

Lastly, the proximity in time to Glover's protected activity and her termination are enough to provide notice of a retaliation claim such that the Defendant cannot claim surprise and prejudice. In *Sickinger*, the district stated that the defendant employer could not claim surprise or prejudice with respect to a retaliatory termination claim that was not included in plaintiff's administrative charge

of discriminatory harassment and failure to promote claims because the charge was filed eight days

after her termination. *Sickinger v. Mega Systems, Inc.*, 951 F. Supp. 153, 157-58 (N.D. IN 1996).

Taking all of Plaintiff's allegations as true, at least two of Defendant's supervisory employees had

knowledge of Glover's complaint of age discrimination and harassment as Glover complained to

supervisor Debbie Missal who then informed Barbara Bolden. (Pl.'s Compl. ¶¶ 24-25). Defendant

also had knowledge that said complaint was made in close proximity to Glover's termination. (Pl.'s

Compl. ¶¶ 25-27). Armed with such knowledge, the Defendant had ample notice that an EEOC

investigation into Glover's termination would involve a possible retaliation claim. Due to the

extensive factual overlap in time, substance, and people, Glover's Charge and Count II of her

Complaint are like and reasonably related to each other.

Defendant's reliance on *Peters v. Renaissance Hotel Operating Company,* 307 F.3d 535 (7th

Cir. 2002)*,* is misplaced. In *Peters*, the plaintiff's charge of discrimination at issue only included a

claim for discriminatory termination. *Id*. at 542-543. The facts stated in the charge included only

that he was discharged, the reason given for his discharge and that other similarly situated white

employees were not discharged for the same conduct. *Id.* An element of a retaliation claim is that

the individual engaged in a protected activity by complaining of discriminatory conduct. *Id.* at *550.

However, Peters' charge does not mention any complaints or the discriminatory conduct for which

he complained, the unequal treatment of African American patrons and employees. *Id.* at *541.

However, in the instant case, the facts surrounding the discriminatory conduct, Bolden's harassment,

underlying Glover's retaliation claim are present on the face of Glover's charge.  (Exhibit 1).

*Menefee v. United Parcel Service, Inc.* is also not analogous to Glover's claim.  2008 U.S.

Dist. LEXIS 9381 (N.D. IN. Feb. 7, 2008). The plaintiff in *Menefee* did not offer any explanation

as to how her retaliation claim was like or reasonably related to the claims in her charge. *Id*. at \*15. Also, no factual support for a retaliation claim was present in her complaint. *Id.* The court was left with no argument from the plaintiff or facts contained in the complaint from which to determine if the claims were like or reasonably related. *Id.* at \*15-16. In the instant case, Plaintiff delineates the facts underlying her retaliation claim in her Complaint and has offered above an explanation as to how her retaliation claim is like and reasonably related to the facts in her EEOC charge. Therefore, *Menefee*'s holding is inapplicable to Glover's case.

### 2.    Glover's Retaliation Claim Grows Out Of Her Charge.

Next, Glover's retaliation claim grows out of her Charge. This second prong requires that the "claim from the complaint could reasonably develop from the EEOC investigation into the original charges." *Caratachea v. Homewood Industries*, 2002 U.S. Dist. LEXIS 18797 at \*4 (N.D. Ill. Oct. 2, 2002)(citing to *Cheek*, 31 F.3d at 500). The Court must "speculate to what the EEOC might or might not discover in the course of its investigation." *Cheek*, 31 F.3d at 500.

It is more than reasonable that Glover's retaliation claim would evolve from an EEOC investigation into her Charge. A retaliation claim requires that the employee engaged in a statutorily protected expression, suffered an adverse action, and that there was a causal link between the protected expression and the adverse action. *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (U.S. 2006).

First, the EEOC would more than likely investigate the protected activity, Glover's complaint, during its investigation into Glover's harassment claim because an employer's knowledge of the prohibited harassment and an employee's complaint of same are important elements in

establishing employer liability in discriminatory harassment cases.[2] As such, it does not take much imagination to infer that the EEOC would ask both Glover and Defendant if Glover complained of the age harassment from Bolden.[3] Taking as true Glover's contention that she complained to Deloris Randall about Bolden's age harassment/discrimination (Pl.'s Compl. ¶ 24), it is more than reasonable to infer that Glover's complaints of age harassment would be discovered and investigated by the EEOC.

Second, it is more than reasonable to infer that the EEOC would uncover the adverse action, Glover's termination, during an investigation into her discriminatory termination claim. Finally, the causal link between Glover's complaint of harassment and her termination would be apparent to the EEOC by simply looking to the proximity of the dates of each activity since Glover complained in late August of 2005 and was terminated September 7, 2005. *See Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007)(the amount of time that passed between the protected activity and the adverse employment action is probative of the retaliatory motive). Viewing these facts in the light most favorable to Glover and drawing all reasonable inferences in her favor, Glover's retaliation claim could reasonably be expected to grow out of an EEOC investigation into her original charge.

**C.    Ella Glover's Retaliation Count is Within the Scope of Her EEOC Charge As She Intended the EEOC To Investigate It As It Was Contained In Her Sworn Intake Questionnaire Submitted on The Same Day She Filed Her**

---

[2]*See Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373-374 (7th Cir. 2007) (plaintiff has burden to show that employer knew of harassment under the co-worker standard of liability and it is likely that if the plaintiff failed to complain, the employer would have no knowledge of the harassment and be under no duty to act); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (plaintiff's compliance with employer's complaint procedures relevant to employer's affirmative defense if harasser is a supervisor).

[3]This point is illustrated in the instant case where the questionnaire served on Defendant by the IDHR with a copy of Glover's Charge asks whether "Complainant brought to Respondent's attention any Complaints of harassment" under the heading "On the issue of harassment." (Exhibit 3 ¶ B8).

**Administrative Charge.**

In determining the scope of an EEOC charge, "allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations." *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 502 (7th Cir. 1994); *Vela v. Village of Sauk Village*, 218 F.3d 661, 664-65 (7th Cir. 2000).[4] Glover clearly intended that the IDHR and EEOC investigate her claim of retaliation as she included it in her CIS which she signed under oath and filed with the IDHR the same day the IDHR prepared her complaint.

In *Triplett v. Midwest Wrecking Company*, the district court denied a Title VII defendant's motion to dismiss the plaintiff's retaliation claim because it was not included in her charge filed with the EEOC. 155 F. Supp. 2d 932, 936-37 (N.D. Ill. 2001). The district court held that the plaintiff satisfied the charge filing requirement by circling the word retaliation on her EEOC intake questionnaire and briefly described the nature of the retaliation. *Id.* The court stated that although the plaintiff, "unassisted by an attorney, failed to check the box labeled retaliation, she adequately asserted the retaliation charge in the questionnaire." *Id.* at 937.

---

[4] *See also Box v. A & P Tea Co.*, 772 F.2d 1372, 1375 (7th Cir. 1985)(the court considered handwritten additions to a typed EEOC charge and EEOC intake questionnaire and permitted a sex discrimination claim in addition to the race discrimination claim alleged in the typed EEOC charge); *Horwitz v. Sterling Miami, Inc.*, 1998 U.S. Dist. LEXIS 7184 (N.D. Ill. Apr. 28, 1998) (the court did not dismiss an ADA claim absent from the formal EEOC charge as the plaintiff clearly included this information in the EEOC questionnaire and thus intended the agency to investigate the allegations); *Jackson v. Local 705, Int. Brotherhood of Teamsters*, AFL-CIO, 2002 U.S. Dist. LEXIS 4908 at * 9 (N.D. Ill. March 22, 2002) (Court held that a racial harassment claim not included in the EEOC charge but described in plaintiff's intake questionnaire and supporting memorandum was within the scope of said charge as the plaintiff "clearly intended the EEOC to investigate racist comments in his workplace" ); *Sickinger v. Mega Systems, Inc.*, 951 F. Supp. 153, 157-58 (N.D. IN 1996) (Court held that plaintiff exhausted her administrative remedies with respect to retaliation claim absent from her EEOC Charge as it was described in plaintiff's EEOC intake questionnaire"); and *Alicea v. City of Chicago*, 2002 U.S. Dist. LEXIS 9128 at *9-10 (N.D. Ill. May 22, 2002)(the district court refused to dismiss a Title VII plaintiff's race discrimination claim that was present in his EEOC questionnaire but absent from his EEOC charge).

Similarly to the plaintiff in *Triplett*, Glover intended that the IDHR and EEOC investigate her retaliation claim. The CIS is in writing, signed under oath, and was filed with the IDHR on the same day the Charge was filed. (Exhibits 1, 2). Glover's response to Question 12 on the CIS demonstrates her intention that the IDHR and EEOC investigate her retaliation claim. (Exhibit 2). As the IDHR drafted the charge for Glover omitting her retaliation claim, Glover should not be penalized for the IDHR's omission.

Additionally, Glover's mere contention that she included her retaliation claim in her IDHR CIS and intended that the IDHR and EEOC investigate her retaliatory discharge is sufficient to survive a motion to dismiss. *See Beach v. DeKalb Clinic*, 2002 U.S. Dist. LEXIS 6527 (N.D. Ill. Apr. 12, 2002) (Court held the plaintiff's contention that she intended the EEOC investigate a sexual harassment claim not included in her EEOC charge by describing same in an intake questionnaire was sufficient to survive a motion to dismiss without the court reviewing the actual EEOC questionnaire).

Finally, it is not relevant that the Defendant did not receive a copy of Glover's CIS in such an ADEA case. According to the Supreme Court, an intake questionnaire filed at the EEOC can satisfy the ADEA charge-filing requirement even if an official charge was not filed, an investigation was not conducted, and the employer was not even notified of the charge. *Federal Express Corp. v. Holowecki, 128 S. Ct. 1147, 1158-1161 (2008)*. In *Holowecki*, the Supreme Court held that the ADEA plaintiff had satisfied her charge-filing requirement under the ADEA by filing an intake questionnaire with the EEOC along with a six page affidavit even though the EEOC never treated it as a charge or delivered it to the employer. *Id.* In light of *Holowecki*, Glover's CIS may itself constitute a charge of retaliation permitting her to file a complaint in federal court. Further, whether the Defendant

received a copy of the CIS and whether the EEOC or IDHR investigated the retaliation claim are issues outweighed by need to protect ADEA plaintiff's rights.

<u>**CONCLUSION**</u>

Glover's retaliation claim is within the scope of her pro se Charge. A liberal construction of Glover's Charge reveals that her retaliation claim is within the scope of her Charge. As such, Glover exhausted her administrative remedies with respect to Count II of her Complaint. In the alternative, Glover's detailed inclusion of her retaliation claim in her IDHR CIS exhausted Glover's administrative remedies. For the foregoing reasons, the Plaintiff requests that this Court deny Defendant's 12(b)(6) motion to dismiss Plaintiff's retaliation claim in Count II of her Complaint or in the alternative grant her leave to amend the Complaint as appropriate.

Respectfully Submitted,
Ella Glover,

/s Uche O. Asonye
One Of Her Attorneys

Uche O. Asonye - 6209522
Mark Pando - 6283693
Scott Fanning - 6292790
Asonye & Associates
11 South LaSalle Street, Suite 2140
Chicago, Illinois 60603
312.795.9110

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 22nd day of July 2008, served a true and accurate copy of the foregoing *Plaintiff Ella Glover's Response to Defendant's Motion to Dismiss Count II* upon the following by electronically filing it with the Clerk of the Court using the CM/ECF system, which will send notification of such filing:

Mr. Gary Ashman
Ashman & Stein
150 North Wacker Drive, Suite 3000
Chicago, Illinois 60606

Respectfully Submitted,
Ella Glover,


 /s Uche O. Asonye
One Of Her Attorneys

Uche O. Asonye - 6209522
Mark Pando - 6283693
Scott Fanning - 6292790
Asonye & Associates
11 South LaSalle Street, Suite 2140
Chicago, Illinois 60603
312.795.9110

EXHIBIT 1

## EQUA... EMPLOYMENT OPPORTUNITY ... MMISSION

| | |
|---|---|
| **GLOVER ELLA M**<br><br>Versus<br><br>**KENWOOD HEALTH CENTER** | **PERSON FILING CHARGE**<br>**GLOVER ELLA M** |
| | THIS PERSON *(check one)*<br>☐ CLAIMS TO BE AGGRIEVED<br>☐ IS FILING ON BEHALF OF ANOTHER |
| | DATE OF ALLEGED VIOLATION<br>*Earliest*      *Most Recent* |
| | PLACE OF ALLEGED VIOLATION |
| | EEOC CHARGE NUMBER   **21BA60064** |
| | DHR Charge Number   **2006CA0846** |

**NOTICE OF CHARGE OF DISCRIMINATION** IN JURISDICTIONS WHERE A FEP AGENCY WILL INITIALLY PROCESS
*(See EEOC "Rules and Regulations" for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

☐ Title VII of the Civil Rights Act of 1964          ☐ The Americans with Disabilities Act

[X] The Age Discrimination in Employment Act of 1967 (ADEA)

**HAS BEEN RECEIVED BY**

☐ The EEOC and sent for initial processing to _____
                                                                (FEP Agency)

[X] The Illinois Department of Human Rights and sent to the EEOC for dual filing purposes.
        (FEP Agency)

While EEOC has jurisdiction (upon expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your cooperation with the Agency.

☐ As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of the statutes as explained in the "EEOC Rules and Regulations" apply.

For further correspondence on this matter, please use the charge number(s) shown.

☐ An Equal Pay Act investigation (29 U.S.C. (d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.

[X] Enclosure: Copy of Charge

**BASIS OF DISCRIMINATION**

See Copy of Charge

**CIRCUMSTANCES OF ALLEGED VIOLATION:**

| DATE<br>October 17, 2005 | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL<br>John P. Rowe, District Director | SIGNATURE  *John P. Rowe* |
|---|---|---|

EEOC form 131-AGE (07/00)

EG IDHR 000542

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| The Privacy Act of 1974 affects this form. See Privacy act statement before completing this form.   06w1012.02 | ☒ IDHR   ☐ EEOC | 2006CA0846 |

## Illinois Department of Human Rights and EEOC

| NAME (indicate Mr. Ms. Mrs.)   Ella M. Glover | | HOME TELEPHONE (Include area code)   (773) 221-9398 |
|---|---|---|
| STREET ADDRESS   9716 S. Jeffery Blvd. | CITY, STATE AND ZIP CODE   Chicago, Illinois 60617 | DATE OF BIRTH   02/27/44 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW)

| NAME   Kenwood Health Care | NUMBER OF EMPLOYEES, MEMBERS 15+ | TELEPHONE (Include area code)   (773) 752-6000 |
|---|---|---|
| STREET ADDRESS   6125 S. Kenwood | CITY, STATE AND ZIP CODE   Chicago, Illinois 60637 | COUNTY   Cook |

| CAUSE OF DISCRIMINATION BASED ON:     AGE      PHYSICAL HANDICAP | DATE OF DISCRIMINATION   EARLIEST (ADEA/EPA)  LATEST (ALL)   08/01/05            09/07/05   ☐ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional space is needed attach extra sheets)

I.  A.  ISSUE/BASIS

     HARASSMENT – SINCE AUGUST, 2005, AND CONTINUING UNTIL SEPTEMBER 7, 2005, DUE TO MY AGE, 61

  B.  PRIMA FACIE ALLEGATIONS

    1.  I am 61 years of age.

    2.  My work performance as a certified nurse's assistant/rehabilitation aide met Respondent's expectations. I was hired on September 29, 1992.

    3.  Throughout the relevant time period I was harassed by Barbara Bolden (27), Charge Nurse, who repeatedly made disparaging remarks referencing my age, stating that I am too old to complete nursing duties, I should quit because I was too old and assigned me the hardest tasks to complete within a short period of time.

(Continued)

| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SUBSCRIBED AND SWORN TO BEFORE ME ON THIS   _Krystal I Rogers_  10/12/05   NOTARY SIGNATURE       MONTH DATE-YEAR |
|---|---|
| "OFFICIAL SEAL"   Krystal I. Rogers   Notary Public, State of Illinois   My Commission Expires Nov. 15, 2006        NOTARY SEAL | x _Ella M. Glover_  10-12-05   SIGNATURE OF COMPLAINANT       DATE   I declare under penalty that the foregoing is true and correct I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |

EG IDHR 000552

Complainant: Ella M. C    er
Charge Number: 2006CA0846
Page 2

Similarly situated, younger employees, were not harassed in this manner.

II.  A.  **ISSUE/BASIS**

DISCHARGE – SEPTEMBER 7, 2005, DUE TO MY AGE, 61

B.  **PRIMA FACIE ALLEGATIONS**

1.  I am 61 years of age.

2.  My work performance as a certified nurse's assistant/rehabilitation aide met Respondent's expectations.

3.  On September 7, 2005, I was discharged by Debbie Missal (30's), Director of Nursing. The reason cited for the discharge was due to alleged patient neglect that occurred on September 1, 2005.

4.  I vehemently deny that I engaged in said conduct. Moreover, there have been other younger certified nurse's assistants who been cited patient neglect and they were not discharged.

III.  A.  **ISSUE/BASIS**

DISCHARGE – SEPTEMBER 7, 2005, DUE TO MY PHYSICAL HANDICAP, HERINATED DISC DISORDER

B.  **PRIMA FACIE ALLEGATIONS**

1.  I am a handicapped individual within the meaning of Section 1-103 (I) of the Illinois Human Rights Act.

2.  Respondent was aware of my condition.

3.  My work performance as a certified nurse's assistant/rehabilitation aide met Respondent's expectations.

4.  On September 7, 2005, I was discharged by Debbie Missal, Director of Nursing. The reason cited for the discharge was due to alleged patient neglect that occurred on September 1, 2005.

5.  I vehemently deny that I engaged in said conduct. My condition is unrelated to my ability to perform the essential functions of my job duties as a certified nurse's assistant/rehabilitation aide.

HMS/RCG/JJT

EXHIBIT 2



## ILLINOIS DEPARTMENT OF HUMAN RIGHTS
## EMPLOYMENT COMPLAINANT INFORMATION SHEET

**ATTENTION:   INTAKE INTERVIEWING HOURS ARE FROM 8:30 A.M. TO 5:00 P.M.-
MONDAY THROUGH THURSDAY <u>ONLY</u>**

<u>NOTICE:</u> "The Department of Human Rights (DHR) Programs are accessible to people with disabilities in compliance with the Americans with Disabilities Act, the Illinois Human Rights Act, and Section 504 of the Rehabilitation Act of 1973.  A person with disability who needs an accommodation to participate in a DHR program, should call, fax, or e-mail Susan Allen, The Department's ADA Coordinator, at (217) 785-5119 (Voice), (217) 785-5125 (TTY), (217) 785-5106 (Fax), or susan_allen@cms.state.il.us".

**READ THIS PAGE CAREFULLY (FRONT AND BACK) TO DETERMINE IF YOU ARE IN THE RIGHT
PLACE TO FILE YOUR EMPLOYMENT CHARGE.**

### <u>THIS IS NOT A CHARGE</u>

In order to file a charge of discrimination in employment:

♦   You must completely fill out this form and sign the last page.

♦   This form must be postmarked or received by the Department within 180 days of the date of the alleged discrimination.

♦   The Department must establish if it has the right under the law to investigate your employment claim.

♦   If the Department accepts your claim of employment discrimination, information will be typed on an official charge form.

♦   The charge form must be signed, notarized and returned to the Department in a timely manner.

| CHICAGO OFFICE | SPRINGFIELD OFFICE |
|---|---|
| 100 W. Randolph Street | 222 South College |
| 10th Floor – Intake Unit | Room 101-A – Intake Unit |
| Chicago, IL 60601 | Springfield, IL 62704 |
| (312) 814-6200 | (217) 785-5100 |
| (312) 263-1579 (TDD) | (217) 785-5125 (TDD) |

CIS-E (7/04)

**WHO CAN BE CHARGED**

1

EG IDHR 000554

- The Department of Human Rights can investigate charges of employment discrimination filed against private employers, state or local government, unions and employment agencies. Individuals can also be charged in some cases.

- The employer charged with discrimination must have at least 15 employees in the state of Illinois in order for the Department to investigate, unless the charge alleges sexual harassment, retaliation or physical or mental handicap discrimination, or unless the employer is a public contractor. (A public contractor is an employer who does business with the state or a unit of local government.)

## TYPES OF DISCRIMINATION COVERED

The Department can only investigate charges alleging the following **Bases** of discrimination:

| | |
|---|---|
| **Age (40 and over)** | **Race** |
| **Physical or Mental Handicap** (unrelated to ability to do the job) | **Unfavorable Military Discharge** |
| | **Marital Status** |
| **Arrest Record** (or criminal history record ordered expunged, sealed or impounded) | **Color** |
| | **Ancestry** |
| **Retaliation** (for opposing unlawful discrimination based upon any of the categories mentioned) | **Military Status** |
| | **Religion** |
| **Coercion** (helping or forcing a person to commit unlawful discrimination based upon any of the categories listed) | **Citizenship Status** |
| | **Sexual Harassment** |
| **Sex** | **National Origin** |

## WHAT THE DEPARTMENT CANNOT DO

- DHR cannot investigate unfair employment actions such as: political affiliations, personality conflicts, sexual orientation, etc., unless such actions are alleged to be for one or more of the reasons (types of discrimination) listed above.

- DHR cannot investigate unfair union practices unless such claims involve one or more of the types of discrimination described above.

- DHR cannot investigate charges against the federal government. Such a charge can only be filed with the EEO office of the agency alleged to have discriminated.

- DHR cannot investigate employers with fewer than 15 employees, unless the type of discrimination is sexual harassment, retaliation, or handicap.

EG IDHR 000555

DEPT. OF HUMAN RIGHTS
INTAKE UNIT

OCT 1 2 2005

**PLEASE PRINT LEGIBLY.**    TODAY'S DATE: _9-13-05_    RECEIVED (PM)
                                                          BY _8:49_

1. Your Name: Mr./Ms./Mrs.    _Ella M Glover_

   Address _9716 South Jeffery_                    Apt. # _House_

   City _Chicago_            State _IL_    Zip _60617_

   Home Phone Number( )    _773    221-9398_

   Day-Time Phone Number ( )

2. The names of two persons who can contact you in the event this office is unable to locate you. Make sure their mailing addresses are different from your mailing address. Your charge could be dismissed if you do not provide this information and we are unable to locate you.

   A.   Name: Mr./Ms./Mrs.    _Elizabeth Taylor_
        Address _8123 South Jeffery_           Apt. # _House_
        City _Chicago_           State _IL_    Zip _60617_
        Phone Number( )    _773    933-4895_

   B.   Name: Mr./Ms./Mrs.    _Mark Melton_
        Address _3847 West 124 Place_          Apt. # _3 E_
        City _Alsip_           State _IL_    Zip _60803_
        Phone Number   ( )   _773    507-5469_

3. Write out the full legal name of the Employer, Union, Employment Agency, etc.,
   (i.e., the Respondent), that you believe discriminated against you in Illinois.

   Name in Full: _Kenwood Health Center_
   Illinois Address: _6425 S. Kenwood_
   City _Chicago, IL. 60637_    State _IL_    Zip _60637_
   Phone Number _(773) 752-6000_           County _Cook_

4. If you were placed at Respondent by a temporary agency which paid your wages, provide the following information about this company:

   Name in Full: _N/A_
   Illinois Address: _N/A_
   City _N/A_    State ____    Zip ____
   Phone Number _( )_           County ____

| OFFICE USE ONLY | | Control Number: _00101012-02_ | Date: | Investigator: | |
|---|---|---|---|---|---|
| Control Number: | | | | | |
| CIS Complete | Y | N | #6 15 empl in IL exc sh & hand | Y | N |
| #3 RP in IL. | Y | N | #8 D/H ≤ 180 | Y | N |
| #3 RP not fed | Y | N | Checked by | | |

EG IDHR 000556

5.  A.  Type of Respondent that you believe discriminated against you in Illinois:

    ✓ Private Company               Government Agency (specify):

    ____ Employment Agency            ____ Federal

    ____ Educational Institution        ____ State
           ____ Public     ____ Private

                            ____ County
    ____ Union
                            ____ City

    B.  What is the nature of the business of the Respondent?

    ____ Retail (specify)                 _____

    ____ Government (specify)         _____

    ____ Manufacturing (specify)

    ✓ Health Care (specify)         *Kenwood Health Center*

    ____ Other (specify)

6.  Does the Respondent have a total of 15 or more people working in the State of Illinois?
    (Consider all locations).

    ✓ Yes                        ____ No

    (approximate total number in IL   *175* )

    Does the Respondent have a total of 15 or more people working in the United States?

    ✓ Yes                        ____ No

7.  Does the Respondent named in question #3 now employ you?

    ____ Yes                         ✓ No

If you have been employed by the Respondent named in question#3, provide the following information:

Job Title   *CNA Physical Rehab Aide*      Date Hired   *9/29/92*

Were you on probation?    ____ Yes    ✓ No

Present or last salary   _____   Per   *11.75 per Hour*

Department   *CNA Physical Rehab Aide*   Supervisor   *Deloris Randall*

EG IDHR 000557

8.  In the spaces below, please indicate each ISSUE OR HARM and the basis (type of discrimination) which you would like the Department to investigate.    Note: See page 2 for the bases the Department can investigate.  Some common issues (harms) are:

Discharge ✓
Harassment ✓
Unequal Pay
Job Eliminated
Failure to Accommodate
(handicap and religion only)

Failure to Hire
Layoff
Transfer
Other (specify)

Demotion
Failure to Promote
Failure to Recall
Warning
Suspension

Please take your time and complete all the information requested for each issue and basis alleged, so that we can serve you better. Fill in a separate section for each issue and basis.

## ISSUE AND BASIS

8a.  Issue (harm): _Discharge_                                              Date: _9/7/05_

Basis (type of discrimination): _Discharge / Age Discrimination_

Reason given for harm by Respondent: _"said" Health Complaint by Barbara Bolden_

Who gave you this information (name/job title)? _Debbie Missal / Don & Barbara Bolden 4th fl._
_Charge Nurse_

Explain why you feel you were discriminated against because of the basis identified above. How were others in your situation treated? Include names and job titles.

_As of 9/29/05 I would have been employed with this company for 13 years. Daily I was harrassed by Barbara Bolden stating 'I was old & should just quit. I was also given the hardest tasks to complete. In 13 years I have never had any disciplinary actions or attendance issues._

## ISSUE AND BASIS

8b.  Issue (harm): _Harrassment / Physical_                               Date: _9/7/05_

Basis (type of discrimination): _Age Discrimination_

Reason given for harm by Respondent: _too old to Complete Duties_

Who gave you this information (name/job title)? _Barbara Bolden 4th fl. Charge Nurse_

Explain why you feel you were discriminated against because of the basis identified above. How were others in your situation treated? Include names and job titles.

_Barbara repeatly stated " I should quit because I was too old." In 2003 I lifted a Heavy patient which caused me to Have a slipped disc in my back._

Note:    Use additional pages for any additional issues and bases.

EG IDHR 000558

9. If you wrote **sexual harassment** in your answer to number 8 above, indicate the <u>name</u> and <u>job title</u> of the harasser:

N/A
_____

Do you want the harasser charged separately as an additional Respondent? _____ Yes ___✓___ No
If yes, give the address and phone number of that person:

10. If you wrote **physical or mental handicap** in your answer to number 8 above, state your medically diagnosable handicap(s):

2003- Slip disc in back
_____

Explain how the Respondent became aware of each handicap:

Discharge Medical Release from: Mercy Works
_____

State whether you requested any form of accommodation:

Light Duty per Doctors Orders
_____

What was the Respondent's response:

Wanted to Discipline Me for Unsafe Practice although a back brace was worn.
_____

If you do not have a handicap, but you believe the Respondent acted because it perceives you as handicapped, explain:

Light Duty per Doctors Orders
_____

11. If you wrote **national origin or citizenship status** in your answer to number 8 above, do you think the Federal Immigration Reform and Control Act of 1986 influenced your employer's actions? If so, explain:

No
_____

12. If you wrote **retaliation** in your answer to number 8 above, state how you opposed unlawful discrimination (i.e., testified at a discrimination hearing, filed a prior discrimination claim, or complained about unlawful discrimination). Include dates, charge numbers, and/or the name or title of the person to whom you complained.

Spoke to Supervisor: Deloris Randall regarding personal attacks by Barbara
Bolden. 3rd wk of August 2005, I was confronted by Ms. Bolden stating " So you
told on me ... Jail Old Folks should just quit. Mrs Pullman stated to Barbara
to learn how to address your staff.  (Social Worker)

13. If there are witnesses that the Department should contact, who can support your claim of discrimination, state their names, addresses and phone numbers and the pertinent information each witness can provide.

Name: Alice Campbell
Address:
Phone No. (713) 722-9596
Information: Co-Worker of 30 years

Name Mrs Pullman
Address
Phone No. (713) 772-6000
Information Co-Worker - Social Worker

6

EG IDHR 000559

Name: ~~Adene Thard~~ Wanda Taylor

Address:

Phone No. (    )

Information: Co-worker, Also wrongfully terminated

14. Do you have any documents to support your claim of discrimination?

✓ Yes         No - Medical
                    - Notices

Subscribed and sworn to before me

this 11th day of Oct 2005

at Chicago, County of Cook, State of Illinois.

15. Have you tried to resolve your situation through a grievance procedure?

____ Yes    ✓ No    If yes, with whom?

**OFFICIAL SEAL**
**RUBBIE L WEBB**
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 09/02/09

Briefly describe your actions and the results thus far:

N/a

16. Have you filed a previous charge against this employer with this Department?

____ Yes    ✓ No    If yes, when?

Charge Number

17. Have you filed a charge regarding this situation with any other Agency?    ____ Yes    ✓ No

EEO    ____ Yes    ____ No    If yes, when?

OTHER: Specify

____ Yes    ____ No    If yes, when?

18. PERSONAL DATA:

We need some information for statistical purposes. Please provide the following information:

Date of Birth   02 / 27 / 44    Sex   F

Circle the category in the list below of national origin or ancestry with which you most strongly identify:

| | | |
|---|---|---|
| Greece = B | Liberia = R | U.S.A. = U |
| Haiti = T | Mexico = M | Vietnam = V |
| India = N | Middle East = L | Other African/Non-Arab = F |
| Ireland = I | Pakistan = K | Other East Asia = W |
| Italy = Y | Philippines = S | Other Eastern Europe = E |
| Japan = J | Poland = O | Other Hispanic = H |
| Korea = A | Puerto Rico = P | Other = Z* |

*Specify:

19. Please specify how you learned of our office. This information will be used to enable us to serve the public better:

friend

I certify that this information is true and correct to the best of my knowledge.

Signature: Ella M. Gleaver    Date: 10-5-05

EG IDHR 000560

# EXHIBIT 3

CHARGE NO: 2006CA0846

STATE OF ILLINOIS     )
                       ) SS
COUNTY OF COOK    )

Krystal Rogers, HAVING BEEN FIRST DULY SWORN, DEPOSES AND STATES THAT SHE DID MAIL A COPY OF THE ATTACHED:

( X )    NOTICE OF PERFECTED CHARGE TO *RESPONDENT* BY REGULAR MAIL

( X )    EEOC FORM 131-VII

( X )    COPY OF CHARGE

( X )    365 DAY NOTICE OF PERFECTED CHARGE TO *COMPLAINANT* BY CERTIFIED MAIL

( X )    EEOC NOTICE OF CHARGE FILED

( X )    COPY OF CHARGE

ON THE 17th DAY OF ___OCTOBER___; 2005 BY *CERTIFIED MAIL* X

AND BY REGULAR MAIL X FROM THE STATE OF ILLINOIS JAMES

THOMPSON CENTER – 100 WEST RANDOLPH STREET – SUITE 10-100,

CHICAGO, ILLINOIS 60601.

Krystal Rogers, Office Coordinator

SUBCRIBED AND SWORN TO BEFORE

ME THIS 17th DAY OF ___OCTOBER___, 2005

NOTARY PUBLIC

"OFFICIAL SEAL"
JACQUELYN TURNER HAMB
Notary Public, State of Illinois
My Commission Expires 8/4/05

EG IDHR 000539

CHARGE NUMBER    2006CA0846    COMPLAINANT    GLOVER ELLA M

RESPONDENT    KENWOOD HEALTH CENTER

QUESTIONNAIRE

**NOTE THAT LISTS OR SUMMARIES OF DATA REQUESTED MUST BE SUPPORTED BY COPIES OF UNDERLYING DOCUMENTS WITHOUT EXCEPTION.**

*Where the word "Basis" appears on the attached pages, it refers to the protected group or category of discrimination. For example, if the charge alleges race discrimination, the "basis" of discrimination is "race", and the question asks for the race of the person listed.*

1. State the full legal name and address of Respondent named herein, and describe briefly the type of work carried on by Respondent at this address.

2. State the full legal name, title and telephone number of the individual from whom further information concerning the charge may be obtained.

3. If Respondent employs 100 or more persons, please attach a copy of the most recent EEO report for the location in question. If not, state the total number of employees at the location and the number of employees within Complainant's position title/job classification. In addition, state the number of employees within Complainant's protected group(s), holding that position title/job classification as of the date of the alleged violation.

4. In addition to the information requested herein, please provide a written position statement on each of the allegations of the charge. For each person having direct knowledge of the allegation(s), provide name, title and a phone number where the person may be reached for questions. You may also include any documentary evidence, affidavits, and other written statements, where appropriate, including any additional information and explanation you deem relevant to the charge.

5. If Complainant was employed at Respondent, provide the following personnel data on Complainant:

a.    Date of hire; and name of person who made hiring decision.

b.    Position(s) in which Complainant was employed. (If more than one, list each, and the relevant dates).

c.    Copies of all other personnel records relevant to the charge, including, but not limited to:

   - Work quality evaluations.

   - Work samples.

   - Attendance records.
   - Disciplinary records.

   - Any medical records describing Complainant's condition, if applicable.

EG IDHR 000544

CHARGE NUMBER 2006CA0846
Page 2

**On the Issue of Harassment:**

B6.    Provide a copy of Respondent's policy regarding harassment, as well as the procedures Respondent follows in the investigation of internal complaints of harassment.

B7.    For the individual(s) responsible for investigating internal complaints of harassment, provide:
    a. Name.
    b. Title.
    c.*Basis:

B8.    State whether Complainant brought to Repondent's attention any complaint of harrassment. If yes:
    a. State whether an investigation was conducted.
    b. Provide a copy and the results of Respondent's investigation of Complainant's internal complaint of harassment.

B9.    If there have been other complaints of harassment against the individual whom Complainant alleges committed harassment, for each employee who filled a complaint, provide:
    a.    Name.
    b.    Title.
    c.    *Basis:
    d.    Copies of any reports of findings or results of Respondent's investigations.
    e.    A copy of any notice of disciplinary action taken against the individual.

B10.    For each employee receiving counseling and/or disciplinary action in the twelve month preceding the date of the alleged violation for having committed harassment against any of Respondent's employees, provide:
    a.    Name.
    b.    Title.
    c.    *Basis:
    d.    Documentation of disciplinary action.

Harassment    (B)

* For an explanation of "Basis", see note on page one.

EG IDHR 000548

*CASE LAW*
*Alicea v. City of Chicago,*
2002 U.S. Dist. LEXIS 9128 (N.D. Ill. 2002)

LEXSEE

**FELIX ALICEA, Plaintiff, v. CITY OF CHICAGO and ANTHONY JASON, in his official and individual capacities, Defendants.**

**No. 02 C 0027**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 9128; 90 Fair Empl. Prac. Cas. (BNA) 1590*

**May 20, 2002, Decided**
**May 22, 2002, Docketed**

**DISPOSITION:** [*1] Claims against Defendant Anthony Jason in his official capacity, as to the *section 1981* and *1983* claims, and the Title VII claims in his individual capacity dismissed. Motion to dismiss as to the Title VII race discrimination claim against the City denied.

**COUNSEL:** For FELIX ALICEA, plaintiff: Uche O. Asonye, Asonye and Associates, Chicago, IL.

For CITY OF CHICAGO, THE, defendant: Laura C. Shroyer, Daniel A. Kaufman, Michael, Best & Friedrich LLC, Steven Jay Teplinsky, Michael Best & Friedrich (Illinois), Mara Stacy Georges, City of Chicago, Law Department, Chicago, IL.

For ANTHONY JASON, defendant: Joseph M. Burns, Beth A. Clukey, Jacobs, Burns, Orlove, Stanton & Hernandez, Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINION BY:** David H. Coar

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Felix Alicea ("Alicea") brings a discrimination and retaliation action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, *42 U.S.C. § 2000e et seq.*, *42 U.S.C. §§ 1981 and 1983*. Alicea alleges [*2]

that his employer, City of Chicago Department of Aviation (the "City") [1], discriminated against him on the basis of race and national origin by failing to take corrective action against Alicea's plant manager, Anthony Jason ("Jason"), who allegedly used racial slurs when referring to Alicea since 1998. Alicea further alleges that the City retaliated against him for complaining about the harassment by issuing him written reprimands and by suspending him. Before this Court is the City's motion to dismiss in part Alicea's complaint. For the reasons stated below, this Court GRANTS in part and DENIES in part the City's motion to dismiss.

> 1   Because the Department of Aviation is a non-suable entity, see e.g., *McCraven v. City of Chicago, 18 F. Supp. 2d 877, 881 (N.D. Ill. 1998)*, the parties have agreed to strike the Department of Aviation from the caption of this case.

**I. Motion to Dismiss Standard**

A motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* challenges the sufficiency [*3] of the complaint for failure to state a claim upon which relief may be granted. Such a motion should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Delgado v. Jones, 282 F.3d 511, 515 (7th Cir. 2002)*. In ruling on the motion to dismiss, this Court not only accepts as true all well-pleaded factual allegations in the complaint, but it also draws all reasonable inferences from those facts in favor of the plaintiff. *First Ins. Funding Corp. v. Fed. Ins. Co., 284*

Case 1:08-cv-02030    Document 16-5    Filed 07/22/2008    Page 3 of 5

Page 2
2002 U.S. Dist. LEXIS 9128, *3; 90 Fair Empl. Prac. Cas. (BNA) 1590

*F.3d 799, 804 (7th Cir. 2002)* (citing *Tobin for Governor v. Ill. State Bd. of Elections, 268 F.3d 517, 521 (7th Cir. 2001).*

## II. Background

The following facts are taken from the complaint. Alicea, a Hispanic male of Puerto Rican decent, was hired as a laborer by the City's Department of Aviation in 1989 and he currently continues in that position. Alicea alleges that since 1998 his plant manager, Jason, a Caucasian male, has subjected Alicea to racial slurs on a daily basis. [2] As a result, Alicea filed [*4] a harassment grievance with the City on December 2, 1999. After filing the grievance, on December 9, 1999, Alicea received a written reprimand and was suspended. He received an additional written reprimand on December 15, 1999.

> 2    Some of the racial slurs Alicea alleges that he was called on numerous occasions are "pork chop" (a derogatory term for Puerto Ricans), "spic," "racoon," and "Felix Bin Laden."

On December 16, 1999, Alicea filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On the EEOC form, Alicea checked the box labeled "National Origin" as the basis for the discrimination charge. The text of the charge reads, "Since my employment I have been subject to harassment in the form of ethnic slurs. I have complained to management but the harassment continued. I believe I have been discriminated against based on my national origin, Puerto Rican, in violation of Title VII of the Civil Rights Act of 1964, as amended." On October 15, 2001, Alicea received a "right to [*5] sue" letter from the EEOC, and he filed this three-count complaint against the City and Jason on January 2, 2002. Count I of the complaint alleges race discrimination in violation of Title VII, Count II alleges national origin discrimination, and Count III is a retaliation claim.

## III. Discussion

The City moves to dismiss part of Alicea's complaint. First, the City argues Count I of the complaint should be dismissed because Alicea's Title VII race claim was not set forth in his EEOC charge, and it therefore is not reasonably related to the allegations in the charge. Second, the City argues that all of the claims against Jason in his official capacity are duplicative because they

are considered suits against the city. Additionally, because the City is not liable for punitive damages, the City argues that Alicea's requests for punitive damages against Jason in his official capacity are improper. Third, the City moves to dismiss Alicea's *section 1981* and *1983* claims, arguing he has failed to state a claim. This Court addresses each claim in turn.

### A. Alicea's Title VII Race Discrimination Claim

Generally, a Title VII plaintiff may bring only those claims included in [*6] the underlying EEOC charge, or those that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *McKenzie v. Ill. Dept. of Transportation, 92 F.3d 473, 481 (7th Cir. 1996)* (citations omitted). The Seventh Circuit has held that this standard is met if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge. Id. The claims are not alike or reasonably related unless there is a factual relationship between them; this means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals. Id.

This Court finds that Alicea's race discrimination claims clearly meets this standard. The race and national origin discrimination claims are alike and reasonably related because they describe the same conduct and implicate the same individuals. Since the Seventh Circuit has stressed that the "essential question" is "what EEOC investigation could reasonably be expected to grow from the original complaint, [*7] " *Novitsky v. Am. Consulting Engineers, L.L.C., 196 F.3d 699, 701 (7th Cir. 1999)*, this Court finds that a charge alleging natural origin discrimination because of "ethnic" slurs naturally would lead to an investigation of the nature of any slurs, including "racial" slurs.

The City, however, argues that Alicea's race discrimination claims should be dismissed because the only box checked on the EEOC discrimination charge was for national origin and not race. While admittedly, in some cases, failure to check the box for race discrimination on the EEOC charge form can result in dismissal of race claims, see *Rodgers v. Arlington Heights Sch. Dist. No. 25, 171 F. Supp. 2d 773, 776-78 (N.D. Ill. 2001); Davis v. Quebecor World, 2002 U.S. Dist. LEXIS 267, No. 01 C 8014, 2002 WL 27660, at*

Case 1:08-cv-02030    Document 16-5    Filed 07/22/2008    Page 4 of 5

Page 3
2002 U.S. Dist. LEXIS 9128, *7; 90 Fair Empl. Prac. Cas. (BNA) 1590

*1-2 (N.D. Ill. Jan. 10, 2002); *Flaherty v. Marchand, 2001 U.S. Dist. LEXIS 16861*, No. 00 C 0565, 2001 WL 1242884, at *2-3 (N.D. Ill. Oct. 17, 2001), such failure does not mandate automatic dismissal of Alicea's race discrimination claims, see *Torres v. City of Chicago, 2000 U.S. Dist. LEXIS 6000*, No. 99 C 6622, 2000 WL 549588, at *2 (N.D. Ill. Apr. 28, 2000).

In this case, even though the EEOC did not check [*8] the box for race discrimination, the national origin and race claims are alike and reasonably related. In its reply brief, the City cites *Babrocky v. Jewel Food Co., 773 F.2d 857, 863 (7th Cir. 1985)*, arguing that allowing the race discrimination claim would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the City of notice of the race discrimination claim since it only received notice of the national origin discrimination claim. This argument, however, is hardly persuasive considering the fact that the race discrimination claim arises out of the same conduct and the same individuals. Indeed, as the Babrocky court also stated:

> A limited EEOC investigation is not necessarily fatal to a complaint that contains allegations like or reasonably related to the EEOC charge but that the EEOC, for some reason or another, failed to investigate. Conditioning a plaintiff's right to recover on the omissions of other parties would unduly undermine the remedial purposes of Title VII. In cases in which the EEOC investigation was overly narrow, the proper inquiry would be into what EEOC investigation could reasonably be expected to grow from [*9] the original complaint.

*Id.* at 864 n.2.

Further, it is clear from Alicea's intake questionnaire that Alicea intended a charge of racial discrimination as well as a national origin discrimination claim. [3] First, Alicea actually checked the box labeled "race" on the intake questionnaire. Second, Alicea specifically wrote, "I got tired of his using racial names." Finally, Alicea also wrote, "that [is] what most other race[s] call Puerto Ricans." While usually it is the EEOC discrimination charge that is relevant in assessing the scope of the claim, see *Novitsky, 196 F.3d 699, 702 (7th Cir. 1999)*,

"allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations" *Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 502 (7th Cir. 1994)*; see also *James F. Jackson v. Local 705, Int'l Broth. of Teamsters, AFLCIO*, No. 95 C 7510, *2002 U.S. Dist. LEXIS 4908, 2002 WL 460841*, at *3 (N.D. Ill. Mar. 26, 2002) (holding an EEOC intake questionnaire and memorandum may be considered because the plaintiff "clearly intended the EEOC to investigate racist comments [*10] in his workplace"). Especially in cases such as this one, where the plaintiff's intent is manifested in writing on a form submitted to the EEOC and where a race discrimination claim naturally would result from an investigation of ethnic slurs, it would be manifestly unfair to prohibit a plaintiff from bringing a Title VII race discrimination claim simply because the EEOC neglected to check a box. The City's motion to dismiss regarding this issue is DENIED.

> 3 Since Alicea has submitted documents outside the pleadings for this Court's consideration, he implicitly is inviting this Court to decide this issue as a Motion for Partial Summary Judgment. See *Sickinger v. Mega Sys., Inc., 951 F. Supp. 153, 156 (N.D. Ill. 1996)*. The Court accepts the invitation and considers the additional submissions.

### B. Claims against Anthony Jason in his Official Capacity and Request for Punitive Damages

The City also moves to dismiss the claims against Jason in his official capacity and Alicea's requests [*11] for punitive damages against Jason in his official capacity as duplicative claims. Alicea concedes that punitive damages are not available against individuals sued in their official capacities, see *Hill v. Shelander, 924 F.2d 1370, 1373 (7th Cir. 1990)*, therefore this Court dismisses all punitive damages claims against Jason in his official capacity.

In addition, the City argues that, because Alicea has named the City as a defendant, claims against Jason in his official capacity are duplicative because official capacity suits are the same as suits against the entity of which the employee is an agent. This Court agrees. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham, 473 U.S. 159, 165-66, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985)* (citations omitted).

Page 4

2002 U.S. Dist. LEXIS 9128, *11; 90 Fair Empl. Prac. Cas. (BNA) 1590

Alicea mistakenly relies on *Murray v. Lichter, et al., 1995 U.S. Dist. LEXIS 15778*, No. 95 C 1921, 1995 WL 631794 (N.D. Ill. Oct. 24, 1995), arguing that a plaintiff merely need allege sufficient facts that the state employee exercised control over his or her employment. As the City points out in its reply brief, [*12] however, the Murray defendants sought dismissal in their official capacities, but not because the claim against them was duplicative. In fact, as Judge Plunkett noted in that case, "since we are addressing official capacity liability, the question is really one of the employer's liability for the acts of its supervisory personnel." Id. at *6 n.5. Thus, because Alicea already names the City as a defendant, the claims against Jason in his official capacity are dismissed as duplicative. [4]

> [4] This Court also dismisses *sua sponte* the Title VII claims against Jason in his individual capacity because it is well established that individuals cannot be sued under Title VII in their individual capacities. *Sattar v. Motorola, 138 F.3d 1164, 1168 (7th Cir. 1998); Williams v. Banning, 72 F.3d 552, 553-55 (7th Cir. 1995).*

*C. Section 1981 and 1983 claims*

The City argues that Alicea's *section 1981* and *1983* claims should be dismissed because Alicea has failed to state [*13] a claim. To bring a municipal liability claim against the City, the plaintiff must allege that "the City had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law." *McCormick v. City of Chicago, 230 F.3d 319, 324 (7th Cir. 2000).* Further, a pleading must only contain enough to allow the court and the defendant to understand the gravamen of the plaintiff's complaint. *Id. at 323-23.*

In McCormick, the defendant moved to dismiss the *pro se* plaintiff's complaint for failure to allege facts that lead to legal conclusions regarding a *section 1983* claim. Id. The complaint in McCormick contained a number of conclusions, including a "smattering of phrases like

'highest policymaking officers' and 'widespread custom,'" and the court found that the complaint was sufficient to survive the motion to dismiss because the Federal Rules of Civil Procedure do not allow claims that lack factual specificity to be dismissed. *Id. at 324-25.*

Alicea's complaint, however, fails to state a claim under *section* [*14] *1981* and *1983* even under these liberal pleading requirements. Unlike the *pro se* plaintiff in McCormick, Alicea alleges neither general boilerplate legal conclusions nor factual specificity that would lead to legal conclusions that would put the City on sufficient notice of the nature of Alicea's alleged municipal policy claims. In his complaint, the closest Alicea comes to alleging a policy or custom is when he alleges that the City's "agents condone such conduct and refuse to take necessary action to correct the discrimination and racial harassment." Compl. P 39. The Seventh Circuit, however, has clearly held that accusations that a defendant did not do enough are "shortcomings of [the] kind [that] are distinct from a policy or custom of racial discrimination." *Smith v. Chicago Sch. Reform Bd. of Trustees, 165 F.3d 1142, 1149 (7th Cir. 1999).* The City's motion to dismiss the *section 1981* and *1983* claims is therefore GRANTED.

**III. Conclusion**

For the foregoing reasons, this Court GRANTS Defendant City of Chicago's motion to dismiss as to the claims against Defendant Anthony Jason in his official capacity and as to the *section 1981* and *1983* claims, [*15] *sua sponte* dismisses the Title VII claims against Defendant Anthony Jason in his individual capacity, and DENIES the motion to dismiss as to the Title VII race discrimination claim against the City.

**Enter:**

**David H. Coar**

**United States District Judge**

**Dated: May 20, 2002**

*CASE LAW*
*Beach v. DeKalb Clinic,*
2002 U.S. Dist. LEXIS 6527 (N.D. Ill. 2002)

9 of 15 DOCUMENTS

**BEACH vs. DeKALB CLINIC**

**01 C 50310**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

*2002 U.S. Dist. LEXIS 6527*

**April 12, 2002, Decided**
**April 12, 2002, Filed, Date Docketed**

**DISPOSITION:**    [*1]  Clinic's motion to dismiss Count II under *Rule 12(b)(6)* denied.

**COUNSEL:** For PAMALA - BEACH, plaintiff: Scott R. Erwin, Law Office of Scott R. Erwin, DeKalb, IL.

For DEKALB CLINIC CHARTERED, defendant: Kevin J. Luther, Heyl, Royster, Voelker & Allen, Rockford, IL.

**JUDGES:** Philip G. Reinhard.

**OPINION BY:** Philip G. Reinhard

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Pamela Beach, has filed a three-count complaint in this court against DeKalb Clinic, Chartered, an Illinois Corporation ("The Clinic"), alleging violations of Title VII, *42 U.S.C. § 2000e et seq.* Beach has sought relief on three theories: gender discrimination (Count I), sexual harassment (Count II), and retaliatory discharge (Count III). Jurisdiction and venue are proper pursuant to *42 U.S.C. § 2000e-5(f)(3)*.

Although the Clinic has answered Counts I and III, it has filed a motion to dismiss Count II with prejudice for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. In deciding a motion to dismiss under 12(b)(6), the court must take all facts alleged in the complaint, and any inferences that might be reasonably drawn from those factual [*2] allegations, and construe

them in the light most favorable to the plaintiff. *E.g., Szumny v. Am. Gen. Finance, 246 F.3d 1065, 1067 (7th Cir. 2001)*. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Id.* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*).

In the Count II, Beach alleges sexual harassment beginning in the summer of 1996. (Compl., p. 3). The last act of sexual harassment was alleged to have occurred in October of 1998. *Id.* Beach filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 1, 2001, and she filed suit in this court on August 31, 2001. The Clinic maintains it was never given notice of Beach's claim of sexual harassment since the charge of discrimination it received only listed facts supporting claims for sex discrimination and retaliatory discharge. (Def. Mot. to Dismiss, Exh. C). Beach replies that her sexual harassment claim is reasonably related to her claims of sexual discrimination and retaliatory [*3] discharge. She further urges this court to look outside the four corners of the EEOC charge form and consider the charge questionnaire she filled out, detailing her sexual harassment claim. (Pl. Memo., p. 4).

In the Clinic's reply in support of its motion to dismiss it asserts, for the first time, that Beach's allegations of sexual harassment are time barred. At this late hour, however, the court will not permit the Clinic to raise such a defense. Beach has not had an opportunity to respond to the defense, and the court thus deems it waived for purposes of this motion to dismiss. *See*

*Venters v. City of Delphi, 123 F.3d 956, 968 (7th Cir. 1997)* ("[a] defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.") (quoting *Perez v. United States, 830 F.2d 54, 57 (5th Cir. 1987))*.

As a preliminary matter, the court realizes that it cannot look to documents outside of the pleadings without converting this motion to dismiss into one for summary judgment. *See Woods v. City of Chicago, 234 F.3d 979, 986 (7th Cir. 2000), cert. denied, 151 L. Ed. 2d 268, 122 S. Ct. 354 (2001).* [*4] Although Beach urges this court to look to the questionnaire referenced in her response to the motion to dismiss, it will not do so. Nevertheless, the court will examine the arguments and facts alleged in Beach's response that are consistent with the complaint, in accordance with the duty to determine whether the plaintiff can prove any set of facts in support of her claim that would entitle her to relief, and the duty to resolve ambiguities in the plaintiff's favor. *See Ross Bros. Constr. Co. v. Int'l Steel Servs., Inc., 2002 U.S. App. LEXIS 4301, No. 01-1578, 2002 WL 413172, at *5 (7th Cir. Mar. 18, 2002); Hrubec v. Nat'l R.R. Passenger Corp., 981 F.2d 962, 963-64 (7th Cir. 1992); Early v. Bankers Life & Cas. Co., 959 F.2d 75, 79 (7th Cir. 1992)*

. Beach contends she intended the EEOC to investigate her claim of sexual harassment, and that she submitted a questionnaire to the EEOC which included allegations of sexual harassment. Proof of these facts would entitle her to proceed despite the lack of sexual harassment allegations in the EEOC charge. *See Vela v. Sauk Village, 218 F.3d 661, 664 (7th Cir. 2000); Cheek v. W. & S. Life. Ins. Co., 31 F.3d 497, 502 (7th Cir. 1994).* [*5] Therefore, Count II is sufficient to withstand this motion to dismiss. Notwithstanding the denial of the motion at this time, it appears that the sexual harassment claim may be beyond the statute of limitations in this case. *See Hall v. Bodine Elec. Co., 276 F.3d 345, 352 (7th Cir. 2002); Speer v. Rand McNally & Co., 123 F.3d 658, 662 (7th Cir. 1997).* The Clinic may thus choose to raise the matter by summary judgment after discovery is completed if Beach elects not to forgo the sexual harassment claim.

For the reasons set forth above, the Clinic's motion to dismiss Count II under *Rule 12(b)(6)* is denied.

DATED: APRIL 12, 2002

JUDGE: REINHARD

*CASE LAW*
*Caratachea v. Homewood Industries,*
2002 U.S. Dist. LEXIS 18797 at *4 (N.D. Ill. 2002)

# CASE LAW

**Caratachea v. Homewood Industries  2002 U.S. Dist. LEXIS 18797**

2002 U.S. Dist. LEXIS 18797, *

6 of 23 DOCUMENTS

**NORMA CARATACHEA, Plaintiff, v. HOMEWOOD INDUSTRIES, Defendant.**

**No. 01 C 9845**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 18797*

**October 1, 2002, Decided**
**October 2, 2002, Docketed**

**DISPOSITION:** [*1] Defendant's Motion to Dismiss Count III of Plaintiff's Amended Complaint DENIED.

**COUNSEL:** For NORMA CARATACHEA, plaintiff: Mitchell A. Kline, Law Office of Mitchell A. Kline, Chicago, IL.

For HOMEWOOD INDUSTRIES, defendant: James Raymond Pranger, Jeralyn Hartwick Baran, Kathleen Veronica Crowe, Chuhak & Tecson, Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINIONBY:** David H. Coar

**OPINION:**

## MEMORANDUM OPINION AND ORDER

Before this Court is Defendant Homewood Industries' Motion to Dismiss Count III of the Plaintiff's Complaint for Failure to State a Claim upon which Relief May Be Granted ("Motion to Dismiss Count III") pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the following reasons, Defendant's motion is denied.

### Background

Plaintiff Norma Caratachea ("Plaintiff" or "Caratachea") is a self-identified Hispanic female who was an employee of Homewood Industries starting in 1995. In November 2000, Defendant Homewood Industries ("Defendant" or "Homewood") terminated Caratachea's employment with the company. On January 24, 2001, Plaintiff filed a Charge of Discrimination "Charge") against Homewood with the EEOC.

Plaintiff, in her Charge, alleged that she was "discriminated [*2] against because of [her] sex, female, and [her] national origin, Hispanic," (Mot. Dismiss, Ex. A) Two allegations are obvious from the face of Plaintiff's Charge: sexual harassment and wrongful termination based upon national origin. Plaintiff's Charge alleged that she was subjected to sexually demeaning and suggestive comments from her co-workers beginning in

August 2000. She further alleged that her complaints about the sexual harrassment to her supervisors failed to lead to redress. Finally, Plaintiff's Charge alleged that Homewood engaged in differential treatment when they terminated her for "throwing cardboard onto the conveyor"; specifically, she alleged that "similarly-situated non-Hispanic females . . . were not terminated." The EEOC dismissed Caratachea's Charge and issued a right to sue letter on September 28, 2001.

In the Amended Complaint presently before this Court, Caratachea maintains the allegations of sexual harrassment and discrimination based on national origin. Count III of Plaintiff's Amended Complaint additionally alleges that she was terminated from employment in retaliation for complaints relating to the sexual harrassment. Plaintiff did not raise any [*3] specific allegations of retaliatory dismissal in her EEOC Charge.

### Standard of Review

Typically, a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* does not test whether the Defendant will prevail on the merits, but instead whether the Plaintiff has properly stated a claim for which relief may be granted. *Pickrel v. City of Springfield, Ill., 45 F.3d 1115 (7th Cir. 1995)*. The court must accept as true all of the plaintiff's well-pleaded factual allegations, as well as all reasonable inferences generating therefrom. Id. Thus, the court will dismiss a complaint under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ledford v. Sullivan, 105 F.3d 354, 357 (7th Cir. 1997)* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 78, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984))*. Any ambiguities are construed in favor of the plaintiff. *Curtis v. Bembenek, 48 F.3d 281, 283 (7th Cir. 1995)*. However, the court need "not strain to find inferences favorable to the plaintiffs which are not apparent on [*4] the face of the . . . complaint." *Coates v. Illinois State Bd. of Ed., 559 F.2d 445, 447 (7th Cir. 1977)*.

### Discussion

Generally in the Seventh Circuit, a Title VII plaintiff

may not include claims in a subsequent complaint that were not included in her EEOC charge. *Harper v. Godfrey Co., 45 F.3d 143, 148 (7th Cir. 1995)*. The general rule is not without its exceptions, though. Because it is lay people, not lawyers, who usually file EEOC charges, see *Cheek v. Western & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)*, there is a well-recognized test for whether allegations not presented to the EEOC can proceed in a subsequent lawsuit. In order to include a claim in a federal complaint that was not brought in an EEOC charge, a plaintiff must satisfy a two-pronged test: "(i) the claim is like or reasonably related to the EEOC charges, and (ii) the claim in the complaint could reasonably develop from the EEOC investigation into the original charges." Id. A claim is reasonably related to allegations in an EEOC charge if a factual relationship exists. Id. For a factual relationship to exist, the EEOC charges and the complaint [*5] must, at a minimum, describe the same conduct and implicate the same individuals. Id. An action that is beyond the scope of a plaintiff's EEOC charge must be dismissed. Id.; see also *Lamas v. Freeman Decorating Co., 37 F. Supp. 2d 1105, 1106 (N.D. Ill. 1999)*.

Defendant argues that count III of Plaintiff's Amended Complaint, alleging retaliatory discharge, must be dismissed due to the fact that she did not include the allegation in her EEOC charge against Homewood. In this case, Caratachea's retaliation claim is reasonably related to the allegations in her EEOC Charge. In Plaintiff's EEOC Charge, she alleges that she was subject to sexually demeaning remarks by her co-workers and that she complained of such harassment to the owner of Homewood. Plaintiff also alleges that she was terminated from her employment at Homewood within three months of reporting the sexual harrassment. The allegation of retaliation describes the same conduct (wrongful termination) and implicates the same individuals (management) as her claim of national origin discrimination.

The second part of the test "is difficult to apply because it requires speculation as to what the EEOC might or [*6] might not discover in the course of an investigation." *Cheek, 31 F.3d at 500*. From the foundation of the facts alleged in Plaintiff's EEOC Charge, it does not require much imagination to arrive at the current allegations of retaliatory firing. This Court finds that the claim could reasonably develop from an EEOC investigation into the original charges.

**Conclusion**

For the reasons stated in this opinion, Defendant's Motion to Dismiss Count III of the Plaintiff's Amended Complaint is DENIED.

**Enter:**

**David H. Coar**

**United States District Judge**

**Dated: October 1, 2002**

*CASE LAW*
*Horwitz v. Sterling Miami, Inc.,*
1998 U.S. Dist. LEXIS 7184 (N.D. Ill. 1998)

LEXSEE 1998 U.S. DIST. LEXIS 7184

**ELAINE HORWITZ, M.D., Plaintiff, v. STERLING MIAMI, INC. d/b/a STERLING HEALTHCARE GROUP, Defendant.**

**97 C 6322**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 7184*

**April 28, 1998, Decided
May 4, 1998, Docketed**

**DISPOSITION:**    [*1]  Dr. Horwitz' ADA claim dismissed without prejudice.

**COUNSEL:** For ELAINE HOWRITZ, M.D., plaintiff: Marc R. Jacobs, Ronald Schreiber, D'Ancona & Pflaum, Chicago, IL.

For STERLING MIAMI INC dba Sterling Healthcare Group, defendant: Robert E. Arroyo, Paul A. Patten, Kathryn T. Ditmarsh, Jackson, Lewis, Schnitzler & Krupman, Chicago, IL.

**JUDGES:** GEORGE M. MAROVICH, UNITED STATES DISTRICT COURT.

**OPINION BY:** GEORGE M. MAROVICH

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Plaintiff Elaine Horwitz, M.D. ("Dr. Horwitz") has filed the present action against Defendant Sterling Miami, Inc. ("Sterling") alleging that Sterling discriminated against her on the basis of her sex and pregnancy in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e* ("Title VII") and on account of a disability in violation of the Americans with Disabilities Act, *42 U.S.C. § 12101 et seq.* ("ADA"). Sterling now moves to dismiss Dr. Horwitz' ADA claim pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons set forth below, Sterling's motion to dismiss the ADA claim is granted.

*BACKGROUND*

Beginning in the summer of 1989, Dr. Horwitz was employed as an emergency room physician by Emergency Physicians Group providing [*2] emergency room medical services at Highland Park Hospital and Rush North Shore Medical Center. As of December 16, 1995, management and staffing of the emergency rooms at Highland Park Hospital and Rush North Shore Medical Center was assumed by Sterling.

Dr. Horwitz began providing the same services on Sterling's behalf at these hospitals as she had provided as an employee of Emergency Physicians Group. At that time, Sterling informed Dr. Horwitz that she could work as a part-time emergency room physician for Sterling and was assured 50 to 60 hours per month of work. Throughout her employment, Dr. Horwitz performed her duties in a satisfactory or better than satisfactory manner.

In November 1996, Dr. Horwitz requested a leave of absence for approximately one week because of a pregnancy loss. Several days later, Dr. Horwitz notified Sterling that she was again available for work. Since Dr. Horwitz requested this leave, Sterling has refused to assign any work to her. Sterling informed Dr. Horwitz that it would not return her to the work schedule because Sterling was no longer employing part-time physicians. However, Sterling continued to retain at least two part-time physicians after [*3] November 1996.

On March 14, 1997, Dr. Horwitz filed a charge of discrimination with the EEOC alleging that Sterling discriminated against her. The EEOC issued her a notice

of right to sue on June 11, 1997. On September 8, 1997, Dr. Horwitz filed her Complaint in this Court alleging that Sterling discriminated against her because of her sex and pregnancy in violation of Title VII and because of her disability in violation of the ADA. Dr. Horwitz alleges that Sterling treated her less favorably than individuals who were not pregnant and/or disabled, failed to accommodate her and discriminated against her by failing to return her to the work schedule or reinstating her after her November 1996 absence.

In the present motion, Sterling alleges that Dr. Horwitz' ADA claim should be dismissed because (1) she did not allege such a claim in her EEOC charge, and (2) she fails to allege in her Complaint that she is a qualified individual with an ADA protected disability.

## DISCUSSION

### I. Standards For a Motion to Dismiss

When considering a motion to dismiss, the Court examines the sufficiency of the complaint, not the merits of the lawsuit. See Triad Assoc. v. Chicago Hous. Auth., [*4] 892 F.2d 583, 586 (7th Cir. 1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence that supports the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). A motion to dismiss will be granted only if the Court finds that the plaintiff can prove no set of facts that would entitle her to relief. See Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 432 (7th Cir. 1993); Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). On a motion to dismiss, the Court draws all inferences and resolves all ambiguities in the plaintiff's favor and assumes that all well-pleaded facts are true. See Dimmig v. Wahl, 983 F.2d 86, 86 (7th Cir. 1993).

### II. Dr. Horwitz' ADA Claim is Within the Scope of Her EEOC Charge

Sterling contends that Dr. Horwitz' ADA claim is beyond the scope of the EEOC charge, and thus should be dismissed, because the charge asserts only that Sterling discriminated against her on the basis of her sex and pregnancy. To pursue a claim under Title I of the ADA, a plaintiff must file an administrative charge with the EEOC prior [*5] to filing a claim in federal court on the same matter. The scope of a federal employment complaint is limited by the scope of the plaintiff's EEOC charge. Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir. 1989); Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). The condition precedent of an EEOC charge serves the dual purpose of affording the EEOC with the opportunity to quickly settle the dispute with the employer and puts the employer on notice of the charges against it. Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992).

Generally, a plaintiff may not bring claims that were not included in the charge filed with the EEOC. Cheek, 31 F.3d at 500. However, even if the charge does not contain the claim, a court must allow the uncharged claim if it is "like or reasonably related to the allegations of the charge and growing out of the allegations." Schnellbaecher, 887 F.2d at 127. A claim is "like or reasonably related" to the EEOC charge only if there is a factual relationship between them. "This means that the EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals." [*6] Cheek, 31 F.3d at 501. An EEOC charge should be construed with "utmost liberality" to determine the permissibility of discrimination claims. Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir. 1985).

In her EEOC charge, Dr. Horwitz complains that Sterling discriminated against her on the basis of her "sex, female (pregnancy)" by refusing to allow her to return to work following her approximately one week leave of absence due to a "conditions related to [her] pregnancy." (Def. Mot. to Dismiss, Ex. 1.) Although Dr. Horwitz checked only the box marked "sex" on her charge as the basis for the discrimination, "what boxes . . . are checked on the EEOC form do not necessarily control the scope of a subsequent civil complaint." Kristufek v. Hussmann Foodserv. Co., 985 F.2d 364, 368 (7th Cir. 1993); see Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 169 (7th Cir. 1976) (plaintiff who checked the race box, but not the sex box on the EEOC form could nonetheless bring an action for sex discrimination because the allegations in her EEOC charge fairly raised claims of both sex and race discrimination).

In this case, the Court finds that the relationship between [*7] the EEOC charge and the Complaint is sufficient to conclude that Dr. Horwitz' ADA claims were fairly raised because both the allegations in the charge and the claim of disability discrimination in the

Complaint are based upon Sterling's refusal to allow Dr. Horwitz to return to work after absence due to her "pregnancy-related condition." Although Dr. Horwitz "attached the most obvious legal theories"--sex and pregnancy discrimination--to Sterling's conduct, her EEOC charge provided ample notice to Sterling and its lawyers of the substance of her Complaint. The factual relationship of the sex and disability charges is related in time, people and substance such that Sterling was on adequate notice of the possibility of an ADA claim. *See Kristufek, 985 F.2d at 368-69; Cheek, 31 F.3d at 504* (discussing *Jenkins, 538 F.2d at 167-69*).

Moreover, in determining the scope of an EEOC charge, it is well-settled that "[a]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate those allegations." *Cheek, 31 F.3d at 502*. Courts often look to information that is not contained in the formal EEOC charge when [*8] determining whether a federal complaint falls within the scope of the EEOC charge. *See, e.g., Box v. A & P Tea Co., 772 F.2d 1372, 1375 (7th Cir. 1985)*(the court considered handwritten additions to a typed EEOC charge and EEOC intake questionnaire and permitted a sex discrimination claim in addition to the race discrimination claim alleged in the typed EEOC charge); *Sickinger v. Mega Sys., 951 F. Supp. 153, 157-58 (N.D. Ind. 1996)*(court relied on an intake questionnaire to conclude that the plaintiff intended the EEOC to investigate an allegation of retaliation even though the intake questionnaire was not attached to or included with the charge); *Fernando v. Rush-Presbyterian-St. Luke's Med. Ctr., 882 F. Supp. 119, 122 (N.D. Ill. 1995)*(claims of discrimination made during the course of an EEOC investigation are proper claims to be made in a Title VII complaint); *cf. Vakharia, M.D. v. Little Co. of Mary Hosp. & Health Care Ctr., 917 F. Supp. 1282, 1294 (N.D. Ill. 1996)*(the EEOC intake questionnaire does not serve as a "charge" for purposes of notifying defendants).

Here, as part of the intake process, Dr. Horwitz filled out an EEOC questionnaire on the same day as [*9] she filed her EEOC charge. Dr. Horwitz specifically stated on the questionnaire that the leave of absence which gave rise to Sterling's allegedly discriminatory conduct was requested because of a "pregnancy-related disability (death of my 20-week old fetus)," and she checked the box marked "disability" as one of her discrimination claims. While it is true that only the charge, not the intake

questionnaire, is sent to an employer, Dr. Horwitz clearly included this information in the EEOC questionnaire because she intended the agency to investigate her allegations. *See Finley v. Illinois Dept. of Public Aid, 1998 U.S. Dist. LEXIS 474, 1998 WL 26156*, at *5 (N.D. Ill. Jan. 12, 1998).

Accordingly, because this Court does not find that Dr. Horwitz' ADA claim is beyond the scope of her EEOC charge, it declines to dismiss the claim on this ground.

### III. *Plaintiff Fails to Allege that She is a Qualified Person with a Disability*

In order to state a claim under the ADA, a plaintiff must have a disability which is defined as "a physical or mental impairment which substantially limits one or more of the major life activities" of an individual. *42 U.S.C. § 12102(2)(A)*. To determine whether a plaintiff has sufficiently [*10] alleged a disability under the ADA, a court should ask (1) whether the plaintiff's condition is a physical or mental impairment; (2) whether that impairment affects a major life activity; and (3) whether the major life activity is substantially limited by the impairment. *Pacourek v. Inland Steel Co., 916 F. Supp. 797, 801 (N.D. Ill. 1996); Patterson v. Xerox Corp., 901 F. Supp. 274, 277 (N.D. Ill. 1995)*.

A "physical or mental impairment" is a physiological disorder or condition which affects one or more body systems, including the reproductive system. *29 C.F.R. § 1603.2(h)(1)*. "Major life activities" include, but are not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *29 C.F.R. § 1630.2(i)*. An individual is "substantially limited" by an impairment if she is "significantly restricted as to the condition, manner and duration under which [she] can perform a particular major life activity as compared to the condition, manner and duration under which the average person in the general population can perform that same major life activity." When determining whether a disability "substantially [*11] limits" a person from performing a major life activity, courts consider: (1) the nature and severity of the impairment; (2) the duration and expected duration of the impairment; and (3) the permanent or long term impact, or the expected long term impact of or resulting from the impairment. *See 29 C.F.R. § 1630.2(j)(2)*. Thus, courts have generally found that "short-term, temporary restrictions are not substantially

limiting" and do not render a person disabled for the purposes of the ADA. *Hamm v. Runyon, 51 F.3d 721, 725 (7th Cir. 1995).*

Sterling argues that the Complaint does not allege that Dr. Horwitz had any form of impairment, much less an impairment that might substantially limit one or more of her major life activities. In her Complaint, Dr. Horwitz alleges that she had a "pregnancy loss" which caused her to take one week leave of absence from her job and that Sterling discriminated against her because of her "disability." (Compl., PP 11, 16 and 18.) As Sterling correctly notes, however, pregnancy itself is not considered a disability under the ADA. *See, e.g., Baker v. Gardner, Carton & Douglas, 1997 U.S. Dist. LEXIS 20002, 1997 WL 781712,* at *5 (N.D. Ill. Dec. 3, 1997); *Chambers v. Wildman,* [*12] *Harrold, Allen & Dixon, 1997 U.S. Dist. LEXIS 16514, 1997 WL 666507,* at *3 (N.D. Ill. Oct. 22, 1997); *Leahr v. Metropolitan Pier & Exposition Auth., 1997 U.S. Dist. LEXIS 10601, 1997 WL 414104,* at *3-4 (N.D. Ill. July 16, 1997); *Walker v. American NTN Bearing Mfg., 1997 U.S. Dist. LEXIS 2919, 1997 WL 116799,* at *2 (N.D. Ill. Mar. 11, 1997); *but see Chapsky v. Baxter v Mueller Div., 1995 U.S. Dist. LEXIS 2609, 1995 WL 103299,* at *1 (N.D. Ill. Mar. 9, 1995).

Dr. Horwitz contends in her response brief that she is not claiming her pregnancy itself is a disability, but rather that her pregnancy-related condition constitutes a disability. [1] Some courts have found that, under certain circumstances, a condition that arises out of a pregnancy may constitute a "disability" under the ADA. *See, e.g., Chambers,* 1997 WL 666507, at *3 ("a disability that arises from pregnancy may be protected if it meets the ADA's requirements, including that the disability be permanent or chronic"); *Walker,* 1997 WL 116799, at *2; *Kindlesparker v. Metro. Life Ins. Co., 1995 U.S. Dist. LEXIS 6164, 1995 WL 275576,* at *1-2 (N.D. Ill. May 4, 1995)(court refused to dismiss ADA claim of a woman who experienced physical conditions related to pregnancy which required medical attention); *but see Leahr,* 1997 WL 414104, at *4 (pregnancy [*13] and related conditions are not disabilities under the ADA). For example, in *Patterson v. Xerox Corp., 901 F. Supp. 274 (N.D. Ill. 1995),* the plaintiff sued her employer for discrimination, invoking the ADA. Her employer moved to dismiss, arguing that the ADA does not recognize pregnancy as a disability. The plaintiff responded that the

disability she claimed was not the pregnancy itself but the severe back pain attributable in part to her pregnancy. The plaintiff alleged that this back pain substantially limited her ability to sit at work for extended periods of time. The *Patterson* court concluded that the plaintiff had sufficiently alleged a "disability" under the ADA to survive a motion to dismiss. *Id. at 278.*

1  Several of the cases that Horwitz cites in support of her proposition, however, relate to infertility, a medical condition that Horwitz does not allege. *See Pacourek, 916 F. Supp. at 801* (holding that infertility is a disability under the ADA); *Erickson v. Board of Governors, 911 F. Supp. 316, 322-23 (N.D. Ill. 1995)*("Plaintiff's allegation that her infertility is a physical impairment which substantially limits the major life activity of reproduction states a claim under the ADA.").

[*14] In the present Complaint, however, Dr. Horwitz does not allege that she had any physical impairment that substantially limits a major life activity. Instead, Dr. Horwitz asserts that she requested a one-week leave of absence because of a pregnancy loss, but that she was again available for work "several days" later. (Compl., P 12.) Dr. Horwitz does not allege that her pregnancy loss or any other pregnancy-related condition substantially limits any major life activity. *Cf. Walker,* 1997 WL 116799, at *2-3; *Garrett v. Chicago Sch. Reform Bd. of Trustees, 1996 U.S. Dist. LEXIS 10194, 1996 WL 411319,* at *2-3 (N.D. Ill. July 19, 1996). Thus, Dr. Horwitz present Complaint alleges nothing more than a short term illness resulting from an unfortunate pregnancy loss. Accordingly, this Court finds that Dr. Horwitz fails to plead all of the elements necessary to state an ADA claim.

## CONCLUSION

For the foregoing reasons, Dr. Horwitz' ADA claim is dismissed without prejudice.

ENTER:

GEORGE M. MAROVICH

UNITED STATES DISTRICT COURT

DATE: April 28, 1998

*CASE LAW*

*Jackson v. Local 705, Int. Brotherhood of Teamsters*, AFL-CIO,
2002 U.S. Dist. LEXIS 4908 at * 9 (N.D. Ill. 2002)

LEXSEE

**JAMES F. JACKSON, Plaintiff, v. LOCAL 705, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO, et al., Defendants.**

**Case No. 95 C 7510**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 4908*

**March 22, 2002, Decided**

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted in part and denied in part.

**COUNSEL:** JAMES F JACKSON, plaintiff, Pro se, Chicago, IL.

For JAMES F JACKSON, plaintiff: Monica Elisabeth McFadden, McFadden Law Offices, Chicago, IL.

For LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, (AFL - CIO), defendant: Melissa J. Auerbach, Cornfield & Feldman, Chicago, IL.

For LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, (AFL - CIO), defendant: Thomas R. Carpenter, Chicago, IL.

For LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, (AFL - CIO), GERALD ZERO, JOHN MCCORMICK, JO PRESSLER, defendants: Robert A. Seltzer, Cornfield & Feldman, Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff James F. Jackson pursues this federal discrimination and state tort action against four defendants: Local 705, International Brotherhood of

Teamsters, AFL-CIO ("Local 705") and three of its officers and trustee staff members, Jo Pressler, John McCormick, and Gerald Zero. The defendants move for summary judgment on all claims. For the reasons outlined below, the motion is granted in part and denied in part.

**I. Background**

In [*2] accordance with the summary judgment standard, the court views the facts in the light most favorable to the non-movant Jackson. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Because the defendants move to strike much of the critical evidence, discussion of facts based on that evidence is reserved for the analysis section. Still, a brief overview will help to situate the case.

Jackson, an African-American man, worked for Local 705 as a business representative from 1989 to September 23, 1994. During this time, he claims to have been the subject of extensive and intensifying offensive conduct by Zero, McCormick, and, to a lesser degree, Pressler. A few examples illustrate. Upon Jackson's return from a commemoration of the March on Washington, Zero told Jackson that Martin Luther King, Jr. was an "uppity black ass nigger" who should have been assassinated long before he was. (Rule 56.1(a)(3) Statement P 123.) In July or August of 1994, Zero told Jackson that Emmett Till should have been killed for whistling at a white woman and that all blacks who behave like him should be killed. (*Id.* P 129.) Jackson observed McCormick [*3] showing a newspaper photograph of a slain Till to people and heard McCormick use the word "nigger" on several occasions. (

*Id.* P 130.) Jackson once overheard Pressler in her office telling another person that African-Americans had small brains, were dumb, and had less knowledge than white people. (*Id.* P 124.) The defendants deny all of these allegations, but do not dispute them for purposes of summary judgment.

On September 23, 1994, Jackson was fired. He filed EEOC charges on October 14, 1994, alleging discriminatory discharge. Jackson's EEOC intake questionnaire also included a reference to "constant negative remarks toward Italian-American and Blacks." (Defs.' Ex. K, Tab 17, at 1451.) Within 30 days of receiving a right to sue letter from the EEOC, Jackson filed his initial complaint in this matter alleging unlawful termination. His first amended complaint, filed on May 15, 1996, added claims against the individual defendants for, *inter alia*, defamation, intentional infliction of emotional distress ("IIED"), and assault, as well as respondeat superior against Local 705. The second amended complaint includes seven counts: (1) Title VII of the Civil Rights Act of 1964 [*4] ("Title VII"), *42 U.S.C. § 2000e et seq.*, claims against Local 705; (2) Age Discrimination in Employment Act of 1967 ("ADEA"), *29 U.S.C. § 621 et seq.*, claims against Local 705; (3) Civil Rights Act of 1866, *42 U.S.C. § 1981*, claims against all four defendants; (4) defamation claims against all four defendants; (5) IIED claims against all four defendants; (6) assault claims against Zero, McCormick, and Pressler; and (7) respondeat superior claims against Local 705.

## II. Analysis

A. Count I: Title VII Claims Against Local 705

Jackson raises three different Title VII theories: (1) racial harassment and hostile work environment; (2) discriminatory discharge; and (3) retaliation. [1]

> 1    The complaint raised a fourth theory of recovery: exclusion or attempted exclusion from union membership. Jackson has voluntarily withdrawn this claim. (Pl.'s Resp. Mem. 53.)

### 1. Racial Harassment/Hostile Work Environment

In general, [*5] a Title VII plaintiff may not bring claims in a lawsuit that were not included in his EEOC charge. *Cheek v. W. & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994).* This rule serves two purposes: (1)

permitting the EEOC to investigate claims, so that there will be an opportunity before the plaintiff files suit "to settle the dispute through conference, conciliation and persuasion"; and (2) giving the employer "some warning of the conduct about which the employee is aggrieved." *Id.* Nevertheless, a Title VII plaintiff need not allege in his EEOC charge each and every fact underlying each claim in his complaint. *Id.* Rather, all claims set forth in a complaint are cognizable that are "like or reasonably related to the allegations of the charge" and can reasonably be expected to grow out of such allegations. *Id.* (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir. 1976)* (en banc) (citation omitted)). "The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions." *Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir. 1985).* [*6]

Local 705 argues that Jackson cannot raise a claim of racial harassment and hostile work environment because his EEOC charge is devoid of any facts relating to such a claim. Indeed, Jackson's one-page EEOC charge form is limited to his September 23, 1994 termination. However, Jackson urges the court to look outside the four corners of the charge--most notably, to consider his intake questionnaire, which alleges "constant negative remarks toward Italian-American and Blacks." (Defs.' Ex. K, Tab 17, at 1451.) Jackson also points to a memorandum he gave to the EEOC representative in which Pressler tells Zero and McCormick to stop using words like "niggers, animals and boys" because doing so could cause them to lose an upcoming election. (Defs.' Ex. K, Tab. 17, at 1453.) An EEOC representative prepared both the intake questionnaire and the charge form. [2] (Pl.'s Ex. 2, PP 7, 15, 16.) Jackson claims that, in response to his specific request, the EEOC representative assured him that the agency would investigate *both* his termination and the negative racial environment and that he signed the charge form only after the representative told him that the charge would encompass his complaints [*7] about negative racial comments. (*Id.* PP 12, 17, 18.) The intake questionnaire indicates that Jackson had not sought assistance from an attorney and there is no suggestion in the record that he did so before signing the charge form two days later. Indeed, Jackson filed his initial complaint in this action *pro se.*

> 2    To find this affidavit, the court went through Jackson's response to Local 705's statement of

Case 1:08-cv-02030   Document 16-9   Filed 07/22/2008   Page 4 of 16

Page 3
2002 U.S. Dist. LEXIS 4908, *7

undisputed fact number 10. Local 705 has moved to strike this response for failure to comply with this court's standing order regarding motions for summary judgment. The court need not decide the merits of the motion to strike because granting it would not affect the court's analysis. Local 705 would have the court accept as undisputed its assertion that "Jackson filed [EEOC] charges . . . alleging discrimination . . . in connection with his termination from employment." The court would not be required to assume that Jackson charged discrimination *only* in respect to this event. That Jackson's responsive statement would be stricken for substantive purposes would not prohibit the court from relying on it as an index to referenced exhibits. *Cf.* Standing Order Regarding Mots. for Summ. J. of 10/14/99 ("It is very helpful if citations to facts in the memorandum are to both the 56.1(a)(1) documents establishing the fact and to the 56.1(a)(3) statement.").

[*8] Accepting Jackson's sworn testimony as true, as the court must at this stage of the proceedings, it is clear that the EEOC dropped the ball by not including racial harassment in the formal charge. The question is whether the EEOC's mistake should preclude Jackson from suing for harassment. In light of Jackson's *pro se* status, the reference in the questionnaire to "constant negative comments" about blacks, the memorandum suggesting routine use of words like "niggers, animals and boys," the erroneous statements made by the EEOC representative, and the remedial purposes of Title VII, the answer must be no. The intake questionnaire and memorandum may be considered because Jackson clearly intended the EEOC to investigate racist comments in his workplace. *See Cheek, 31 F.3d at 502* ("Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate those allegations."). The questionnaire and memorandum indicate that, at a minimum, Jackson brought the remarks to the attention of the EEOC. And a claim of racial harassment "can reasonably be expected to grow out of an EEOC investigation" of these allegations. [*9] *Id. at 500.* If there were no written record of the comments, Jackson might be out of luck. *See Vela v. Village of Sauk Village, 218 F.3d 661, 665 n.2 (7th Cir. 2000)* ("We would not agree . . . that a claim orally communicated to the agency, but omitted through the latter's fault could, simply on that account, be treated as if properly filed."). So too the written references, standing

alone, might not suffice. But the combination of the writings and Jackson's description of the interview suggests that he did everything he could reasonably be expected to do to preserve his racial harassment claim. On these facts, the errors of an EEOC representative will not bar Jackson's claim. *See Babrocky, 773 F.2d at 864 n.2* ("Conditioning a plaintiff's right to recover on the omissions of other parties would unduly undermine the remedial purposes of Title VII.").

Courts in this district have reached the same result, sometimes on less compelling facts. See, e.g., *Finley v. Illinois Dep't of Public Aid, 1998 U.S. Dist. LEXIS 474,* at *11-16, No. 97 C 3381 (N.D. Ill. Jan. 9, 1998) (essentially identical facts); [*10] *Horwitz v. Sterling Miami, Inc., 1998 U.S. Dist. LEXIS 7184,* at *7-9, No. 97 C 6322 (N.D. Ill. Apr. 28, 1998) (same, except no mention of *pro se* status, who prepared the charge, or any misrepresentation by the EEOC representative). Although it reached the same result, the court in *Sickinger v. Mega Sys., Inc., 951 F. Supp. 153, 158 (N.D. Ind. 1996)*, relied on the fact that the employer could not claim prejudice or surprise upon discovering a discriminatory discharge claim where the employee had filed her EEOC charge, which alleged only sexual harassment, just eight days after being terminated. The timing put the employer on constructive notice of the termination claim, the court reasoned.

Jackson's racial harassment claim was certainly less obvious than the claim in *Sickinger.* Indeed, Jackson concedes that Local 705 did not receive notice of the claim. But that fact, standing alone, is not dispositive under Seventh Circuit case law. In *Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992)*, "the actual typewritten charge plaintiff filed with the EEOC . . . only made reference to her termination and to her belief that she had been discriminated [*11] against because of her race." However, the plaintiff also submitted a separate "affidavit" that included an explicit reference to the defendant's allegedly discriminatory promotion policies. *Id. at 1110-11.* Applying a standard of "utmost liberality" and relying on the affidavit, the Seventh Circuit held that the plaintiff's denial of promotion claim was properly preserved. *Id. at 1111.* Indeed, the court of appeals went further than the district court and held that two derivative claims, not expressly mentioned in the affidavit, were also preserved. *Id.*

*Box v. A & P Tea Co., 772 F.2d 1372, 1375 (7th*

*Cir. 1985)*, is similar. There, the typed charge discussed race discrimination but made no suggestion of a sex discrimination claim. In rejecting the defendant's motion for summary judgment on the sex discrimination claim, the court relied in part on a statement in the plaintiff's "EEOC questionnaire that she was not promoted because she was black and because she was a female." *Id.* Both *Rush* and *Box* relied on statements made outside the formal charge without even discussing the fact that the defendant was not entitled to [*12] service of these materials. These cases do not undermine the goal of notice to the employer because, in the usual case, a competent EEOC investigation will inform the employer of claims that were made to the EEOC but erroneously omitted from the formal charge. *See Cheek, 31 F.3d at 505* ("The investigation . . . would have put [the employer] on notice that [the plaintiff] was claiming that [a supervisor] had sexually harassed her.").

Two recent Seventh Circuit decisions focus on the goal of employer notice, but neither impacts the case at bar. In *Novitsky v. Am. Consulting Eng'rs, L.L.C., 196 F.3d 699 (7th Cir. 1999)*, the court affirmed the entry of summary judgment against a plaintiff whose EEOC charge failed to include the critical incident of discrimination, even though the incident was mentioned in her intake questionnaire. Some language in that opinion can be read to imply that a court may never look outside the four corners of an EEOC charge, but that language must be read in context. The panel expressly distinguished the case "in which the EEOC refused to accept a charge, or told someone that an intake questionnaire and a charge are the [*13] same thing." *Id. at 702.* That is precisely what *Jackson* says happened. But *Jackson's* case is even stronger than the *Novitsky* hypothetical because *Jackson*, unlike the plaintiff in that case, was not assisted by counsel when he signed the EEOC charge. As the concurring judge explained:

> We do not now decide whether an illiterate or *pro se* person who signs a charge prepared by the EEOC, which leaves out critical information provided by the claimant to the EEOC in the intake questionnaire, would be similarly bound by the charge. That issue is not before us and is in fact substantially different from the one we decide today. A number of courts have recognized that equitable considerations may require a court to look

outside the formal charge where the employee has done all that she can to present the claim to the EEOC, particularly where the failure to include the allegations results from EEOC negligence or misinformation.

*Id. at 703* (Rovner, J., concurring).

More recently, the Seventh Circuit rejected a plaintiff's attempt to rely on oral representations made to the EEOC representative but omitted from the formal charge. *Vela v. Village of Sauk Village, 218 F.3d 661 (7th Cir. 2000)*. [*14] Citing *Cheek, Rush,* and *Box,* the court reaffirmed the general principle that allegations outside the charge may be considered when the charging party intended the agency to investigate those allegations, but added the limitation that the allegations must be written. *Vela, 218 F.3d at 664.* Presumably, the court was concerned that some Title VII plaintiffs would be unable to resist the temptation to prevaricate regarding what was said in conversations with the EEOC and wanted some contemporaneous documentation to minimize this potential. One court in this district has interpreted *Vela* to foreclose reliance on even written materials outside the charge and questionnaire, but the court noted that the plaintiff there had not claimed that the EEOC intake representative had misled her. *Dillon v. M.S. Carriers, Inc., 2000 U.S. Dist. LEXIS 11778, at *27, No. 98 cv 2012 (N.D. Ill. Aug. 9, 2000).*

Local 705's reliance on *Park v. Howard University, 315 U.S. App. D.C. 196, 71 F.3d 904 (D.C. Cir. 1995)*, is misplaced. There was no evidence in *Park* that the EEOC (let alone the employer) ever had access to the relevant questionnaire. [*15] *71 F.3d at 909.* In any event, this court cannot favor precedent from another circuit over the Seventh Circuit case law summarized above.

Local 705 has an even more porous second line of defense to the harassment claim. It argues that it cannot be held vicariously liable because the undisputed facts show "(a) that [it] exercised reasonable care to prevent and correct any . . . harassing behavior, and (b) that [Jackson] unreasonably failed to take advantage of any preventative or corrective opportunities provided by [Local 705] or to avoid harm otherwise." *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 141 L. Ed. 2d 633, 118 S. Ct.*

2257 (1998). The parties waste a great deal of effort arguing over whether Local 705's failure to plead this defense amounted to waiver. The more basic problem for Local 705 is that this affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." [3] Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765. [*16] In the case at bar, the alleged racial harassment culminated in Jackson's termination. From that moment on, the Faragher-Ellerth defense was never available to Local 705. [4] See Molnar v. Booth, 229 F.3d 593, 600 (7th Cir. 2000) (squarely holding that this defense was not available because harassment culminated in tangible employment action).

> [3] For an explanation of the rationale behind this principle, see infra note 15.
> [4] The court therefore denies as moot Jackson's motion to strike the sections of Local 705's reply memorandum that discuss the Faragher-Ellerth defense.

### 2. Discriminatory Discharge

The court also rejects Local 705's motion for summary judgment on the termination claim. Local 705 contends that Jackson does not have direct evidence of discriminatory discharge because several alleged statements by Zero, who Local 705 concedes was the decision-maker regarding Jackson's discharge, are not sufficiently linked to Jackson's termination. See, e.g., McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686-87 (7th Cir. 1991) [*17] (requiring that racially-motivated remarks be "related to the employment decision in question"). Notably absent from Local 705's list of statements attributed to Zero is the following:

> Rev Jackson is the next to go. We'll get rid of that nigger. He can kiss all the ass he wants. We're going to use and abuse him and get everything we can out of him. Then we're going to get rid of him. I have no use for niggers.

(Pl.'s Ex. 6, P 8.) According to Mary Mariani, Zero made this statement in the presence of Pressler and McCormick in July or August of 1994. Jackson was terminated on September 23, 1994. It is hard to imagine more direct evidence of discriminatory discharge.

The defendants object to the Mariani affidavit on two

grounds, neither of which withstands scrutiny. First, the defendants note that "Mariani's statement fails to identify where [the] conversation occurred, where affiant Mariani was in relation to Zero, Pressler and McCormick, and whether anything else was said." (Defs.' Mot. to Strike at 8.) The result of these deficiencies, the defendants urge, is inadmissible for lack of an adequate foundation. See [*18] Jones v. Fed. Home Loan Mortgage Corp., 1999 U.S. Dist. LEXIS 20787, at *19, No. 93 C 5448 (N.D. Ill. Jan. 3, 2000) ("A proper foundation for a conversation must include information as to when and where the conversation occurred, who was present, and who said what to whom."). It is true that to establish a genuine issue of material fact the nonmovant on summary judgment must produce admissible evidence. See Winskunas v. Birnbaum, 23 F.3d 1264, 1267-68 (7th Cir. 1994). But recent Seventh Circuit case law makes clear that

> no rule of evidence requires a "foundation"; "foundation" is simply a loose term for preliminary questions designed to establish that evidence is admissible. At trial, it is sometimes considered an orderly procedure to produce testimony that a conversation occurred at a particular time and place and between the witness and someone else before the witness is permitted to testify to the conversation's content. The Federal Rules of Evidence provide that relevant evidence is generally admissible, and McPherson does not contend that Holsworth's testimony is irrelevant. We find no reason -- relevance or otherwise -- why the testimony should be excluded. Though Holsworth's testimony [*19] regarding the identity of the A.I. Credit representative and the date of the conversation was inexact, it was specific enough to demonstrate the conversation's occurrence and relevance.

A.I. Credit Corp. v. Legion Ins. Co., 265 F.3d 630, 637-38 (7th Cir. 2001) (citations omitted). By like token, the information provided in Mariani's affidavit is specific enough to establish relevance. See Fed. R. Evid. 401 (evidence is relevant if it bears on the existence of any fact of consequence to the determination of the action). Mariani identifies the parties to the conversation, a

two-month period in which the conversation took place, the speaker, and an exact quotation of what was said. Omitting the location, like failing to pinpoint the speaker and date in *A.I. Credit*, does not render the statement inadmissible. The defendants cite no authority in support of the proposition that an affiant must describe her relative position in order to establish a foundation for what she claims to have seen and heard. Nor do the defendants explain the relevance of "whether anything else was said," let alone why this omission should render Mariani's statement inadmissible.

[*20] The defendants' second objection is that Jackson should be barred from introducing Mariani's statement because he did not specifically disclose it in response to an interrogatory. On January 14, 1999, the defendants served an interrogatory asking Jackson to identify the date of and witness to each racial epithet and demeaning language allegedly used by Zero. Jackson objected to this interrogatory for several reasons, including its implicit presumption that Jackson had personal knowledge concerning each of Zero's racist statements. Without waiving this objection, Jackson directed the defendants to a list of witnesses including Mariani. Nothing in Mariani's affidavit or elsewhere in the summary judgment record suggests that Jackson was present when the alleged conversation took place. This court will not prohibit Jackson from introducing evidence that he failed to include in an answer to an interrogatory because it was not within his personal knowledge. Indeed, such an answer itself would have been improper. *See Bank of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1166 (7th Cir. 1996)* ("Sworn interrogatory answers may be considered in conjunction with [*21] summary judgment motion only if the person answering the interrogatory had personal knowledge or was competent to testify as to the matters stated.").

3. *Retaliation*

Absent direct evidence of retaliation, a plaintiff "must show that (1) he engaged in activity protected under Title VII; (2) he suffered an adverse employment action; and (3) a causal connection exists between the adverse action and his participation in the protected activity." *Hill v. Am. Gen. Fin., Inc., 218 F.3d 639, 645 (7th Cir. 2000)*. Local 705 wisely concedes the first element--in addition to filing his EEOC charge, Jackson demonstrated publicly and complained to the national union--but argues that Jackson has failed to establish a

dispute of fact on the second and third. The adverse employment action cited by Jackson is the failure of Joint Council 25 to turn the chaplaincy held by him into a full-time paid position. Denial of a raise and denial of a promotion each constitutes an adverse employment action. *See Hunt v. City of Markham, 219 F.3d 649, 654-55 (7th Cir. 2000)* (raise); *Ribando v. United Airlines, Inc., 200 F.3d 507, 511 (7th Cir. 1999)* (promotion). [*22]

Local 705's most serious arguments are directed toward causation. William Hogan, the presiding officer of Teamsters Joint Council 25, states in an affidavit that he was unable to achieve his goal of making the chaplaincy a full-time paying position due to the hostility and opposition of Zero and McCormick. (Pl.'s Ex. 23, P 65.) Local 705 argues that this paragraph must be stricken for lack of foundation. This argument fails. The rest of Hogan's affidavit, even omitting the other paragraphs to which Local 705 objects, and reasonable inferences drawn therefrom establish a sufficient foundation for this statement. On the hostility point, Hogan describes a Joint Council 25 meeting in which Zero and McCormick made clear their opposition to Jackson and their retaliatory motives. (*Id.* PP 62, 63) Zero's behavior was so disruptive that the meeting was relocated out of the Local 705 hall. (*Id.* PP 31-51.) From Hogan's statement that he had the authority to create the chaplain position, (*id.* P 18), Local 705 would have the court infer that Hogan could unilaterally add full-time status and a salary. But this inference is belied by Hogan's statement that he "began to take the political [*23] steps necessary to make the position a full-time paying position." (*Id.* P 26.) It is true that Hogan does not outline those steps nor explain why he believes that Zero's and McCormick's retaliatory opposition to Jackson was critical to the chaplaincy remaining part-time and unpaid, but Hogan was well-positioned to form such a belief as a witness to the aborted meeting, as the chief proponent of the raise and promotion, and as the presiding officer of Joint Council 25. No more foundation is required.

As a fallback, Local 705 argues that Hogan's "goal" of making the chaplaincy a paid position is too speculative to support the conclusion that Jackson suffered an adverse employment action. The goal was not so speculative as Local 705 makes out. Hogan states that he intended "within a short period of time" to make the position full-time and paid. (*Id.* P 20.) Hogan may have required approval from other decision-makers (perhaps

even Zero and McCormick) in order to execute his plan, but it is reasonable to suppose that, as the presiding officer of the organization, Hogan's proposals had a decent chance of being adopted. Jackson has alleged more than his own belief in the possibility [*24] of securing the raise and promotion. *Cf. Aquilino v. Univ. of Kansas, 268 F.3d 930, 936 (10th Cir. 2001)* ("[The plaintiff]'s alternative-career-path theory rests on little more than her own, untested belief . . . ."). The presiding officer of the relevant decision-making body says that Jackson suffered an adverse employment action as a result of Zero's and McCormick's retaliatory opposition. This creates a genuine dispute of fact.

Despite his termination, Jackson remained a member of Local 705 until May 30, 1995. Jackson alleges retaliatory interference with his rights as a union member--specifically, his right to participate and speak as a chaplain at the March 14, 1995 meeting of Joint Council 25 (described above) and at a May 1995 meeting of the Local 705 retirees club. [5] After his termination from Local 705, Jackson served as an unpaid chaplain for three entities: Joint Council 25, the Local 705 retirees club, and the Teamsters Black Caucus. (Defs.' Rule 56.1(a)(3) Statement P 159.) Even assuming that these unpaid positions qualified as employment for purposes of Title VII, Jackson has not produced evidence to show that the interference by Local 705's agents, [*25] apart from the alleged impact on Jackson's promotion and raise prospects, materially affected the "terms or conditions" of his employment. *King v. Bd. of Regents of Univ. of Wisconsin Sys., 898 F.2d 533, 537 (7th Cir. 1990).* It is undisputed that Jackson was never terminated from these positions. (Defs.' Rule 56.1(a)(3) Statement P 159.) Jackson provides no evidence to show that he was unable to participate in the March Joint Council meeting. In fact, the meeting was moved to an alternate venue as a result of Zero's disruptive behavior. On the other hand, it is undisputed for summary judgment purposes that McCormick excluded Jackson from the May retirees club meeting for retaliatory reasons. (Pl.'s Rule 56.1(b)(3) Statement PP 355, 356.) The question is whether this one-time exclusion constituted an "adverse employment action" for Title VII purposes. Systematic exclusion from meetings can meet this standard, *Johnson v. City of Fort Wayne, 91 F.3d 922, 932-33 (7th Cir. 1996),* but the exclusion here from just one meeting cannot be said to have materially altered the terms or conditions of Jackson's chaplaincy. The court therefore grants summary judgment [*26] in favor of Local 705 on this theory of

recovery.

> 5   Because Jackson seeks recovery only under federal law, the court expresses no view as to whether he might have a claim for retaliation under the International Brotherhood of Teamsters Constitution.

B. Count III: *Section 1981* Claims Against All Defendants [6]

> 6   The careful reader will notice that the analysis skips from Count I to Count III. This is because Jackson voluntarily withdraws Count II, his ADEA claims.

The defendants argue that Jackson cannot bring a claim under *42 U.S.C. § 1981* because he was an at-will employee of Local 705. *Section 1981(a)* provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." [*27] *See also id. § 1981(b)* (defining the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"). Because an employer is generally free to terminate an at-will employee for any reason or no reason at all, the argument goes, an at-will relationship is not really a contract with respect to duration. Dicta in one opinion suggests that the Seventh Circuit might accept this argument. *See Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1035 (7th Cir. 1998).* As a preliminary matter, it is worth noting that the *Gonzales* dicta applies only to Jackson's termination claim, not to his claims of harassment and retaliation. But the problem for the defendants is more fundamental.

This court does not believe that the Seventh Circuit would adopt the *Gonzales* dicta if squarely presented with the question of whether termination of an at-will employment relationship can support a *section 1981* claim. Every other court of appeals to consider the question has come out the other way. *See Skinner v. Maritz, Inc., 253 F.3d 337, 342 (8th Cir. 2001);* [*28] *Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 262-63 (2d Cir. 2000); Perry v. Woodward, 199 F.3d 1126, 1133 (10th Cir. 1999); Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-19 (4th Cir. 1999); Fadeyi v. Planned Parenthood Ass'n, 160 F.3d 1048, 1051-52 (5th Cir.*

1998); cf. Haddle v. Garrison, 525 U.S. 121, 126, 142 L. Ed. 2d 502, 119 S. Ct. 489 (1998) (concluding that an at-will employee may sue under 42 U.S.C. § 1985(2) for tortious interference with employment relationships). One of the most thoughtful and complete explanations applying Illinois law appears in Riad v. 520 South Michigan Avenue Associates, 78 F. Supp. 2d 748, 754-57 (N.D. Ill. 1999). This court wholly agrees with and adopts that analysis. Suffice it to say that Illinois law does not permit the termination of an at-will employee for a reason that violates public policy. Palmateer v. Int'l Harvester Co., 85 Ill. 2d 124, 421 N.E.2d 876, 878, 52 Ill. Dec. 13 (Ill. 1981). Jackson's at-will employment status does not bar his section 1981 discriminatory termination claim.

[*29] The defendants note that the same standards which govern liability under Title VII also apply to section 1981 claims and therefore reassert their Count I arguments as to each claim under Count III. For the reasons outlined above, these arguments are once again rejected.

Defendants McCormick and Pressler argue that judgment must be entered in their favor on the termination claim because Zero alone had the authority to fire Jackson. They claim that their participation in the decision was limited to recommending Jackson's termination five months before it happened. (Rule 56.1(a)(3) Statement PP 92, 93, 109, 110.) It is true that "personal liability under section 1981 must be predicated on the actor's personal involvement." Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991). However, "the element of personal involvement may be satisfied by proof that a supervisor had knowledge of the alleged acts of discrimination and failed to remedy or prevent them." Amin v. Quad/Graphics, Inc., 929 F. Supp. 73, 78 (N.D.N.Y. 1996). Here, Jackson produces evidence to show that both McCormick and Pressler held supervisory positions and were present when [*30] Zero stated that he was going to "get rid of that nigger," referring to Jackson. (Pl.'s Ex. 6, P 8.) The court has already rejected Local 705's objection to this evidence, which, if believed, is sufficient to establish McCormick's and Pressler's personal liability for Jackson's termination. See Amin, 929 F. Supp. at 78-79 (holding that "evidence that defendants . . . possessed the requisite knowledge and failed to act in response" defeated their summary judgment motion); see also Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985) (supervisor's knowledge and failure to take any preventive action constituted sufficient

personal involvement to support personal liability under section 1983).

Next, Pressler argues that there is insufficient evidence to support the racial harassment claim against her. Statute of limitations and evidentiary objections aside, the court agrees that Pressler's single racist remark overheard by Jackson, which was not directed toward him, is inadequate to create a genuine question of fact and therefore enters judgment in her favor on this claim. That she may have used the word "nigger" out of Jackson's presence is of little relevance. [*31] Pressler makes the same argument with respect to Jackson's retaliation claim. Jackson does not respond to this argument and the court sees no record evidence of Pressler's participation in the retaliation, so Pressler's motion for summary judgment on this claim is granted.

C. Counts IV and VII: Defamation Claims Against All Defendants

Local 705 argues that this court cannot exercise supplemental jurisdiction over Jackson's defamation (Count IV) and derivative respondeat superior (Count VII) claims because they do not derive from the same nucleus of operative fact as his federal claims. District courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). "The state and federal claims must derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966). "A loose factual connection between the claims is generally sufficient." Ammerman v. Sween, 54 F.3d 423, 424 (7th Cir. 1995).

Jackson alleges [*32] two types of per se defamation: (1) "words which impute inability to perform or want of integrity in the discharge of duties of office or employment"; and (2) "words which prejudice a particular party in his profession." Pease v. Int'l Union of Operating Eng'rs Local 150, 208 Ill. App. 3d 863, 567 N.E.2d 614, 618-19, 153 Ill. Dec. 656 (Ill. App. Ct. 1991). The only statements mentioned in the complaint that appear to fall into these categories are accusations of financial malpractice and expense account irregularities. (Compl. PP 47, 48.) After Local 705 raised statute of limitations problems with respect to these statements, Jackson shifted the focus of his defamation claim to post-termination statements by Zero and McCormick that

Jackson is not really a man of the cloth.

Local 705 asserts that there is no factual nexus between these statements and Jackson's federal claims. This assertion is false. In his deposition, Jackson claimed that Zero and McCormick told Joint Council members that Jackson was not a minister on March 14, 1995. (Defs.' Ex. J, at 525:4-6.) As described above, Hogan's affidavit alleging that Zero's and McCormick's opposition to Jackson was [*33] critical in preventing conversion of the chaplaincy into a full-time, paid position also centers on the events of March 14, 1995. A jury could reasonably infer that the allegedly defamatory statements played a role in causing the putative adverse employment action. The common nucleus of operative fact for Jackson's defamation and retaliation claims is Zero's and McCormick's statements to the Joint Council on March 14, 1995.

The real problem for Jackson on this defamation theory is the statute of limitations. Jackson filed his first amended complaint adding a defamation count on May 15, 1996. Illinois law provides a one-year statute of limitations for defamation actions. *735 ILCS 5/13-201.* Thus, statements made in March of 1995 cannot form the basis of a timely defamation claim. Jackson's testimony that Zero told "certain persons" that Jackson was not a minister is insufficient to support a timely claim because the date is not specified. *See Colucci v. Chicago Crime Comm'n, 31 Ill. App. 3d 802, 334 N.E.2d 461, 466 (Ill. App. Ct. 1975)* (where statute of limitations is involved, plaintiff must prove that statements were made on a precise date). To the extent Jackson's [*34] defamation claim is grounded in these statements, judgment in favor of the defendants is entered.

Jackson also alleges that Zero admitted in his deposition that he continues to tell people that Jackson is not a minister, but such an admission does not appear in the testimony Jackson cites. (Defs.' Ex. J, at 53:16 to 56:16.) In addition, Jackson cannot rely on statements made by Zero during his deposition because these statements were relevant to the proceedings and are therefore absolutely privileged under Illinois law. *See Defend v. Lascelles, 149 Ill. App. 3d 630, 500 N.E.2d 712, 718, 102 Ill. Dec. 819 (Ill. App. Ct. 1986).* This court enters judgment in favor of defendants on these two defamation sub-claims.

Jackson points to additional defamatory statements, but there is no common date, audience, or any other factual link between these statements and the failure of Joint Council 25 to turn Jackson's chaplaincy into a full-time, paid position. Without such a common nucleus of operative fact, the court is without jurisdiction to entertain this state law claim. Pat Matarrese, head of the Local 705 retirees group, asserts that McCormick told him on at least three [*35] occasions on or after May 17, 1995 that Jackson was not a reverend or minister. (Pl.'s Ex. 24, PP 12, 13. [7]) Even assuming that a defamation claim based on these statements would be timely, *but cf. Colucci, 334 N.E.2d at 466* (where statute of limitations is involved, alleging publication "on or about" or "subsequent to" a specific date, without accompanying details or information, is not enough), Jackson does not suggest that Matarrese was in a position to affect Joint Council 25's decision on the planned raise and promotion. Jackson's defamation claim grounded in these statements is dismissed for lack of jurisdiction. To the extent defamation is the foundation for Jackson's respondeat superior claims (Count VII), those claims are dismissed or judgment is entered in favor of Local 705, as appropriate.

[7]   In light of the court's disposition, *see infra,* Local 705's objection to paragraph 13 is denied as moot.

C. Counts VI and VII: Assault Claims Against All Defendants [8]

[8]   For ease of exposition, the court will discuss Jackson's IIED claim (Count V) later. *See infra* Section II(D).

[*36] The two alleged instances of assault took place on January 28, 1995 and March 14, 1995. Local 705 contends that neither assault claim shares a common nucleus of fact with Jackson's federal claims and that this court therefore lacks jurisdiction over the assault claims. As noted above, Zero's and McCormick's behavior at the March 14, 1995 Joint Council meeting is near the core of Jackson's federal retaliation claim. According to Jackson, the very same statements and threats constituted assault. This court clearly has supplemental jurisdiction over the assault claim arising from the Joint Council meeting. In proving that Jackson's "fear of imminent peril" on March 14 was "well-founded," *Parrish v. Donahue, 110 Ill. App. 3d 1081, 443 N.E.2d 786, 788, 66 Ill. Dec. 860 (Ill. App. Ct. 1982),* he will almost certainly want to introduce evidence relating to defendants' previous threatening behavior toward him. By similar token, the hostility

shown by the defendants toward Jackson on January 28 may help substantiate his claim that the opposition expressed to the Joint Council on March 14 was so intense as to effectively thwart Hogan's plan to turn the chaplaincy into a full-time, [*37] paid position. Causation here is essential to Jackson's federal retaliation claim. This is an admittedly loose nexus of fact, but it suffices to establish supplemental jurisdiction over the January 28 assault as well.

Local 705 next attacks Jackson's assault claims on the merits, arguing that he has failed to produce enough evidence to support a critical element of these claims. Illinois law defines a civil assault as "an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." 443 N.E.2d at 788. Local 705 asserts that "mere words do not create a well-founded fear of imminent peril." (Local 705 Mem. at 73.) However, at least one of the sources cited by Local 705 to support this assertion directly contradicts it:

> Even apart from such cases where the words indicate the intent of an act, there may be other situations in which the words themselves, without any accompanying gesture, are sufficient under the circumstances to arouse a reasonable apprehension of imminent bodily contact. Words [*38] are never spoken in a vacuum, and they cannot be utterly divorced from past conduct, or from the accompanying circumstances.

*Restatement (Second) of Torts § 31, cmt. d; see also Merheb v. Illinois State Toll Highway Auth., 267 F.3d 710, 714 (7th Cir. 2001)* ("An assault requires words, *ordinarily* accompanied by a menacing gesture (such as pointing a gun at the plaintiff), that make the plaintiff fear an imminent attack.") (emphasis added); *People v. Floyd, 278 Ill. App. 3d 568, 663 N.E.2d 74, 76, 215 Ill. Dec. 324 (Ill. App. Ct. 1996)* ("In Illinois, we have held that words alone are not *usually* enough to constitute an assault.") (emphasis added). [9] Words alone can sometimes suffice, even without an accompanying threatening gesture. *See People v. Rynberk, 92 Ill. App. 3d 112, 415 N.E.2d 1087, 1090, 47 Ill. Dec. 774 (Ill. App. Ct. 1980)* (discussed *infra*).

[9] Local 705 avoids the critical word "usually" by quoting instead another court's mischaracterization of *Floyd* as "noting that words alone are not enough to constitute assault." *Merheb v. Illinois State Toll Highway Auth., 2000 U.S. Dist. LEXIS 1667,* at *39, No. 98 C 3190 (N.D. Ill. Feb. 10, 2000). Counsel for Local 705 either did not read *Floyd* or intentionally tried to conceal what the case actually said about the relevant point of law. In any event, *Merheb* is distinguishable because the threat of violence there was not even made directly to the claimant. *Id.* at *8-9, *38-39.

[*39] The critical question is whether the totality of the admissible evidence--words, past conduct, and surrounding circumstances--can support "a well-founded fear of imminent peril" during each alleged instance of assault. Jackson withdraws his assault claim against Pressler so the focus is on Zero and McCormick. In his deposition, Jackson stated that on January 28, 1995, while he was protesting outside the Local 705 hall, Zero "came out of the union hall and told me if I put that megaphone to my mouth one more time, what he was going to do to my 'black ass' and everything." (Defs.' Ex. J., at 448:13-16.) "He told me if I stick my mouth up to that horn again, he was going to ram it down my so-and-so throat." (*Id.* at 451:6-8.) At the same time, Zero also said that he should have a "necktie" (i.e., lynching) party for Jackson. (*Id.* at 555:20 to 556:3.) It is undisputed that Jackson was fearful that Zero would follow through on the threat to cram the megaphone down his throat. (Rule 56.1(b)(3) Statement P 341.) During this exchange, McCormick was 15 to 20 feet away and laughed. In this instance, laughing could not have generated a reasonable fear of imminent peril from McCormick [*40] or have suggested that he and Zero were acting in concert, [10] so he is entitled to judgment in his favor on this claim.

> [10] A known assassin's sinister cackle moments after making an explicit murder threat would be a different story. *See Restatement (Second) of Torts § 31, illus. 4.*

With respect to Zero, there is additional evidence that bears on the objective reasonableness of Jackson's fears. Zero and McCormick carried around a picture of a black man's hanging, which Jackson found to be threatening. (*Id.* P 343.) When Zero showed Jackson a

picture with a black person being hung and said "if all of them was like that, they wouldn't have to go back to Africa," Jackson considered the combination of words and actions as a threat. (*Id. P 344*.) Jackson also considered personally threatening Zero's and McCormick's statements concerning the Emmett Till case that if they shot or hung black men they wouldn't be whistling at white women. (*Id. P 345*.) In addition to these directly threatening actions and [*41] statements, Jackson claims that Zero regularly made derogatory comments to African-Americans. (Rule 56.1(a)(3) Statement P 120.) Jackson was 65 years old at the time, is 5 feet 7 inches tall, and weighs 195 pounds; Zero is over 6 feet tall and weighs over 250 pounds. [11] (Rule 56.1(b)(3) Statement P 351, 352.)

> [11] Other evidence proffered by Jackson on this point is inadmissible. At one point in his deposition, Jackson suggested that Zero had threatened to kill him, but offered no details as to date or time. (Ex. J, at 230:22 to 231:1.) The court grants Local 705's motion to strike this testimony. Without establishing that this alleged threat occurred prior to January 28, 1995 or March 14, 1995, it has no relevance on Jackson's assault claims. Because it is similarly irrelevant, the court strikes the portion of Jackson's deposition transcript discussing his fear and discomfort with having Zero in attendance. (*Id.* at 229:10 to 239:23.)

Against this backdrop, a jury could reasonably conclude that Jackson had [*42] a well-founded fear of imminent harm. This case is not too far removed from *People v. Rynberk, 415 N.E.2d at 1090*, where a six-foot, 240-pound male defendant advanced to within a foot of the victim and threatened to "beat her head in," which caused her to believe he was going to strike her, especially in light of her prior involvement in litigation against him. The Illinois Appellate Court affirmed the defendant's conviction for assault. On the relevant element, the distinction between criminal and civil assault is not substantial. *Compare 720 ILCS 5/12-1* ("reasonable apprehension of receiving a battery"), *with Parrish, 443 N.E.2d at 788* ("well-founded fear of imminent peril"). As in *Rynberk*, here the aggressor's only movement was to approach the victim, the aggressor was physically dominant, the verbal threat was direct, there was a history of conflict, and the victim believed that the aggressor would actually carry out the threat. Granted, the victim in

*Rynberk* was a woman in a wheelchair, but there was no evidence that the defendant had previously made direct threats to her. In contrast, Zero's prior threatening statements could reasonably [*43] contribute to Jackson's fears. Although the absence of any evidence that Zero took concrete steps toward carrying through on his threat makes it a close question, the court finds that Jackson has established a genuine issue of material fact as to the reasonableness of his apprehension on January 28, 1995.

The March assault claim is stronger. At the Joint Council meeting, Zero threatened to throw Jackson's "black ass through the window," and Jackson feared that he would make good on the threat. (Rule 56.1(b)(3) Statement PP 303, 340.) An additional factor supporting the reasonableness of this fear is Zero's threatening behavior on January 28. Also, Dennis McNamara, a witness to the incident, has averred that Zero was very angry when he made the threat, that based on his observation of Zero's statements and physical state that he would make good on the threat, and that he was concerned for Jackson's safety. (*Id. PP 335, 336, 338, 339*.) Summary judgment in favor of Zero on this claim is denied. On the other hand, Jackson could not even recall in his deposition whether McCormick was present at the meeting. (Pl.'s Ex. 1, at 461:2-7.) There is no evidence that McCormick assisted in [*44] Zero's assault or that Jackson feared an imminent attack from McCormick. Judgment is entered in favor of McCormick.

Local 705 contends that it cannot be held vicariously liable for Zero's alleged assaults. The theory is that Zero was not acting within the scope of his employment or in furtherance of his employer's interests. *See Rubin v. Yellow Cab Co., 154 Ill. App. 3d 336, 507 N.E.2d 114, 115, 107 Ill. Dec. 450 (Ill. App. Ct. 1987)*. Although it is a close question, the argument fails. "Under Illinois law, the conduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the master." *Duffy v. United States, 966 F.2d 307, 314 (7th Cir. 1992)*. First, as a high officer of Local 705, it is reasonable to suppose that Zero had authority to maintain its reputation. Asking a former employee to refrain from demonstrating publicly outside the union hall is the type of thing one might expect from a union leader. The evidence strongly suggests that Zero had authority [*45]

over the union hall itself, so it was entirely foreseeable that he might ask an individual to leave the premises. Second, both alleged assaults occurred in or near the Local 705 hall. Finally, it is plausible to think that stopping a public display of disapproval and excluding a disgruntled former employee from the union hall would serve Local 705's interests.

The fact that Zero's actions may have escalated beyond the bounds of what could reasonably serve Local 705's interests does not foreclose the possibility of vicarious liability. See Metzler v. Layton, 373 Ill. 88, 25 N.E.2d 60, 62 (Ill. 1939) ("The master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act.") (quoting Gulf, Colorado & Sante Fe Ry. Co. v. Cobb, 45 S.W.2d 323, 325 (Tex. Ct. Civ. App. 1931)). Illinois courts have held that the employer may be liable where the employee acts [*46] with the dual purpose of furthering the employer's interests and venting personal anger. Gregor v. Kleiser, 111 Ill. App. 3d 333, 443 N.E.2d 1162, 1166, 67 Ill. Dec. 38 (Ill. App. Ct. 1982). "It is sufficient if [the employee's] actions were prompted only in part by a purpose to protect [the employer's] property or further the employer's business." Bryant v. Livigni, 250 Ill. App. 3d 303, 619 N.E.2d 550, 559, 188 Ill. Dec. 925 (Ill. App. Ct. 1993). Local 705's motion for summary judgment on the respondeat superior assault claims is denied.

D. Counts V and VII: Intentional Infliction of Emotional Distress Claims Against All Defendants

Local 705 argues that Jackson's intentional infliction of emotional distress claim is preempted by the Illinois Human Rights Act (the "IHRA"), 775 ILCS 5/8-111(C). 12 Whether a common law claim is so displaced "depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." Maksimovic v. Tsogalis, 177 Ill. 2d 511, 687 N.E.2d 21, 23, 227 Ill. Dec. 98 (Ill. 1997). Contrary to the [*47] position taken by Local 705 and some courts in this district, 13 it does not matter that the conduct giving rise to the tort claim could also support an IHRA claim. The IHRA was not intended to preempt all tort claims arising

out of actions it prohibits. Id. 687 N.E.2d at 24. Rather, the critical question is whether the plaintiff can "establish the necessary elements of the tort independent of any legal duties created by the [IHRA]." Id. (emphasis added); accord Luttrell v. O'Connor Chevrolet, Inc., 2001 U.S. Dist. LEXIS 14651, at *7-8, No. 01 C 979 (N.D. Ill. Sept. 18, 2001).

12 In its reply brief, Local 705 for the first time attempts to expand this argument to include Jackson's other state law claims. This attempted expansion arguably comes too late. See Wilson v. O'Leary, 895 F.2d 378, 384 (7th Cir. 1990) (argument not raised until reply brief is waived). But even if this argument goes to subject matter jurisdiction, the court would reject it with respect to the assault claims as well. See Maksimovic v. Tsogalis, 177 Ill. 2d 511, 687 N.E.2d 21, 22, 227 Ill. Dec. 98 (Ill. 1997) (holding that common law assault claim was not preempted by the IHRA).

[*48]

13 See, e.g., Averhart v. Cook County Corr. Dep't, 2002 U.S. Dist. LEXIS 1414, at *12, No. 01 C 5569, (D. Ill. Jan. 28, 2002) (holding IIED claim preempted by the IHRA because "that claim is based on the same acts that form the basis of plaintiff's racial harassment and retaliation claims"); Haywood v. Lucent Techs. Inc., 169 F. Supp. 2d 890, 914 (N.D. Ill. 2001) ("[Plaintiff] concedes that her IIED claim is based on the same conduct underlying her discrimination claim; therefore, her IIED claim clearly is 'inextricably linked' to her federal claims, and it is preempted by the IHRA.").

In Illinois, a plaintiff establishes a claim for intentional infliction of emotional distress by showing that: (1) the conduct involved was "truly extreme and outrageous," (2) the defendant either intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and (3) the conduct in fact caused severe emotional distress. McGrath v. Fahey, 126 Ill. 2d 78, 533 N.E.2d 806, 809, 127 Ill. Dec. 724 (Ill. 1988). [*49] "The extreme and outrageous character of the conduct can arise from the abuse of a position of power." Doe v. Calumet City, 161 Ill. 2d 374, 641 N.E.2d 498, 507, 204 Ill. Dec. 274 (Ill. 1994). An employer's abuse of authority over an employer can qualify. Milton v. Illinois Bell Tel. Co., 101 Ill. App. 75, 427 N.E.2d 829, 832, 56 Ill. Dec. 497

*(Ill. App. Ct. 1981); see also Pavilon v. Kaferly, 204 Ill. App. 3d 235, 561 N.E.2d 1245, 1251, 149 Ill. Dec. 549 (Ill. App. Ct. 1990)* (finding sexual harassment by employer to be extreme and outrageous). The particular sensitivity of the plaintiff is also a relevant factor. *See McGrath, 533 N.E.2d at 811* ("Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress.").

If Jackson can show that the alleged conduct is extreme and outrageous (more on that later), it will be because it was a racist and sometimes threatening abuse of supervisory power directed toward an individual known by all to be especially sensitive to this [*50] type of conduct, not because it may also have violated the IHRA. *See generally Benitez v. KFC Nat'l Mgmt. Co., 305 Ill. App. 3d 1027, 714 N.E.2d 1002, 1009, 239 Ill. Dec. 705 (Ill. App. Ct. 1999)* ("Since the elements of [IIED] are quite different from those necessary to establish a civil rights violation under the [IHRA], the [IHRA] does not preempt such a cause of action.") (internal quotation marks and citations omitted). Repeatedly calling a black employee a "nigger" was offensive long before the Illinois legislature banned racial harassment in the workplace. *Cf. Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)* ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (citation omitted); *Pavilon, 561 N.E.2d at 1251* (finding sexual harassment by employer to be "extreme and outrageous"). But even if racist comments of this type were not considered outrageous before the passage of the IHRA, Jackson's IIED claim still would survive. [*51] A jury could reasonably conclude that Zero's implied and direct threats of physical harm were extreme and outrageous quite apart from their racial content. *Cf. Krocka v. City of Chicago, 203 F.3d 507, 517 (7th Cir. 2000)* (finding IIED claim preempted by IHRA because comments "were only offensive to the extent that they referred to [plaintiff]'s disability").

Next, Local 705 attacks the IIED claim on its merits, arguing that the alleged conduct was not "truly extreme and outrageous." In support of this argument, Local 705 offers two erroneous propositions of law. First, Local 705 asserts that there is a heightened standard of

outrageousness in the employment context. One of the cases cited by Local 705 directly contradicts this assertion, at least with respect to a superior's conduct. In *Piech v. Arthur Andersen & Co., 841 F. Supp. 825, 831 (N.D. Ill. 1994)*, the court, citing *McGrath*, recognized that "when, as here, the defendant has some degree of power over the plaintiff, the severity of the conduct that plaintiff need allege decreases as the defendant's level of control increases." Most of the other cases cited by Local 705 merely recognize [*52] that conflicts in the workplace are inevitable and that most do not rise to the level of "extreme and outrageous." *See Oates v. Discovery Zone, 116 F.3d 1161, 1174 (7th Cir. 1997)* [14]; *Harris v. First Fed. Sav. & Loan Ass'n, 129 Ill. App. 3d 978, 473 N.E.2d 457, 459, 85 Ill. Dec. 89 (Ill. App. Ct. 1984)*; *Heying v. Simonaitis, 126 Ill. App. 3d 157, 466 N.E.2d 1137, 1144, 81 Ill. Dec. 335 (Ill. App. Ct. 1984)*. The only case cited by Local 705 that provides any support for a higher standard is *Pudil v. Smart Buy, Inc., 607 F. Supp. 440, 444 (N.D. Ill. 1985)*. However, the *Pudil* decision preceded *McGrath* and *Doe*, in which the Illinois Supreme Court made clear that a power disparity, like an employer-employee relationship, *lowers* the required level of outrageousness. *See Doe, 641 N.E.2d at 507; McGrath, 533 N.E.2d at 810*.

14 The court once again feels compelled to comment on Local 705's questionable use of precedent. Local 705 quotes the following language from *Oates*: "the circumstances surrounding a typical employment dispute usually do not rise to the level of extreme and outrageous conduct." (Local 705 Mem. at 67.) How this statement supports the proposition that a higher standard applies in the employment context is a mystery. But this error in logic is forgivable. What is less easily forgiven stems from Local 705's omission of the word "accordingly" from the beginning of the quoted sentence. *Oates, 116 F.3d at 1174*. The preceding sentence states the general standard for outrageousness. *Id.* In context, it is clear that the Seventh Circuit applied the general standard, *not* a higher one.

[*53] Local 705's second erroneous legal argument is that, as a matter of law, racial slurs fail to rise to the level of truly extreme and outrageous conduct. The cases relied upon by Local 705 do not support this position. In *Irving v. J.L. Marsh, Inc., 46 Ill. App. 3d 162, 360 N.E.2d 983, 985-86, 4 Ill. Dec. 720 (Ill. App. Ct. 1977)*, the court,

in what it described as a "difficult issue" to resolve, held that a store clerk's isolated act of writing "arrogant nigger" on a return slip was not sufficiently outrageous to support an IIED claim. The *Irving* court did not suggest that multiple racial slurs could never qualify. Nor did the court in *Briggs v. N. Shore Sanitary Dist., 914 F. Supp. 245, 252 (N.D. Ill. 1996)*, make any such sweeping generalization. But whatever the *Irving* and *Briggs* courts may have said, a categorical approach of the kind urged by Local 705 cannot be reconciled with the Illinois Supreme Court's clear statement that "the outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case." *McGrath, 533 N.E.2d at 811.*

The question [*54] is "whether the distress inflicted is so severe that no reasonable man could be expected to endure it." *McGrath, 533 N.E.2d at 809* (quoting *Restatement (Second) of Torts § 46, cmt. j (1965)).* Jackson claims to have heard Zero and McCormick use the word "nigger" and other racially derogatory terms on several occasions. (Rule 56.1(a)(3) Statement PP 120-136.) It is undisputed for summary judgment purposes that Zero and McCormick talked about lynching (or having "necktie parties" for) Jackson. (Rule 56.1(b)(3) Statement PP 16, 17.) And, as noted above, a jury could reasonably conclude on the evidence presented that Zero's behavior on two occasions was so extreme as to constitute assault. The threat of physical harm distinguishes this case from those in which racial slurs have been held insufficient to support an IIED claim. *Cf. Harris, 473 N.E.2d at 459.* Other factors weighing in favor of outrageousness here also include the abuse of supervisory authority, the duration of the offensive conduct, and Jackson's special sensitivity to racial threats as an older black man. This is much more than a typical employment dispute or even an average case of [*55] racial harassment. Jackson's evidence goes well beyond "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *McGrath, 533 N.E.2d at 809* (quoting *Restatement (Second) of Torts § 46, cmt. d).* The court cannot conclude as a matter of law that a reasonable man could be expected to endure the defendants' conduct.

Local 705 argues that it cannot be held vicariously liable on the IIED claim because the individual defendants were not acting in furtherance of Local 705's interests. To the extent that the IIED claim rests on the same conduct that underlies the assault claims, the court

rejects Local 705's argument for the reasons outlined above. The other instances of racial harassment arguably stand on a different footing. Under current Illinois law, an employer can be vicariously liable for the tortious conduct of his employee only if the employee was acting within the scope of his employment. [15] *Wright v. City of Danville, 174 Ill. 2d 391, 675 N.E.2d 110, 118, 221 Ill. Dec. 203 (Ill. 1996).* This, in turn, requires that the employee's conduct be "actuated, at least in part, by a purpose to serve the master." *Duffy, 966 F.2d at 314.* [*56] As the Seventh Circuit has observed, "it would be the rare case where racial harassment against a co-worker could be thought by the author of the harassment to help the employer's business." *Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1422 (7th Cir. 1986).* The question for Local 705 becomes whether Jackson's IIED claim can stand on the two instances of assault. This court believes that it can. In the course of the first assault, Zero not only threatened to ram a megaphone down Jackson's throat, but used the phrase "black ass" and also threatened to lynch him. These statements were made in front of numerous witnesses, two of whom laughed. A jury could reasonably find that this assault alone was an affront no reasonable man could be expected to endure.

> 15    The *Restatement (Second) of Agency* recognizes that a principal also may be liable for "the torts of his servants acting outside the scope of their employment [if the servant] was aided in accomplishing the tort by the existence of the agency relation." *Id.* § 219(2)(d). For Title VII purposes, the fact that harassment by a supervisor culminated in a tangible employment action raises a nonrebuttable presumption that the employment relationship aided the harassment. *Faragher, 524 U.S. at 807.* No Illinois case cites this subsection of the *Restatement,* and, as far as this court is aware, no Illinois case applies this theory of vicarious liability.

[*57] Defendant Pressler argues that no record evidence shows that she intentionally caused Jackson any severe emotional distress. Jackson's evidence against Pressler consists, at most, [16] of the following: (1) she told another person that African-Americans had small brains, were dumb, and had less knowledge that white people; (2) she constantly used the word "nigger"; (3) on January 28, 1995, she laughed while Jackson was being assaulted by Zero; (4) she sent a memorandum to Zero and McCormick advising them to refrain from using racially

derogatory terms and to put a token black person on their slate; and (5) she filed a "bogus" defamation suit against Jackson. The court agrees that this evidence is insufficient to make out an IIED claim against Pressler. Pressler did not make the first statement to Jackson or send him the memorandum, and there is no evidence that she ever used the word "nigger" in the presence of any black person. (Pl.'s Ex. 8, P 9.) The filing of a frivolous lawsuit is not "truly extreme or outrageous" where the suit is voluntarily dismissed a month-and-a-half later. Similarly, her laughter during the January assault, while rude and insensitive, was not outrageous. [*58] And even if the combination of these events was outrageous, there is insufficient evidence to support an inference that Pressler intended them to inflict severe emotional distress or knew that there was a high probability that her actions would inflict such distress. The court therefore enters summary judgment the IIED claim in favor of Pressler.

> 16  In light of the court's holding, see infra, Local 705's motion to strike material relevant to this claim is denied as moot.

E. Mitigation of Damages

Under Title VII and section 1981, a defendant can show that the plaintiff failed to mitigate damages by demonstrating that "the plaintiff was not reasonably diligent in seeking other employment and that there was a reasonable chance that plaintiff might have found a comparable position." Sheehan v. Donlen Corp., 173 F.3d 1039, 1049 (7th Cir. 1999) (Title VII); accord Hunter, 797 F.2d at 1427 (section 1981). According to the defendants, the undisputed facts show both that [*59] Jackson was not reasonably diligent and that there was a reasonable chance of comparable employment. Jackson argues that the defendants waived this affirmative defense by not pleading it and, in any event, fail to

establish the elements of the defense. Whether or not the defense has been waived (and there is good reason to think it has not been, see Behr v. Drake Hotel, Inc., No. 82 C 5551, 1986 U.S. Dist. LEXIS 18990 (N.D. Ill. Oct. 20, 1986)), the defendants have failed to show as a matter of law that Jackson had a reasonable chance of finding a comparable position. The only relevant record evidence is that 20 union representative positions and 49 union organizer positions were filled at another Chicago labor union between September 1, 1994 and May 1, 2001. (Rule 56.1(a)(3) Statement P 195.) The defendants offer no evidence to show that Jackson had a reasonable chance of being hired for any of these positions. As is generally true, "the issue of mitigation is a question of fact for the jury." Smith v. Great Am. Rests., 969 F.2d 430, 438 (7th Cir. 1992).

### III. Conclusion

Perhaps the best way to summarize the court's holding is simply to [*60] catalogue the claims that remain in the case. They are: (1) the Title VII claims against Local 705 for unlawful termination, racial harassment, and retaliation; (2) the parallel section 1981 claims against all four defendants, except for the racial harassment and retaliation claims against Pressler, on which summary judgment is entered in her favor; (3) the assault claims against Zero and Local 705; and (4) the IIED claims against Zero, McCormick, and Local 705.

ENTER:

JOAN B. GOTTSCHALL

United States District Judge

DATED: March 22, 2002

*CASE LAW*
*Menefee v. United Parcel Service, Inc.*,
2008 U.S. Dist. LEXIS 9381 (N.D. IN. 2008)

1 of 100 DOCUMENTS

**CONELLA MENEFEE, Plaintiff, v. UNITED PARCEL SERVICE, INC.,
Defendants.**

**No.: 1:07-CV-202 PS**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
INDIANA, FORT WAYNE DIVISION**

*2008 U.S. Dist. LEXIS 9381*

**February 7, 2008, Decided
February 7, 2008, Filed**

**COUNSEL:** [*1] For Conella Menefee, Plaintiff:
Cynthia Rockwell, Lori W Jansen, LEAD ATTORNEYS,
Rockwell & Jansen LLC, Fort Wayne, IN.

For United Parcel Service Inc, Defendant: Ellen M
Girard, John A Klages, LEAD ATTORNEYS, Quarles &
Brady LLP - Chi/IL, Chicago, IL.

**JUDGES:** PHILIP P. SIMON, JUDGE.

**OPINION BY:** PHILIP P. SIMON

**OPINION**

**OPINION AND ORDER**

Colleen Menefee is an African-American woman
who worked as a package car driver for UPS for many
years until she injured her back in 2003.
According to her Complaint, injured white males were
given management positions as accommodations for their
disabilities, but she, an African-American woman, was
not. Menefee also alleges that later, when she tried to get
UPS's doctor to release her from the physical restrictions
that prevented her from returning to work, UPS imposed
higher physical requirements on her than the standard
requirements placed on all other drivers. Menefee
brought this action, alleging that UPS discriminated
against her on the basis of her sex and race. Before the
Court is Defendant's motion to dismiss. Because
Menefee's allegations from the 2006 time period are not
time-barred, UPS's motion to dismiss her sex and race
discrimination claims are denied. But [*2] because she

did not exhaust her Title VII retaliation claim before the
Equal Employment Opportunity Commission (EEOC),
that claim is dismissed.

**I. BACKGROUND**

According to the Complaint, Plaintiff Conella
Menefee is an African-American woman who has worked
for UPS as a package car driver since July 1994. (Compl.
PP 3, 5.) In 2003, she injured her back on the job and was
taken off of work with "permanent" restrictions. (*Id.* P 7.)
She contacted the UPS District Workforce Planning
Manager to ask about getting a reasonable
accommodation under the terms of her union's Collective
Bargaining Agreement. (*Id.* P 8.) She believes that UPS
has allowed injured white males to take management
positions as accommodations for their injuries. (*Id.*) On
June 18, 2004, she received a letter from the Workforce
Planning Manager stating that she was not eligible for a
reasonable accommodation under the Americans with
Disabilities Act (ADA). (*Id.* P 9.)

On July 2, 2004, Plaintiff wrote to the Workforce
Planning Manager to complain about "being left in
limbo" about her employment status. (*Id.* P 10.) She
stated that she knew of white employees that were given
work accommodations under the collective bargaining
agreement. [*3] (*Id.*) She complained that she had "on
various occasions asked or even applied for other jobs
within the company," but had "always been met with
unfair and unjust practices." (*Id.*)

Plaintiff again attempted to obtain a management
position in September 2004. (*Id.* P 11.) She was given an

assessment test, but did not get an interview. (*Id.*) She believes that UPS lied to her when it told her that she did not obtain a high enough score on a written psychological exam to be considered for the position. (*Id.*) She again notified human resources of her desire to apply for a management position in November 2005 and March 2006. (*Id.* P 12.)

In March 2006, Plaintiff passed a functional capacity evaluation for heavy lifting. (*Id.* P 13.) The results of the evaluation reported that she was qualified to work at the "HEAVY Physical Demand Level for an 8 hour day according to the Dictionary of Occupational Titles. Her specific acceptable Leg Life capability was 70.0 lb and Torso Lift capability was 80.0 lb" (*Id.*) As a result of the exam, the company physician, Dr. Lazoff, released her to return to her duties as a package car driver, with no restrictions. (*Id.* P 14.) However, UPS still refused to put Plaintiff [*4] back on the job, and told her that the safety department needed to investigate her condition further. (*Id.* P 15.) On May 18, 2006, she filed a grievance with her union asking to be reinstated to her former position. (*Id.* P 16.) After she filed the grievance, she was told that she needed to see Dr. Lazoff a second time for another review of her condition. (*Id.* P 17.) On July 28, 2006, Lazoff told Plaintiff that he could not release her to her old position because she could not lift 70 lbs. over her shoulder level. (*Id.* P 18.) Plaintiff alleges that lifting 70 lbs. above shoulder level has never been one of the job requirements of a package car driver, but that Lazoff evidently relied on erroneous information that he received from Defendant's worker's compensation nurse. (*Id.*)

Defendant then sent Plaintiff to a Dr. Cavanati for a second opinion; on September 11, 2006, Cavanati released Plaintiff to return to her job with no restrictions. (*Id.* PP 19-20.) However, Defendant continued to refuse to return her to her job, and instead insisted that Plaintiff be evaluated by yet another physician. (*Id.* P 21.) As of the time the Complaint was filed, Plaintiff had not seen a third physician.

Menefee [*5] filed her EEOC Charge on October 5, 2006, alleging that UPS discriminated against her on the basis of race, sex, and disability. (Def.'s Ex. 2.) She claimed that UPS held her to different lifting requirements than it set for other employees. (*Id.*) She also claimed that two male employees had back problems, yet were allowed to work. (*Id.*) On July 2,

2007, having received her right-to-sue letter, she filed this lawsuit. In her Complaint, she alleged that UPS discriminated against her on the basis of race and sex, but she dropped her ADA charge and added a retaliation claim. (Compl. PP 23-24.)

UPS moves to dismiss, arguing that Menefee's race and sex claims are time-barred, and that she never exhausted her retaliation claim. UPS also claims that Menefee pled herself out of court by alleging facts demonstrating that UPS acted in compliance with the collective bargaining agreement that governed the handling of Menefee's grievance. UPS attached the collective bargaining agreement to its motion. Menefee then filed a "Response in Opposition to Defendant's Motion to Dismiss and Designation of Evidence," to which she appended her own affidavit describing the course of events between the parties [*6] since she filed her Complaint. UPS then asked that Menefee's affidavit be stricken, yet remarkably the company attached its own evidence -- a letter from Dr. Lazoff -- to its reply.

## II. DISCUSSION

*Rule 12(b)(6)* provides for the dismissal of claims that fail to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. In the *Rule 12(b)(6)* context, a district court accepts as true all well-pleaded allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *Moranski v. Gen. Motors Corp., 433 F.3d 537, 539 (7th Cir. 2005)*. "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations . . . , a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)*.

At the outset, because both parties have submitted evidence to support their arguments, I must consider which of their exhibits to evaluate in reviewing the motion to dismiss. "[D]ocuments attached to a motion to dismiss are considered part [*7] of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1248 (7th Cir. 1994)*. However, "the converse is also true: documents that are neither included in the plaintiff's complaint nor central to the claim should not be considered on a motion

to dismiss." *Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 972.* Defendant asks the Court to consider Plaintiff's EEOC charge, the collective bargaining agreement, and a statement by Dr. Lazoff. Plaintiff seeks inclusion of her own affidavit.

Plaintiff's EEOC charge is referenced in the Complaint, and is central to her claim. *Marshall v. La-Z-Boy, Inc., 2007 U.S. Dist. LEXIS 80522, 2007 WL 3232188, at *2 (N.D. Ind. Oct. 30, 2007)* (collecting cases in which courts considered EEOC charges that were attached to defendant's motion to dismiss); *Perkins v. University of Illinois, 1995 U.S. Dist. LEXIS 17025, 1995 WL 680758, at *3 (N.D. Ill. Nov. 14, 1995)* (same). Plaintiff herself has not objected to the exhibit. Therefore, I will consider it in evaluating the present motion.

The collective bargaining agreement [*8] is a horse of a different color; it is not central to Menefee's claims. Menefee alleges that she was discriminated against on the basis of race and sex over the course of more than two years, not that UPS breached the provisions of the CBA. Thus, whether or not UPS complied with the physical examinations provision of the CBA is neither here nor there with regard to whether the company treated Plaintiff unfavorably compared to white men.

The same applies for Dr. Lazoff's statement which UPS has asked me to consider. The only purpose for including Dr. Lazoff's statement is to stake out UPS's defense that Lazoff's initial decision to release Menefee was based on his mistaken belief that she was returning as a manager, not a driver. Obviously, it falls well outside the pleadings, and cannot be considered on a motion to dismiss. In addition, Menefee's affidavit essentially restates the allegations of the complaint and includes new facts about developments since the complaint was filed -- therefore, it is certainly not central to the complaint. Thus, the Court will consider the EEOC charge and exclude all other evidentiary materials in deciding the motion to dismiss.

## A. Whether Plaintiff's [*9] Title VII Claims Are Time-Barred

An individual wishing to challenge an employment practice under Title VII of the Civil Rights Act of 1964 must file a charge within 300 days "after the alleged unlawful employment practice occurred." *42 U.S.C. § 2000e-5(e)(1).* Plaintiff filed her EEOC charge on October 5, 2006; accordingly, her Title VII claims are

time-barred if they accrued before December 9, 2005. [1] Indeed, Menefee's EEOC charge explicitly states that discrimination did not begin until December 30, 2005. (Def.'s Ex. 2.)

> 1   However, it is important to note that Plaintiff also sued under *42 U.S.C. § 1981,* which has a four-year limitations period. *Jones v. R.R. Donnelley & Sons, Co., 541 U.S. 369, 382, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004).* Therefore, as UPS concedes, her *§ 1981* race discrimination claim is timely. But because *§ 1981* does not reach sex discrimination claims, *Friedel v. City of Madison, 832 F.2d 965, 967 n.1 (7th Cir. 1987),* Plaintiff's discrimination claims that pre-date December 2005 are time-barred.

Defendant argues that Menefee's claims accrued either in June 2004, when UPS allegedly refused to allow her to return to work with an accommodation, or in September 2004, when it allegedly failed to [*10] promote her. UPS characterizes all of Menefee's subsequent requests for accommodation and promotion as seeking reconsideration of the initial denial. UPS cites to *Lever v. Northwestern Univ., 979 F.2d 552 (7th Cir. 1992),* in which the Seventh Circuit stated that "[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." *Id. at 556.* But UPS overstates the holding of that case. *Lever* dealt with a university's denial of tenure to a female professor; the employer's "refusal to undo a discriminatory decision" occurred within the context of the university's internal grievance procedures. The court explicitly contrasted the facts in that case with *Webb v. Indiana Nat'l Bank, 931 F.2d 434 (7th Cir. 1991):*

> Lever's situation is well removed from [*Webb*], in which a person applied for jobs with the same employer, was turned down twice, and filed a charge with after the second denial. We held that the applicant was entitled to an opportunity to show that the second decision was independent of the first, in which case she could challenge the second (and only the second) decision. An applicant does not have to sue about the first wrong to be entitled to contest [*11] a second. . . . But when the first decision is connected to and implies the second -- when, in other words, a single

discriminatory decision is taken, communicated, and later enforced despite pleas to relent -- the time starts with the initial decision.

*Lever, 979 F.2d at 556* (citations omitted); *see also Stepney v. Naperville Sch. Dist. 203, 392 F.3d 236, 240 (7th Cir. 2004)* (holding that the limitations period was not tolled by employer's failure to remedy its allegedly lawful conduct, therefore claims were time-barred because no discrete actionable violation took place within the limitations period).

Obviously, this case is more similar to *Webb* than to *Lever*. Nothing in the Complaint indicates that Menefee went back to UPS in March 2006 to appeal the company's 2004 refusal to interview her for a management job. Rather, Menefee alleges that she went back in an attempt to return to her job as a driver. (Compl. PP 13-15.) UPS's alleged failure to allow Plaintiff to return is completely distinct from its failure to promote her or provide her with another accommodation in 2004. Thus, although Menefee cannot bring a Title VII claim for UPS's allegedly discriminatory conduct in 2004, she [*12] is entitled to prove that UPS's refusal to let her return to work in 2006 was discriminatory.

Moreover, Menefee is even entitled to go forward with any claim that she was wrongfully denied an accommodation in March 2006 when she sought to apply for a management position. (Compl. P 12.) It is impossible to determine from the face of the Complaint whether this incident was merely a continuation of UPS's initial failure to accommodate, or whether it was a new, discrete act of discrimination. *See Miller v. UPS, 2008 U.S. Dist. LEXIS 3753, 2008 WL 111842, at *3 (S.D. Ind. Jan. 15, 2008)* (denying motion to dismiss on statute of limitations grounds, where it was unclear from the face of the complaint whether particular incidents were simply failures to remedy the initial discrimination, or whether they were discrete actionable violations). Therefore, the motion to dismiss on statute of limitations grounds is denied.

**B. Whether Plaintiff Has Pled Herself Out of Court**

Defendant next argues that Plaintiff "pleads UPS' defense in that its reason for sending Menefee to a third doctor was required by the explicit language" of the collective bargaining agreement. This argument is frivolous. First, as discussed [*13] above, because the

CBA is not attached to the Complaint and is not central to Plaintiff's claim it would be inappropriate for the Court to review its terms at this stage. Second, the Complaint only pleads that Defendant "is now insisting that Plaintiff be evaluated by a third physician for the fourth time." Thus, the face of the complaint only pleads that UPS insisted on a third examination, not that UPS was complying with the CBA when it did so.

Finally, even if the CBA were part and parcel of the Complaint, UPS's compliance with the third-physician reexamination policy would not require dismissal of Plaintiff's claims. Although it might be difficult to prove, UPS could have discriminated against Plaintiff by enforcing the CBA selectively, *i.e.,* by holding her to a higher lifting standard than others or otherwise co-opting the medical review process for discriminatory reasons. In such a case, compliance with the CBA would not immunize the company from Title VII liability. *Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 79, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977)* ("[N] either a collective-bargaining agreement nor a seniority system may be employed to violate [Title VII] . . . ."). Therefore, the motion to dismiss [*14] on this ground is denied.

**C. Failure to Exhaust Retaliation Claim**

Plaintiff brings a Title VII retaliation claim, but she never presented that claim to the EEOC for its administrative review. [2] "[G]enerally, a Title VII plaintiff may bring only those claims that were included in her original EEOC charge, or that are like or reasonably related to the allegations of the charge or growing out of the charge." *Gawley v. Indiana Univ., 276 F.3d 301, 313 (7th Cir. 2001)* (citing *McKenzie v. Ill. Dep't of Transp., 92 F.3d 473, 481 (7th Cir. 1996)*) (internal citations omitted). As the Seventh Circuit has stated, "Normally, retaliation [and] sex discrimination . . . charges are not 'like or reasonably related' to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another." *Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 726 (7th Cir. 2003); see also Cable v. Ivy Tech State Coll., 200 F.3d 467, 477 (7th Cir. 1999)* (retaliation claim not reasonably related to discrimination claim where there is no factual overlap evident from the body of the EEOC complaint).

> 2  As discussed in note 1, *supra,* Defendant's motion does not pertain to Plaintiff's § 1981 claim. [*15] Defendant concedes that Plaintiff has a valid retaliation claim under § 1981, which

does not require exhaustion of remedies. *Randolph v. IMBS, Inc., 368 F.3d 726, 732 (7th Cir. 2004).*

Menefee did not include retaliation in her EEOC charge. And in her response to the motion to dismiss, Plaintiff does not offer any explanation of how her retaliation claim is "like or reasonably related to" her EEOC charge. Nothing in her charge or her Complaint even suggests a factual basis for a retaliation claim. To state a claim of Title VII retaliation, Plaintiff must plead facts supporting that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action. *McKenzie, 92 F.3d at 483.* But Menefee has not alleged any statutorily protected expression or any link between such expression and an adverse action on the part of UPS. And although a plaintiff may circumvent the exhaustion requirement on a retaliation claim that arises *after* the filing of an EEOC charge, *id. at 482-83,* Menefee has not alleged that UPS retaliated against her after she filed her October 2006 charge. [*16] Therefore, her Title VII retaliation claim is dismissed for failing to exhaust the claim.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (DE 12) is **GRANTED IN PART** and **DENIED IN PART.** Plaintiff's Title VII retaliation claim is dismissed for failure to exhaust administrative remedies. The motion to dismiss Plaintiff's Title VII sex and race discrimination claims on limitations grounds is denied. What remains are Plaintiff's *§ 1981* race and retaliation claims in their entirety, and Plaintiff's Title VII race and sex discrimination claims related to discriminatory acts that occurred after December 9, 2005. Construing Defendant's reply as a motion to strike, the Court has not considered Plaintiff's affidavit in considering the motion to dismiss, so Defendant's motion to strike (DE 15) is **DENIED AS MOOT.**

## SO ORDERED

ENTERED: February 7, 2008.

s/ Philip P. Simon

PHILIP P. SIMON, JUDGE

UNITED STATES DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| ELLA M. GLOVER, | ) | | |
| Plaintiff, | ) | Case No.: | 08-CV-2030 |
| | ) | | |
| v. | ) | | |
| | ) | Judge: | Virginia Kendall |
| KENWOOD HEALTHCARE | ) | | |
| CENTER, INC., | ) | Magistrate: | Arlander Keys |
| Defendant. | ) | | |

**NOTICE OF FILING**

TO:    Mr. Gary Ashman
        Ashman & Stein
        150 North Wacker Drive, Suite 3000
        Chicago, Illinois 60606

**PLEASE TAKE NOTICE** that on the 22nd day of July, 2008, the undersigned caused to be filed with the Clerk at the United States District Court for the Northern District of Illinois, Eastern Division, 219 South Dearborn Street, Chicago, Illinois, 60604, *PLAINTIFF ELLA GLOVER'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT II* and corresponding *Certificate of Service*, copies of which are attached and herewith served upon you.

**Dated:** July 22, 2008

Respectfully Submitted,

 s/Uche Asonye
One of his attorneys

Uche O. Asonye - 6209522
Mark Pando - 6283693
Scott Fanning - 6292790
Asonye & Associates
11 South LaSalle Street, Suite 2140
Chicago, Illinois 60603
312.795.9110