IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ELLA GLOVER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 2030 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| KENWOOD HEALTHCARE CENTER, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ella Glover ("Glover") filed suit against Kenwood Healthcare Center, Inc. ("Kenwood") under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. Specifically, Count I of Glover's Amended Complaint alleges that Kenwood, her former employer, subjected her to a hostile work environment and relegated her to inferior work assignments due to her age. Count II alleges that Kenwood retaliated against Glover when she complained to a supervisor about the hostile work environment. Count III alleges that Kenwood terminated Glover's employment on the basis of her age. Kenwood moves for summary judgment. For the following reasons, Kenwood's Motion for Summary Judgment is granted in part and denied in part.

## STATEMENT OF FACTS[1]

Kenwood is a long-term skilled care nursing center in Chicago, Illinois that has been in business for over thirty years. (Pl. 56.1 Resp. ¶ 1.) Glover, a resident of Illinois, was employed by Kenwood as a Physical Rehabilitation Aide ("Rehab Aide") and a Certified Nurse's Assistant ("CNA") from September 29, 1992 until September 7, 2005. (Pl. 56.1 Resp. ¶ 2, Def. 56.1 Resp. ¶ 2.) Glover was over forty years old throughout her entire employment with Kenwood. (Def. 56.1 Resp. ¶ 1.) Glover received several awards while employed at Kenwood including two in June 1997 for attendance and "professional dedication and outstanding performance." (Pl. 56.1 Resp. Ex. 9, 36.) Glover generally worked as a Rehab Aide for several floors and would fill in for other CNAs on the fourth floor when they were out sick or on vacation. (Pl. 56.1 Resp. ¶ 5.) Beginning in August 2005, Glover was assigned as a CNA on the fourth floor on a more regular basis, filling-in for someone who would be away for several weeks at a time.[2] (Pl. 56.1 Resp. ¶ 5.) Glover's duties as a CNA included caring for Kenwood residents' well-being and sanitary needs, continually checking each resident for personal hygiene, and cleaning the residents when necessary. (Pl. 56.1 Resp. ¶ 13.)

Barbara Boldon ("Boldon"), a Charge Nurse, was the supervisor of the fourth floor at

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Kenwood's Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Def. 56.1 Ex. __."; citations to Glover's Answers to Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Pl. 56.1 Resp. ¶ ___."; citations to Glover's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Pl. 56.1 Add. Facts Ex. __."; citations to Kenwood's Response to Plaintiff's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Def. 56.1 Resp. ¶ __."

[2] According to Pl. 56.1 Resp. ¶ 5, Glover was filling-in for Alice Campbell who was on vacation. However according to Def. 56.1 Resp. Ex. 32, Affidavit of Deloris Randall, Glover was filling-in for another employee who was on medical leave for the month of August. Glover had worked on the fourth floor before but August 2005 was the first time she was there with this degree of frequency. Kenwood states that Glover was on the fourth floor for a total of ten days during the month of August 2005. (Pl. 56.1 Resp. Ex. 34, at 7.) Regardless, it is undisputed that Glover was assigned to the fourth floor to fill-in for a longer-term vacancy, not merely a day or two.

Kenwood and qualified as a supervisor under the ADEA.[3]  (Pl. 56.1 Resp. ¶¶ 6, 10.)  Boldon's duties

included supervising the fourth floor and ensuring the CNAs were doing their work.  (Pl. 56.1 Resp.

¶ 6.)  Boldon never hired or fired any CNAs.  (Pl. 56.1 Resp. ¶ 10.)  Boldon's supervisor at Kenwood

was Jacqueline Thomas ("Thomas") and Thomas' supervisor was Deborah Missal ("Missal"),

Kenwood's Director of Nursing.  (Pl. 56.1 Resp. ¶ 12.)  Missal's supervisor was the Administrator

of Kenwood.  (Pl. 56.1 Resp. ¶ 12.)  Boldon voluntarily resigned from Kenwood in December 2005.

(Pl. 56.1 Resp. ¶ 12.)  Glover acknowledges that Kenwood is justified in terminating a CNA if that

CNA is guilty of insubordination, inconsiderate treatment of a patient, or neglect of duty.  (Pl. 56.1

Resp. ¶ 9.)  She denies, however, that Kenwood engaged in a practice of dismissing its employees

for such behavior.  (Pl. 56.1 Resp. ¶ 9.)

## I.  August 2005

Glover consistently filled-in on the fourth floor as a CNA during the month of August 2005.

(Pl. 56.1 Resp. ¶ 5.)  She worked there on ten separate days during that month.  (Pl. 56.1 Resp. Ex.

34, at 7.)  Glover and Boldon both worked the 7 a.m. to 3 p.m. shift.  (Def. 56.1 Ex. 3, Dep. of

Barbara Boldon ("Boldon Dep.") at 32:10-15.)  The fourth floor was divided into four sections, each

section with a capacity of fifteen to seventeen beds.[4]  (Def. 56.1 Resp. Ex. 34, ("Patient Census").)

One CNA was assigned to each section.  (Patient Census.)  The residents on the fourth floor did not

require as high a level of care as the ones on the second and third floors.  (Pl. 56.1 Ex. A, Dep. of

---

[3] Kenwood agreed to a stipulation before Magistrate Judge Jeffrey Cole stating that Barbara Boldon was a supervisory employee for purposes of the ADEA.  (Pl. 56.1 Resp. Ex. F, at 25-26.)  However, Boldon claims she did not have the authority at Kenwood to hire or fire employees.  (Def. 56.1 Resp. Ex. 3, Dep. of Barbara Boldon, at 113:3-7.)

[4] The Patient Census is disputed by the parties.  However the Court references it not to prove how many residents Glover attended to on September 1, 2005, but rather to describe the general operations of Kenwood's fourth floor.

Ella Glover ("Glover Dep.") at 374: 3-10.) However, the residents occasionally required CNAs to lift them on and off of their beds, for which Glover sought the help of colleagues when necessary. (Glover Dep. at 374:1-24.)

The parties' description of the relationship between Glover and Boldon differs significantly. According to Glover, she only had intermittent contact with Boldon prior to this month. (Glover Dep. at 119:4-10.) Glover testified at her deposition that Boldon routinely assigned Glover the section with the heaviest and most difficult residents on the floor. (Glover Dep. at 136:1-23.) Glover testified that during the past years, Boldon occasionally made harassing statements to her about her age, even though they did not interact much. (Glover Dep. at 187:21-23.) According to Glover, these harassing statements increased in frequency after August 1, 2005, when Glover began working on the fourth floor. (Glover Dep. at 191:7.) Glover testified that Boldon would tell her: "you been here too long; you think you know it all; you should just quit; you're too old anyway; you should go and try to look for another job; you probably can't find another job." (Glover Dep. at 191:7-13.) Glover estimates that Boldon told her she was "too old" approximately twelve or fifteen times between August 1, 2005 and September 7, 2005, the date Glover was terminated. (Glover Dep. at 193:16-17.)

The parties agree that Glover complained about Boldon to her friend Alice Campbell ("Campbell"), who was almost the same age as Glover. (Def. 56.1 Resp. ¶ 5.) Campbell confirmed that she heard Boldon make a comment about old employees wanting to have things their way. (Def. 56.1 Resp. ¶ 5.) Campbell, however, did not interpret this as a statement disparaging the age of employees; but rather as a reference to employees who had been at Kenwood for a long time. (Def. 56.1 Resp. ¶ 4.) Glover testified that she also complained to her friend Allison Credit

("Credit"), a supervisor of Housekeeping, when they ate lunch together. (Glover Dep. At 210:5-15.)

Glover also testified that she told Louis Randall ("Randall"), the CNA Supervisor at Kenwood, that Boldon was harassing her because of her age. (Glover Dep. at 198:5-9.) According to Glover, this conversation occurred the third week of August 2005, while Glover was in a resident's room on the fourth floor.[5] (Glover Dep. at 201:17-23.) Glover testified that she told Randall that Boldon made comments about Glover's age and gave her the most difficult residents to work with. (Glover Dep. at 432:9-14.) The day after Glover spoke to Randall, Boldon confronted Glover about her complaints and assigned Glover an extra resident, one that required heavy lifting. (Glover Dep. at 432:9-14, Pl. 56.1 Resp. Ex. G, Affidavit of Ella Glover ("Glover Affidavit") at ¶ 5.) Glover testified that she never formally complained to the assistant director of nursing, the director of nursing, or the Administrator of Kenwood regarding Boldon's harassing statements. (Glover Dep. at 208-09:18.)

Randall and Boldon dispute Glover's claims. Randall states in an affidavit that Glover never complained to her about Boldon or anyone else at Kenwood harassing her because of her age. (Def. 56.1 Resp. Ex. 32, at 2.) Boldon testified at her deposition that she never harassed Glover about her age, never purposely assigned her difficult residents, nor did she confront Glover over her alleged complaint to Randall. (Boldon Dep. at 74:2.) Boldon points to the CNA assignment sheets for the months of August and September 2005, which support Boldon's claim that she did not single Glover out for difficult residents, as it appears the CNAs rotated, working on different sections of the fourth floor on different days. (Pl. 56.1 Resp. Ex. O.)

---

[5] Glover had earlier discussed Boldon's behavior with colleagues at the cafeteria during their lunch break, but she is not sure if Randall heard all of her comments. (Glover Dep. at 198:21-24.)

## II. September 1, 2005

On September 1, 2005 there were four CNAs assigned to the fourth floor. (Pl. 56.1 Resp. ¶ 85.) At the time, Glover was sixty-one years old, and two of the three other CNAs were sixty and fifty-six years old. (Pl. 56.1 Resp. ¶ 85.) One of the residents assigned to Glover's care on September 1, 2005 was Felicia Ivy ("Ivy").[6] (Pl. 56.1 Resp. ¶ 15.) Ivy was incontinent and unable to attend to her own sanitary and personal hygiene needs. (Pl. 56.1 Resp. ¶ 16.)

The parties dispute what happened on September 1, 2005. Glover claims that Boldon had assigned her sixteen residents to care for, while the other three CNAs only had fourteen residents each. (Glover Affidavit at ¶ 7.) Glover states that when she complained to Boldon, Boldon told her to take care of the extra residents because they were "easy" ones. (Glover Affidavit at ¶ 7.) At her deposition, Glover testified that she dropped Ivy back to her room just before 1 p.m. and then left to help two other residents get to their rooms. (Glover Dep. at 100:16-19.) Glover testified that when she left Ivy, Ivy was clean and unsoiled. (Glover Dep. at 120:8.) Glover testified that she took her lunch break at 1 p.m. (Glover Dep. at 108:23.) According to Glover, lunch breaks were not allowed to be taken on the fourth floor, so Glover walked up a flight of stairs to get her lunch, and then took the elevator down to the cafeteria. (Glover Dep. at 123:12-15, 100:21-23.)

Glover testified that the elevator stopped on the fourth floor. (Glover Dep. at 100:23.) According to Glover, Boldon got on the elevator and told Glover that Ivy "said she was soiled" and that Glover should clean her after her lunch break (Glover Dep. at 101:1-7.) Glover knew that Ivy had a history of claiming she had a bowel movement when she did not in fact have one. (Glover Dep. at 106:21-24.) Glover stated that she assumed that if Ivy was in fact soiled, Boldon, as the

---

[6] Ivy does not appear to be one of the extra two residents that Glover was assigned.

Charge Nurse, would have told Glover to clean her at that moment. (Glover Dep. at 107:8.) Glover further testified that she believed that the CNAs who covered the floor for her while she was on a lunch break would attend to Ivy if she was in fact soiled. (Pl. 56.1 Ex. C, Dep. of Jacklyn Thomas ("Thomas Dep.") at 73:15-23.) Moreover, Glover testified she was already on her lunch break and she thought Boldon was trying to get her written up by inducing Glover to bring her lunch on the fourth floor to clean Ivy. (Glover Dep. at 121:10-13.)

Glover testified that she told Boldon that she would check on Ivy after her hour-long lunch break, and then Glover and Boldon rode the elevator together to the cafeteria. (Glover Dep. at 107:7-9.) Glover stated that she ate lunch with her colleagues, including Boldon, and returned to the fourth floor at 2 p.m. (Glover Dep. at 102:3-4, 108:23.)

Boldon disputes these facts. At her deposition, she testified that she was called to Ivy's room by Ivy's call light before 1 p.m. (Boldon Dep. at 51:10-11.) Boldon stated that she then ran into Glover on the fourth floor around 1 p.m., and told Glover that Ivy had soiled herself and needed to be cleaned. (Boldon Dep. at 51:24.) Boldon points to the statement of a Social Services aide, Inel Pulliam ("Pulliam"), who overheard Boldon command Glover to change Ivy because Ivy had soiled herself. (Def. 56.1 Resp. Ex. 7, Pulliam Statement ("Pulliam Statement").) Boldon testified that in response to her command, Glover responded that she would change Ivy after lunch. (Boldon Dep. at 51:24.) Pulliam saw Glover go to lunch instead of attending to Ivy. (Pulliam Statement.) Boldon testified that she reported Glover's failure to clean Ivy to Thomas but did not seek out another CNA to clean Ivy. (Boldon Dep. at 52:7-20, 59:20-24.) Boldon stated that she then went to lunch just after 1 p.m., where she again ran into Glover, who had still not attended to Ivy. (Boldon Dep. at 53:1.) According to Boldon, the smell of Ivy's feces was overpowering when Boldon returned to

the fourth floor from lunch. (Boldon Dep. at 90:8-10.)

Both parties agree that Glover attended to Ivy after lunch, around 2 p.m., and that Ivy was in need of cleaning and changing.

## III. September 7, 2005

The parties agree that Kenwood received a fax on September 7, 2005, addressed to "Mrs. Kline" of Kenwood. (Pl. 56.1 Resp. ¶ 23.) The fax stated that its author visited Kenwood on September 1, 2005, at around 1:15 p.m. (Def. 56.1 Ex. 10, Fax to Kenwood ("Visitor Fax").) While on the fourth floor, the author smelled feces down the hallway and saw a young lady sitting in her room covered in feces. (Visitor Fax.) The young lady identified herself as Ivy and said that she had been left in that state by her nurse. (Visitor Fax.) The author concluded that the "incident happened on the 7-3 shift." (Visitor Fax.)

The parties also agree that Thomas and April Watkins ("Watkins"), Kenwood's Director of Social Services and an "abuse coordinator," immediately began an investigation into the allegations contained in the fax. (Pl. 56.1 Resp. ¶ 24.) Their Investigation Report states that the fax arrived at Kenwood at 1:13 p.m. and by 1:30 p.m. Thomas and Watkins had interviewed Ivy and her roommate Geneva Cayolle ("Cayolle"), and had completed an Investigation Report summarizing the incident. (Pl. 56.1 Resp. Ex. 59, Kenwood Investigation Report ("Investigation Report") at 4.) The Investigation Report states that Thomas and Watkins interviewed Ivy, Boldon and Glover, along with several other employees and residents of Kenwood. (Pl. 56.1 Resp. Ex. 105, at 8.) However, both Boldon and Glover claim that they were not interviewed as part of this investigation.

Kenwood terminated Glover's employment on the afternoon of September 7, 2005 based on the findings of the investigation. (Pl. 56.1 Resp. ¶ 44.) Missal, Kenwood's Director of Nursing,

personally discharged Glover for insubordination, inconsiderate treatment of a patient, and neglect of duty. (Pl. 56.1 Resp. ¶ 44, Def. 56.1 Ex. 20, Dep. of Deborah Missal ("Missal Dep."), at 42:1-5.) This was the only disciplinary action taken against Glover during her nearly thirteen years of employment with Kenwood. (Def. 56.1 Resp. ¶ 3.)

## IV. Post-Termination

Boldon was disciplined by Kenwood on September 11, 2005 for not being more specific when she reported Glover to her supervisor on September 1, 2005. (Def. 56.1 Resp. Ex. 23.) On September 13, 2005, six days after she was terminated from Kenwood, Glover filed an intake form with the Illinois Department of Human Rights ("IDHR"). (Pl. 56.1 Resp. Ex. 4.) Glover stated that she was discriminated against by Kenwood due to her age. (Pl. 56.1 Resp. Ex. 4.) Glover also filed a claim for unemployment benefits with the Illinois Department of Employment Security ("IDES"), where she did not list age discrimination or retaliation as a reason for being terminated from Kenwood. (Pl. 56.1 Resp. ¶ 69.)

It is undisputed that Glover timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 12, 2005 alleging age discrimination and discrimination based on a physical handicap.[7] The EEOC terminated its processing of this charge on March 7, 2008 and gave Glover ninety days to sue under the ADEA.

The parties disagree about who replaced Glover as a CNA and Rehab Aide at Kenwood after she was terminated. Glover states she was replaced by Sheila Johnson ("Johnson"), who was thirty-two years old at the time. (Pl. 56.1 Ex. 33, at 2.) Kenwood states that Glover was replaced by

---

[7] Glover's alleged physical handicap is not relevant to this suit brought under the ADEA and is not discussed in Glover's Amended Complaint.

Theresa Bagby ("Bagby"), who was sixty-six years old at the time. (Pl. 56.1 Resp. ¶ 86.) Kenwood states that Johnson was hired to replace Campbell, who voluntarily retired soon after Glover was terminated. (Def. 56.1 Resp. ¶ 58.) Kenwood also states that Johnson quit for personal reasons after two weeks of employment at Kenwood. (Missal Dep., at 72:17-23.) Glover states that Bagby was a long-term employee of Kenwood, hired in 1980, who did not possess the physical rehabilitation training that Glover did. (Pl. 56.1 Resp. ¶ 86.)

On November 7, 2005, Kenwood's Information Officer, Brigite Grossman, conducted a video interview with Ivy and her roommate, Cayolle, regarding the incidents on September 1, 2005. (Pl. 56.1 Resp. Ex. 58, 58A, Video Interview with Ivy and Cayolle ("Video Interview"), at 1.) In the video, the residents give inconsistent statements about whether and for how long Ivy was left soiled, with Ivy at times claiming that she was immediately tended to by Glover. (Video Interview at 6.) At one point, Cayolle stated Ivy soiled herself at noon, while Ivy stated it occurred at 1:30 p.m. (Video Interview at 6.) Glover testified that neither Ivy nor Cayolle is a credible witness. (Glover Dep. 327:5-11.) Specifically, Glover testified that she believes Cayolle suffers from Alzheimer's Disease. (Glover Dep. 327:5-11.)

Glover timely filed this suit under the ADEA on April 10, 2008, alleging Kenwood harassed, retaliated against, and terminated her because of her age.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable

inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

### I. ADEA

The ADEA prohibits employment discrimination against employees over the age of forty. *See* 29 U.S.C. § 621 *et seq.* Glover alleges that, as a result of her age, she was harassed, given inferior job assignments, retaliated against and terminated by Kenwood. Throughout her nearly thirteen years of employment at Kenwood, Glover was over forty years old.

To establish a violation of the ADEA, a plaintiff must demonstrate that she suffered an adverse employment action because of her age. *See Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993). A plaintiff must prove by a preponderance of the evidence that age was the "but for" cause of the employer's adverse employment decision. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct.

2343, 2350 (2009) (an act or omission is not considered a "but for" cause of an event if the event would have occurred without it). To do so, a plaintiff may show discrimination by utilizing either the direct or indirect methods of proof. *See Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008).

## A.  Direct Method

A plaintiff establishes unlawful discrimination under the direct method by presenting direct or circumstantial evidence that creates a "convincing mosaic of discrimination." *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). A plaintiff must put forth evidence that demonstrates she is a member of a protected class and as a result suffered the adverse employment action. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006). The focus of the direct method of proof is not whether the evidence offered is "direct" or "circumstantial" but rather whether the evidence "points directly" to a discriminatory reason for the employer's action. *Id*. Direct evidence of discrimination essentially consists of an admission by the employer that it took an adverse employment action against an employee based upon prohibited animus. *See Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence of intentional discrimination can consist of suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext and other evidence which allows the jury to reasonably infer discrimination. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). To survive summary judgment, a plaintiff must prove that age was the "but for" cause of the adverse employment decision. *See Gross*, 129 S. Ct. At 2350.

## B.  Indirect Method

A plaintiff creates a presumption of unlawful discrimination under the indirect method by establishing a prima facie case of discrimination. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283,

1290 (7th Cir. 1997). To establish a prima facie case of discrimination under the ADEA, a plaintiff must put forth evidence that: (1) she belongs to a protected class; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the employer. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). Summary judgment is appropriate if a plaintiff fails to establish any of these elements. *See Atanus*, 520 F.3d at 672. However, if a plaintiff establishes each of these elements, she creates a presumption that shifts the burden to the employer to "produce a legitimate, noninvidious reason for its actions." *Id*. at 673. If the employer satisfies its burden of production and rebuts plaintiff's prima facie case of discrimination, the burden shifts back to the plaintiff to show that the employer's reasons are false and only a pretext for discrimination. *Id*. at 672.

## II. Count I - Hostile Work Environment & Adverse Employment Action

Glover claims in Count I of her Amended Complaint that she was subjected to a hostile work environment and was forced to take on inferior assignments due to her age.

### A. Verbal Harassment

Glover alleges that Kenwood created a hostile work environment by subjecting her to verbal abuse. A workplace is considered a hostile work environment where the harassment is sufficiently "severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). A plaintiff must establish that the workplace was both subjectively and objectively offensive. *See Rogers*, 320 F.3d at 752. A workplace is subjectively offensive when the plaintiff actually perceives it as such; it is objectively offensive when a reasonable person would find it hostile or abusive. *See Ezell*, 400 F.3d at 1047-48.

The Court looks to the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Id.*

Here, Glover claims that her Charge Nurse, Boldon, verbally harassed her with comments about her age. According to Glover, Boldon's verbal comments—that Glover has been at Kenwood for too long and thinks she knows everything; that Glover should just quit; that Glover is too old; and that Glover would probably be unable to find another job—occurred approximately twelve-to-fifteen times from August 1, 2005 until September 7, 2005. This satisfies the requirement that the comments were pervasive. *See Wash. v. Am. Drug Stores, Inc.*, 119 Fed. App'x 3, 6 (7th Cir. 2004) (a handful of incidents over thirteen months is not pervasive); *Rogers*, 320 F.3d at 753 (several comments over a period of months not pervasive). The comments, however, were not severe.

While Campbell did overhear Boldon refer to older employees on one occasion, that reference was to long-term employees and their tendency to be set in their ways. It was not a derogatory comment based on age. None of the other comments Glover claims were made are supported by anything in the record other than Glover's self-serving statements. *See Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 615 (7th Cir. 2001) (uncorroborated generalities are insufficient to support an employment discrimination claim at summary judgment).

Even if the Court were to credit Glover's self-serving statements and find that the comments were both pervasive and severe, the Court must still assess whether the statements were merely subjectively offensive or objectively offensive.[8] Rude and inappropriate comments are not

___

[8] Glover's failure to formally complain to Kenwood about these statements weighs against her claims that she was subjectively offended by them. But Kenwood is incorrect to assume that Glover's failure to follow its harassment policy and report Boldon's behavior to a specific Kenwood supervisor bars Glover from pursuing this claim in this Court.

necessarily severe enough to change the conditions of a plaintiff's employment. *See Ezell*, 400 F.3d at 1048; *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675 (7th Cir. 2005) (boorish behavior is not necessarily age harassment). Here, Boldon's comments, while rude, did not render Glover's workplace unworkable or hellish. *See Ezell*, 400 F.3d at 1048 (ignorant stereotypes made by plaintiff's supervisor did not constitute a hostile work environment); *Wyninger*, 361 F.3d at 977 (the workplace that is actionable is the one that is "hellish"). Moreover, other CNAs at Kenwood who were of a similar age as Glover, such as Campbell, did not find Boldon's comments offensive or examples of age discrimination. Therefore, Glover has failed to show that Boldon's alleged verbal harassment created a hostile work environment under the ADEA.

### B. Inferior Work Assignments

Glover also alleges that she was assigned the heaviest and most difficult residents to care for. Glover's Response to Defendant's Motion for Summary Judgment characterizes this claim as an adverse employment action under the ADEA, not as a hostile work environment claim. As such, this Court will adopt the ADEA analysis and proceed under the direct and indirect methods.

#### i. Direct Method

Under the direct method, Glover must put forth evidence that demonstrates she is a member of a protected class and as a result suffered an adverse employment action. *See Burks*, 464 F.3d at 751; *see* Section I(A) *supra*. The protected class encompasses employees over forty years of age. An adverse employment action is one where the conditions in which an employee works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or an otherwise significantly negative alteration in her workplace environment. *See O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004); *see e.g.*, *Santelli v. Electo-Motive*, 136 F. Supp. 2d 922, 935 (N.D. Ill.

15

2001) (Kennelly, J.) (transfer to the most difficult work at the plant can constitute adverse employment action).

Here, it is uncontested that Glover was over forty years of age when she began receiving work assignments from Boldon in August 2005. While Glover satisfies the first prong of the test, however, she is unable to demonstrate that her inferior work assignments constituted an adverse employment action or that they were assigned due to her age. Glover was a temporary fill-in on the fourth floor for employees who were on vacation or on medical leave. The work assignments on the fourth floor were divided into four sections, each with fifteen to seventeen beds. *See* Patient Census. Each day that she was on the fourth floor, Glover, like each CNA, was assigned a single section. There is no evidence that she was regularly assigned a larger workload than the other CNAs.

Glover's contention that she was assigned a section with the heaviest residents is also not supported by the evidence. Kenwood's CNA assignment sheets for August 2005 indicate that Glover was assigned to different parts of the fourth floor on different days, like the other CNAs she worked with. (Pl. 56.1 Ex. O, Kenwood CNA Assignment Sheets.) Assuming Kenwood's long-term residents stayed in the same rooms, Glover has no basis for her claim that she was only assigned the section with the heaviest and most difficult residents. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1117 (7th Cir. 2009) (a policeman assigned to strip mall detail did not suffer an adverse employment action because it is a job that someone has to do, and that others have done). Because Glover does not demonstrate her work assignments created a humiliating, degrading, unsafe, or unhealthful workplace, she cannot claim she suffered an adverse employment action on this ground.

Glover also claims that on one occasion she was assigned sixteen residents when the other CNAs on the fourth floor were only assigned fourteen. However, Boldon told Glover that these extra

two residents were "easy" ones, and Glover does not dispute this. There is no information that the extra two residents imposed a greater burden, and as such, this single instance does not create a humiliating, degrading, unsafe, or unhealthful environment. *See Hancock v. Potter*, 531 F.3d 474 (7th Cir. 2008) (a mere alteration of job responsibilities is not an adverse employment action).

Therefore, neither of Glover's complaints constitute a significant alteration in her workplace. Moreover, two of the three other CNAs on the fourth floor were approximately Glover's age, challenging Glover's assertion that her age was the "but for" cause of the allegedly inferior assignments. Glover does not present evidence as to why she was singled out by Boldon for her age while the other similarly-aged and older CNAs were not. Therefore, Glover has failed to demonstrate that she has suffered an adverse employment action based on inferior work assignments.

### ii. Indirect Method

To prevail under the indirect method, Glover must establish a prima facie case of discrimination. One element of a prima facie case of discrimination is an adverse employment decision. *See* Section I(B) *supra*. Because Glover cannot demonstrate that Boldon's statements or work assignments constituted an adverse employment decision, her claim fails the indirect method also. *See Atanus*, 520 F.3d at 672 (summary judgment is appropriate if a plaintiff fails to establish any of the prima facie elements of discrimination).

Glover cannot show that she was given allegedly inferior assignments because of her age. Since she suffered no adverse employment condition[9] and Boldon's statements do not rise to the level of a hostile work environment, this Court need not consider any animus on Boldon's part that

---

[9] Glover's claims in Count I relate only to the allegedly inferior resident assignments she received and the one instance where she was assigned sixteen residents, not her termination.

may have influenced her decisions.  *See Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999) (evidence of discriminatory motives must have some relationship with the employment decision). As such, even taking Glover's deposition testimony as true, she has not presented sufficient evidence to survive Kenwood's Motion for Summary Judgment on Count I.

## III.  Count II - Retaliation

Glover claims that Kenwood retaliated against her for complaining to Randall about Boldon's harassment.  Specifically, Glover states that as a result of her complaint, Boldon gave her an additional work assignment, and Glover's employment was subsequently terminated.  The ADEA prohibits employers from discriminating against employees who engage in a protected activity.  *See* 29 U.S.C.A. § 623(d).  Protected activities include those that employees engage in to oppose a practice made unlawful by the ADEA, including participating in investigations.  *Id.*

In her deposition testimony, Glover states that she spoke to Randall on the fourth floor of Kenwood during the third week of August 2005.  Glover testified that she clearly described Boldon's harassing statements to Randall at this meeting.  Communicating discriminatory workplace conduct to an employer constitutes not only protected activity but opposition to the activity as well.  *See Crawford v. Metro. Gov't of Nashville and Davidson County*, 129 S. Ct. 846, 850-51 (2009) (statute protects employees who communicate discrimination to employer; opposition to discrimination is implied).  Glover's conversation with Randall was therefore a protected activity under the ADEA.

### A.  Direct Method

Having demonstrated a protected activity, Glover must present evidence of an adverse action and a causal connection between that action and her protected activity.  *See Burks*, 464 F.3d at 758. Glover alleges two separate adverse actions: an additional work assignment and her termination.

18

### i. Additional Work Assignment

Glover claims that Boldon confronted her after she complained and assigned her an additional resident after Boldon learned of Glover's complaint. To demonstrate an adverse retaliatory action, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (internal quotations omitted). Anti-retaliation statutes protect an individual from retaliation that produces an injury or a harm, not from all retaliation. *Id*. Snubbing, petty slights, and minor annoyances do not create such deterrence. *Id*. at 68-70 (a reassignment from prestigious forklift duty to the arduous and dirtier standard track laborer tasks counts as retaliation).

Here, Glover's claims regarding her additional work assignment, even if believed, do not rise to the level of an adverse employment action. Glover argues that the day she complained about the comments, Boldon assigned her to a resident who required "heavy lifting." It is unclear from Glover's testimony, however, what additional work this actually required on her part. According to Glover's deposition testimony, she often asked another CNA to help her lift a heavy resident, and the other CNAs always complied. There is no indication that Glover was burdened by this assignment, that she even completed it, or that it was outside the scope of her normal job activities—which it clearly was not. The reassignment of job duties is not automatically actionable. *Id*. Glover has provided no evidence showing the impact this additional resident had on her job or the duration of this additional duty. This Court uses an objective standard to judge whether a particular reassignment is materially adverse, and Glover has not provided any evidence as to the

precise nature of the additional duties this extra resident involved. Because she has failed to demonstrate actionable retaliation as to the additional work assignment, the Court need not address her claims of a causal link.

### ii. Termination

Glover also claims that Kenwood terminated her in retaliation for her complaint to Randall that she was being harassed. It is undisputed that termination is an adverse action. *See Burks*, 464 F.3d at 758. Therefore, to survive summary judgment, Glover must demonstrate a causal connection between her complaint and her termination. Because Glover was fired for cause, and not explicitly for old age, she must rely on circumstantial evidence of discrimination to demonstrate a causal link. Circumstantial evidence includes but is not limited to: suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext and other evidence which allows the jury to reasonably infer discrimination. *See Hemsworth*, 476 F.3d at 491. Speculation based on suspicious timing alone does not support a reasonable inference of retaliation. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). A plaintiff must also "put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination in termination." *Burks*, 464 F.3d at 759. Speculation based on animus and pretext must be related to influence over the decision-maker and the adverse employment action. *See Staub v. Proctor Hosp.*, 560 F.3d 647, 656 (7th Cir. 2009), *cert. granted*, --- U.S. ---, 130 S. Ct. 2089, 176 L.Ed. 2d 720 (2010); *see Hemsworth*, 476 F.3d at 491 (age-related remarks are relevant in a discriminatory-discharge case when they are in reference to the adverse employment action). Uncorroborated generalities are insufficient to support an employment discrimination claim at summary judgment. *See Oest*, 240 F.3d at 615.

Here, Glover worked for nearly thirteen years at Kenwood without any disciplinary notices. Glover was terminated in early September 2005, mere weeks after she complained to Randall in late August. *See Lang v. Ill. Dep't of Children and Family Serv.*, 361 F.3d 416 (7th Cir. 2004) (extremely suspicious timing where an employee's performance was never criticized during five years of employment, but disciplinary action occurred the same month he complained about racial discrimination).[10] Glover thus demonstrates suspicious timing.

Glover, however, is unable to put forth any additional circumstantial evidence. The evidence Glover points to is explained or minimalized through other undisputed facts. For example, Glover emphasizes Boldon's harassing remarks as evidence of age-discriminatory animus. However, the only corroborated statement that Glover presents was one overheard by Campbell. Campbell testified that Boldon's reference was to long-term employees and their tendency to be set in their ways. It was not a derogatory comment based on age. None of the other comments Glover claims were made are supported by anything in the record other than Glover's self-serving statements. *See Oest*, 240 F.3d at 615 (uncorroborated generalities are insufficient to support an employment discrimination claim at summary judgment).

Glover also emphasizes Boldon's alleged discriminatory animus and its effect on Kenwood's decision to terminate her. However, Kenwood conducted an independent investigation into the matter, minimizing the effect, if any, of Boldon's alleged animus. *See Staub*, 560 F.3d at 656 (employers are not liable for a nondecisionmaker's animus where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts

---

[10] Glover also argues that Kenwood conducted a hasty investigation before terminating her. Because this Court is satisfied that Glover's termination occurred suspiciously soon after her complaint, it need not analyze the timing or diligence of Kenwood's internal investigation.

relevant to the decision). While Kenwood's internal investigation revealed inconsistent and conflicting statements, there is no evidence that Boldon's alleged animus influenced Missal, the decision-maker, or any of the parties interviewed. A plaintiff may not survive summary judgment by relying on solely suspicious timing and speculating as to its effect on the employer. *See Johnson v. Nordstrom Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) (plaintiff's personal belief carries no weight in summary judgment analysis).

Here, Glover has failed to present circumstantial evidence beyond suspicious timing. As such, she cannot survive summary judgment under the direct method.

### B. Indirect Method

Glover alleges the same two employment actions—an additional work assignment and termination—as evidence of discrimination under the indirect method. To prevail under the indirect method, Glover must show that: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting these expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Atanus*, 520 F.3d at 677; Section I(B) *supra*. Failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim. *See Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). Glover satisfied the first element by complaining to Randall. *See* Section III(A)(i) *supra*. Glover's termination satisfies the third element. *See Burks*, 464 F.3d at 758. Thus, the Court will address Glover's job performance and whether she was treated less favorably than similarly situated employees.

### i.  Job Performance

Glover must demonstrate that she performed her job according to Kenwood's legitimate expectations.  *See* Section I(B) *supra*.  Where an employee is terminated for performance deficiencies, a detailed refutation of events which underlie an employer's negative performance assessment creates a factual issue whether the employer's explanation is credible or merely a pretext for discrimination.  *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994).  Here, Kenwood alleges Glover was insubordinate, inconsiderate of her resident, and neglected her duty.  However, taking her evidence as true, Glover creates genuine issues of fact as to whether she performed according to Kenwood's expectations.  It is undisputed that Glover worked for nearly thirteen years at Kenwood without any disciplinary actions.  Moreover, Glover testified that Boldon gave no indication, as they rode the elevator to the cafeteria together, that Glover's decision to take her lunch before attending to Ivy was contrary to Boldon's order or risked putting Ivy health at risk.  Kenwood's own investigation contained several inconsistent findings and at points revealed that Glover actually did change Ivy immediately after she was soiled.  Glover's specific denial that certain events took place, and her explanations for actions that her supervisors subsequently complained of, satisfy her burden on this element.  *See Dey*, 28 F.3d at 1460-61.  It is therefore a disputed fact as to whether Glover performed her job well.

### ii.  Treated Less Favorably

Even if she can meet the other three factors, Glover must also demonstrate that she was treated less favorably than similarly situated employees who did not engage in protected activity.  Similarly situated employees are those that are "directly comparable to her in all material respects."  *See Burks*, 464 F.3d at 751.  Factors relevant to this Court's inquiry include whether the employees

reported to the same supervisor, were subject to the same standards, and had engaged in similar conduct without "such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Glover argues that her termination constituted unduly harsh treatment relative to other employees' violations. For support, she points to the CNA Chart which shows that several CNAs had their more severe penalties rescinded and replaced with a suspension. Presumably these CNAs had comparable job duties, as they were employed in the same position as Glover by the same employer as Glover. However, Kenwood notes that, unlike Glover, all of these CNAs were reprimanded for abuses such as theft or inconsiderate treatment of staff, not for violations that put a resident's health at risk. Moreover, Glover does not provide any evidence that these CNAs engaged in protected activity prior to their punishment. In fact, by failing to address whether other employees engaged in protected activity, Glover's comparisons lack any reference to the retaliatory aspect of her claim. As such, Glover is unable to satisfy the fourth element of her prima facie case under the indirect method.

Glover does not present enough evidence to sustain a retaliation claim based on the one additional resident or her termination under either the direct or indirect method. Therefore, Kenwood is entitled to summary judgment on Count II.

## IV. Count III - Termination

Finally, Glover claims she was terminated because of her age in violation of the ADEA. The Court will analyze Glover's claims under the direct and indirect methods.

## A. Direct Method

Under the direct method, a plaintiff must prove that age was the "but for" cause of her termination. *Gross*, 129 S. Ct. At 2350. A plaintiff must demonstrate that she is a member of a protected class and that as a result she suffered an adverse employment action. *See* Section I(A) *supra*. It is uncontested that Glover is a member of a protected class and that her termination constitutes an adverse employment action. Therefore, to survive summary judgment, Glover must demonstrate a causal link between her age and her termination. Because Glover was fired for cause, and not explicitly for old age, she must rely on circumstantial evidence of discrimination. Circumstantial evidence includes but is not limited to: suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext and other evidence which allows the jury to reasonably infer discrimination. *See Hemsworth*, 476 F.3d at 491. Speculation based on suspicious timing alone does not support a reasonable inference of discrimination. *See Sauzek*, at 918. A plaintiff must also "put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination in termination." *Burks*, 464 F.3d at 759. Speculation based on animus and pretext must be related to influence over the decision-maker and the adverse employment action. *See Staub*, at 656; *Hemsworth*, 476 F.3d at 491 (age-related remarks are relevant in a discriminatory-discharge case when they are in reference to the adverse employment action). Uncorroborated generalities are insufficient to support an employment discrimination claim at summary judgment. *See Oest*, 240 F.3d at 615.

Given the analysis in Section III *supra*, Glover has already established the suspicious nature of the timing of her termination, mere weeks after she engaged in protected activity. As stated

above, however, suspicious timing alone is not sufficient to support a circumstantial evidence claim unless there is other evidence that "supports the inference of a causal link." *See Culver v. Gorman & Co.*, 416 F.3d 540, 546 (2005). Glover does not put forth any additional circumstantial evidence. The evidence Glover points to is explained or minimalized through other undisputed facts. For example, Glover emphasizes Boldon's harassing remarks as evidence of age-discriminatory animus. However, the only corroborated statement that Glover presents was one overheard by Campbell. Campbell testified that Boldon's reference was to long-term employees and their tendency to be set in their ways. It was not a derogatory comment based on age. None of the other comments Glover claims were made are supported by anything in the record other than Glover's self-serving statements. *See Oest*, 240 F.3d at 615 (uncorroborated generalities are insufficient to support an employment discrimination claim at summary judgment).

Glover also emphasizes Boldon's alleged discriminatory animus and its effect on Kenwood's decision to terminate her. However, Kenwood conducted an independent investigation into the matter, minimizing the effect, if any, of Boldon's alleged animus. *See Staub*, 560 F.3d at 656 (employers are not liable for a nondecisionmaker's animus where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision). While Kenwood's internal investigation revealed inconsistent and conflicting statements, there is no evidence that Boldon's alleged animus influenced Missal, the decision-maker, or any of the parties interviewed. A plaintiff may not survive summary judgment by relying on solely suspicious timing and speculating as to its effect on the employer. *See Nordstrom*, 260 F.3d at 733 (plaintiff's personal belief carries no weight in summary judgment analysis).

Glover presents no facts that explain why she was singled out for termination based on her age while many of her CNA colleagues, several of whom were older than her, were not. Moreover, Glover does not present evidence that specifically explains why her age is the "but for" cause of an investigation into insubordination, inconsiderate treatment of a patient, and neglect of duty. *See Lindsey v. Walgreen Co.*, --- F.3d ---, 2010 WL 3156549 (7th Cir. 2010) (plaintiff must show age was the determinative factor in an employer's decision to fire her, not just a motivating factor). Here Glover cannot demonstrate that age was even a motivating factor in her termination. As such, Glover cannot survive summary judgment on this Count under the direct method.

**B. Indirect Method**

To establish a prima facie case of discrimination under the ADEA, a plaintiff must put forth evidence that: (1) she belongs to a protected class; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the employer. *See Wyninger*, 361 F.3d at 978. It is undisputed that Glover belongs to a protected class and that she suffered an adverse employment action. Thus, the Court will only address whether Glover performed to Kenwood's legitimate expectations and whether similarly situated employees were treated more favorably.

*i. Employer's Legitimate Expectations*

Glover bears the burden of presenting evidence that she performed her job according to her employer's legitimate expectations. However, when an employer cites "performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its

challenged conduct." *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008); *see also Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) (where an employee accuses employer of lying about its legitimate employment expectations in order to set up a false rationale for termination, this issue merges with the question of pretext). "Even when an employer has proffered a legitimate, nondiscriminatory explanation for its conduct, summary judgment will not be appropriate if the aggrieved employee produces evidence from which a jury reasonably could find that the stated explanation is false and that the real reason was discriminatory." *Duncan*, 518 F.3d at 491-92. To demonstrate pretext, a plaintiff must show that the employer's nondiscriminatory reason was dishonest and that the employer's true reason was based on discriminatory intent. If the plaintiff cannot offer this evidence directly, indirect evidence challenging the credibility of the employer's reasoning or demonstrating that the reasons relied upon for termination are factually baseless, must be presented. *See Senske*, 588 F.3d at 507 (to show an employer's explanations are not credible, employee must point to evidence that they are not the real reasons, not grounded in fact, or are insufficient to warrant the employment decision); *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007).

Here, Glover has provided enough evidence to create a genuine issue of fact as to whether she performed her job well. Kenwood claims that it terminated Glover for insubordination, inconsiderate treatment of a patient, and neglect of duty for eating her lunch instead of promptly attending to a soiled resident. However, Glover's deposition testimony specifically refutes the details Kenwood relied upon in its investigative report. *See Senske*, 588 F.3d at 507 (employee must show that employer was lying with respect to each of its proffered explanations). Taking her evidence as true, Glover creates genuine issues of fact as to whether she performed according to

Kenwood's expectations. It is undisputed that Glover worked for nearly thirteen years at Kenwood without any disciplinary actions. Moreover, Glover testified that Boldon gave no indication, as they rode the elevator to the cafeteria together, that Glover's decision to take her lunch before attending to Ivy was contrary to Boldon's order or risked putting Ivy health at risk. Kenwood's own investigation contained several inconsistent findings and at points revealed that Glover actually did change Ivy immediately after she was soiled. Glover's specific denial that certain events took place, and her explanations for actions that her supervisors subsequently complained of, satisfy her burden on this element. *See Dey*, 28 F.3d at 1460-61. It is therefore a disputed fact as to whether Glover performed her job well.

### ii. Similarly Situated Employees

Next, Glover must show that Kenwood treated similarly situated employees younger than forty more favorably than they treated her. Alternatively, Glover can present evidence that Kenwood hired a substantially younger employee to replace her. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996) (if employee is replaced by someone not substantially younger, no inference of age discrimination is generally appropriate). Similarly situated employees are those that are "directly comparable to [the plaintiff] in all material respects." *See Burks*, 464 F.3d at 751. Factors relevant to this Court's inquiry include whether the employees reported to the same supervisor, were subject to the same standards, and had engaged in similar conduct without "such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18.

Here, Glover has presented enough evidence to show that Kenwood hired someone younger to replace her. Kenwood claims that it replaced Glover with Bagby, an employee who is older than

Glover. According to Glover, however, Bagby has been employed at Kenwood since 1980 and does not possess all of the qualifications that Glover did. Moreover, there is evidence that Kenwood replaced Glover with both Bagby and Johnson. (Pl. 56.1 Ex. 33, at 2.) Although Bagby is older than Glover, Johnson is substantially younger.

Glover has raised a genuine issue of material fact regarding her replacement at Kenwood. Glover has met her burden by presenting Kenwood's own admission, in an IDHR Questionnaire, that it replaced Glover with Bagby and Johnson. While Johnson may have voluntarily resigned after two weeks, her limited duration at Kenwood does not discount the fact that she may have been hired, at least in part, to replace Glover. Therefore, Glover has satisfied all four elements of her prima facie case.

### iii. Kenwood's Legitimate, Nondiscriminatory Reason for the Employment Decision

Under the *McDonnell Douglas* framework, because Glover has satisfied the elements of her prima facie case, the burden shifts to Kenwood to proffer a legitimate, nondiscriminatory reason for its employment decision. *See Duncan*, 518 F.3d at 491; Section I(B) *supra*. "The employer's explanation can be foolish or trivial or even baseless so long as the company honestly believed in the reasons it offered for the adverse employment action." *Wyninger*, 361 F.3d at 979 (internal quotations omitted). An employer's legitimate, nondiscriminatory reason must be clearly set forth, through the introduction of admissible evidence. *See Duncan*, 518 F.3d at 493 (citation omitted).

Here, Kenwood argues that Glover disobeyed a direct command from her charge nurse and instead went to lunch while a resident remained soiled for over an hour. Kenwood claims that Glover's actions violated its policies and one of the stated punishments for such a violation is termination. Kenwood conducted an investigation of the event on September 7, 2005, and concluded

that Glover's insubordination, inconsiderate treatment of a patient, and neglect of duty warranted termination. This decision was made independently, without regard to Glover's age or her engagement in any protected activities.[11] Kenwood therefore satisfies its burden by presenting a legitimate, nondiscriminatory reason for its employment decision.

### iv. Pretext and False Reasons

Under the *McDonnell Douglas* framework, if an employer satisfies its burden of production and rebuts a plaintiff's prima facie case of discrimination, the burden shifts back to the plaintiff to show that the employer's reasons are false and only a pretext for discrimination. *See Atanus*, 520 F.3d at 672; Section I(B) *supra*. An employer cannot avoid a trial when there is an issue of material fact as to whether its proffered reasons for termination are merely a pretext. *Hasan v. Foley & Lardner LLP*, 552, 530 F.3d 520.

Here, as discussed above, Glover has raised issues of material fact concerning the incidents of September 1, 2005 and her subsequent termination. Glover worked for nearly thirteen years at Kenwood without any disciplinary actions. Moreover, Glover testified that Boldon gave no indication, as they rode the elevator to the cafeteria together, that Glover's decision to take her lunch before attending to Ivy was contrary to Boldon's order or risked putting Ivy health at risk. Kenwood's own investigation contained several inconsistent findings and at points revealed that Glover actually did change Ivy immediately after she was soiled. Glover has put forth enough evidence to question whether her termination was merely a pretext for age discrimination.

Glover has presented a genuine issue of material fact as to whether she was discharged on

---

[11] Kenwood maintains that Glover never engaged in a protected activity because she never complained about age discrimination or harassment.

the basis of her age.  As such, Kenwood is not entitled to summary judgment regarding Count III.

## CONCLUSION AND ORDER

For the reasons stated, Kenwood's Motion for Summary Judgment is granted in part and denied in part.  Kenwood's Motion is granted as to Count I and Count II.  Kenwood's Motion is denied as to Count III.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 30, 2010